**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
_ _ _ _

Robert Harris, Darius Harris, Eric Redmond, Malcolm
Stewart, and Peter Reeves

                                             *Plaintiffs*,                    :

                                                                              :

                                                                              :          Docket No.: <u>3:22-cv-479-TSL</u>-MTP

                                                                              :

                       against                                                :

                                                                              :          **COMPLAINT FOR**
Sam Dobbins, in his individual capacity, Charles                              :          **DECLARATORY AND**
Henderson, in his individual and official capacities as                       :          **INJUNCTIVE RELIEF AND**
Interim Chief of Police of Lexington, Mississippi, the                        :          **INDIVIDUAL DAMAGES**
City of Lexington, the Lexington Police Department,                           :

                                                                              :

                                             *Defendants*.                    :


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
_ _ _ _


## PRELIMINARY STATEMENT

1.      This country prohibits all public officials, including police officers, from

discriminating against people on the basis of race. The City of Lexington, Mississippi, does not

follow that law. Lexington Police Department (LPD) operates within a culture of corruption and

lawlessness, daily and habitually subjecting Black citizens to harassment and brutality, in

violation of their constitutional rights.

2.      Lexington is a tiny and deeply segregated town in Holmes County, Mississippi—

one of the poorest counties in the nation. Lexington is home to less than 1800 people—

approximately 1500 of whom are Black and 300 are White; but this overwhelmingly Black-

populated town is controlled by a wealthy White family called the Barretts, the Mayor, the

former Police Chief who maintains power, the City Attorney, and the City Judge, who are all White.



3.     Under the leadership of Defendants Sam Dobbins and later Charles Henderson, LPD has violated Black Lexington citizens' constitutional rights incessantly for over a year and continues to do so today. However, the targeting and merciless brutality by LPD reached a climax on Friday, April 8, 2022.

4.     The night of April 7, 2022, Lexington's Black community members met to discuss their grievances against LPD. The following day, LPD falsely arrested two of the meeting's most

outspoken participants–Plaintiffs Robert Harris and Darius Harris. The retaliation and baseless arrests that Plaintiffs Robert and Darius Harris experienced are consistent with how LPD treats any Black resident who stands up for themselves, speaks out, or dares to live their lives in Lexington. In fact, Plaintiffs Robert and Darius Harris had been falsely arrested in retaliation for opposing police harassment in the past.

5.      Throughout 2021 and 2022, Plaintiffs and other Black Lexington citizens have been falsely arrested, forced to undergo baseless searches and seizures at roadblocks, and subjected to unreasonable force by LPD officers when they verbally object to police mistreatment.

6.      These Plaintiffs, Black Lexington citizens, are a protected group and seek to have this Court guarantee their right to equal protection and due process of the laws of this nation, to be free of unreasonable search and seizure, to be free from excessive force, to be free from retaliation for exercising their protected First Amendment rights, and to travel freely for the purpose of meeting their everyday needs and providing for their families in the State of Mississippi without unlawful interference.

7.      The evidence in this case reflects a continuous pattern of LPD's harassment, coercion, threatening conduct, and often brutal mistreatment of Plaintiffs and other Black Lexington citizens who were engaging in quality time with their families, conducting professional obligations, or merely traveling on public roads for the purpose of paying bills, getting to work, or otherwise living out this nation's simple promise of "life, liberty, and the pursuit of happiness."

8.      The acts and conduct of LPD, as outlined above and described below, have not been directed toward enforcing any valid law of the State of Mississippi or furthering any

legitimate policy of the State of Mississippi, but have been for the purpose of and have had the effect of preventing and discouraging Black citizens from exercising their constitutional rights of citizenship.

9.      Plaintiffs Robert Harris, Darius Harris, Eric Redmond, Malcolm Stewart, and Peter Reeves therefore file this Complaint, raising claims under 42 U.S.C. § 1983 and the Court's inherent equitable power based on (i) violations of their rights to equal protection under the Fourteenth Amendment; (ii) violations of their rights to due process under the Fourteenth Amendment; (iii) violations of their rights to be free of unreasonable search and seizure under the Fourth Amendment; (iv) violations of their rights to be free of excessive force under the Fourth Amendment; (v) violations of their rights to free speech and association under the First Amendment; (vi) violations of their fundamental rights to travel freely under the United States Constitution; and (vii) violations of their rights to be free from discrimination under Title VI of the Civil Rights Act of 1964. This is an action for damages and injunctive relief against Defendants under 42 U.S.C. § 1983 and the Court's inherent power to grant equitable relief.

10.     But for LPD's unconstitutional and unlawful actions, the Plaintiffs would never have been targeted, harassed, arrested, jailed, or prosecuted.

In support of these claims, Plaintiffs show as follows:

## JURISDICTION

11.     This action, brought pursuant to 42 U.S.C. § 1983 and inherent equitable power, alleges violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as Title VI of the Civil Rights Act of 1964, seeks relief from the denial of the equal protection and due process of the laws under the Fourteenth Amendment, and seeks

redress of the deprivation of rights, privileges and immunities guaranteed by the First, Fourth, and Fourteenth Amendments, as implemented by the above-identified Congressional enactment.

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).

13.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

14.     This Court is authorized to award attorneys' fees under 42 U.S.C. § 1988(b).

## VENUE

15.     Venue is proper in the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted herein occurred therein.

## JURY DEMAND

16.     Plaintiffs demand trial by jury in this action.

## PARTIES

17.     Plaintiff ROBERT HARRIS is a Black adult resident of Lexington, Holmes County, Mississippi. Robert is forty-nine (49) years of age, the father to five (5) children, and a community leader. He is a well-known mechanic who has been servicing the surrounding communities for approximately 23 years. Previously, he worked with the Mallory Health Clinic for 10 years, driving patients to and from their doctor's appointments.

18.     Plaintiff DARIUS HARRIS is a Black adult resident of Tchula, Holmes County, Mississippi. He is an entrepreneur in the construction industry and a single father. He travels to Lexington several times each week to visit his brother, Robert Harris.

19.     Plaintiff ERIC REDMOND is a Black adult resident of Lexington, Holmes County, Mississippi. Eric is an upstanding citizen who has seven (7) children. His love for children propelled him to begin working in the community, teaching youth to play softball. Eric currently works as the Chief of the Canton, Mississippi Fire Department and has previously served in law enforcement for 10 years.

20.     Plaintiff MALCOLM STEWART is a Black adult resident of Lexington, Holmes County, Mississippi, and is a mechanic by trade.

21.     Plaintiff PETER REEVES is a Black adult resident of Lexington, Holmes County, Mississippi. Peter is thirty-one (31) years of age and has one son. He is the head football coach and Vice President of the Lexington Colts Youth Sports Incorporated.

22.     Upon information and belief, Defendant Charles Henderson, as Interim Chief of Police of Lexington, Mississippi is an individual who resides in Lexington, Mississippi and is a citizen of Mississippi. Defendant Henderson, in his official capacity as Interim Chief of Police of Lexington, Mississippi, is responsible for establishing and maintaining adequate policies and procedures at LPD and supervising officers, employees, and agents of LPD. Defendant Henderson has authorized the misconduct of LPD officers, employees, and agents, including false arrests and excessive force, and has personally violated Black citizens' constitutional rights. Defendant Henderson is being sued in his official and individual capacities.

23.     Upon information and belief, Defendant Sam Dobbins, as former Chief of Police of Lexington, Mississippi, is an individual who resides in Sallis, Attala County, Mississippi, and is a citizen of Mississippi. Defendant Dobbins, as former Chief of Police of Lexington, Mississippi, supervised officers, employees, and agents of LPD and authorized the misconduct of LPD officers, employees, and agents, including false arrests and excessive force, and has

personally violated Black citizens' constitutional rights. Defendant Dobbins is being sued in his individual capacity.

24.    The Lexington Police Department is an entity of the City of Lexington, a political subdivision of the State of Mississippi.

25.    The City of Lexington is an entity and a political subdivision of the State of Mississippi.

26.    The aforementioned parties reside in the State of Mississippi.

## FACTUAL ALLEGATIONS

27.    In early July 2021, Black residents of Lexington, Mississippi, began filing official complaints with Mayor Robin McCrory and the Board of Aldermen against the Lexington Police Department, which routinely violates Black citizens' rights afforded to them by the United States Constitution. These complaints detailed the ways LPD routinely targets, harasses, threatens, assaults, and falsely arrests Black citizens. However, despite numerous citizen complaints, the constitutional violations have only worsened.

28.    According to data compiled by JULIAN and ACLU-Mississippi, the LPD has customarily violated the First, Fourth, and Fourteenth Amendments, the fundamental right to travel freely, and the Civil Rights Act. Over 200 Black citizens have formally or informally complained about being harassed, arrested, or fined for baseless reasons in the past year or so.

29.    The tactics employed by LPD against these Black citizens are like those recommended for use by the United States Army to quell armed rioters in occupied nations. These tactics are wholly unnecessary on peaceful Americans.  And unfortunately, the constitutional violations visited upon these Plaintiffs by LPD, under the control and purview of Defendants, are

neither accidents nor anomalies. They are part of a pattern, practice, and custom of corruption and lawlessness visited upon hundreds of Black citizens.

### A.    *Robert and Darius Harris:*

30.    According to victim accounts and video footage, LPD targeted, assaulted, and falsely arrested Plaintiffs Robert and Darius Harris on New Year's Eve 2021. LPD has a history of targeting and harassing the brothers. Celebrating the beginning of a New Year, a tradition celebrated across this nation, the brothers were shooting fireworks at Robert Harris' residence when LPD officers arrived and threatened to arrest them for allegedly violating the City's fireworks ordinance. Notably, the conduct that the officers cited as violating the law was not prohibited by the ordinance that the officers had referenced.

31.    Both Robert and Darius, exhausted by LPD's constant harassment, told the officers, including Defendant Dobbins, to vacate their premises. The brothers, still standing on private property, unarmed, and posing no imminent threat to the officers, verbally resisted the officers' threats of arrest. Robert Harris had just held up his hand toward the officers in a plea for them to stand down when suddenly and without warning, an officer tased Darius Harris, striking him in the chest and abdomen in an act of excessive force. Darius fell to the ground, writhing in agony. Defendant Dobbins stood over him while the electricity was still coursing through his body and commanded him to put his hands behind his back—a command that was impossible for Darius to fulfill at that moment. He continued to roll and scream on the ground as Dobbins looked down and shined his flashlight in his face. Officers then proceeded to arrest him. See images below.



The still photograph above, captured from cell phone footage, shows Robert Harris raising his hand in a plea for police to stand down. Darius, in a red hat, stands behind him.



The stills immediately above and below show Darius Harris on the ground seconds after the taser probes made initial contact with his body. The probes are still in his body, and the volts are still electrocuting him at these points.



The image below shows Defendant Dobbins shining his flashlight into Darius Harris' eyes while he was still being tased. It was at this moment that Dobbins commanded Darius to put his hands behind his



The image below depicts the moment when LPD cuffed Darius.



32.    Once detained and jailed, officers held Darius for a cash fee of $35.00.[1] When Robert Harris went to the police station to inquire about his brother after he was jailed, Defendant Dobbins told him to "shut up" and "leave." When Robert did try to leave, Defendant Dobbins grabbed his arm and twisted it, pulling it behind his back, and detained him. Defendant Dobbins brought Robert to his office and told him that if they kept "bumping heads," there would be a "killing." Robert was scared for his life.

33.    LPD officers violated Darius Harris' right to free speech under the First Amendment on New Year's Eve simply because the officers did not like the stance the brothers

---

[1] LPD has a history of requiring arrestees to pay their bail and fees in cash before they can be released from custody. For instance, when a mother went to pick up her minor child from the police station, LPD required her to pay a $30 traffic ticket from 2010 in cash before they allowed them to leave.

took against them. Moreover, LPD officers violated Darius's Fourth Amendment right against unreasonable search and seizure and his right to be free of excessive force. Darius Harris experienced severe pain when the barbs from the taser were removed—over an hour after he was tased—and he continues to have back pain as a result of the tasing. LPD officers similarly violated Robert Harris' right to free speech under the First Amendment for merely inquiring about his brother's arrest, and Defendant Dobbins violated Robert's Fourth Amendment right against unreasonable search and seizure and his right to be free of excessive force by forcibly arresting and detaining Robert when he posed no danger and was not suspected of any criminal activity.

34.    These constitutional violations by LPD reached a boiling point after the Lexington community held a "Know Your Rights" meeting on April 7, 2022, to express their grievances against LPD. Both Robert and Darius attended that event and spoke openly to the audience about their experience with LPD on New Year's Eve. Known friends of LPD officers attended the event. Within twenty-four (24) hours following the meeting, LPD officers falsely arrested Robert and Darius Harris again.

35.    LPD charged the brothers with the felony of "retaliation against an officer" and possession of marijuana. Robert Harris, a respected anti-drug activist, reports that he witnessed an officer plant drugs in his vehicle. LPD also alleged that the brothers had outstanding warrants but refused to provide copies of said warrants.

36.    On or about April 11, 2022, Darius Harris was escorted to the police station by a local activist to collect paperwork regarding his arrest, charges, and court dates, but LPD officers refused to provide any information. In this exchange, LPD officers became ill-mannered and forceful, resulting in Darius's departure. Although Darius usually visits Robert in Lexington

several times per week, since his false arrest, he has tried to avoid entering the town out of fear that he will again be targeted, assaulted, and arrested.

37.    In addition to these instances of retaliation, Plaintiffs have been subjected to discriminatory treatment at the hands of LPD that was motivated by racial animus. For instance, Robert Harris has been subject to disparate enforcement of municipal laws. LPD officers ticketed cars parked in Robert Harris' yard following the New Year's Eve incident and in the yards of other Black Lexington citizens, giving them 24 hours to move them or else get towed. Some residents lost vehicles to LPD and were without transportation for weeks. In contrast, Defendant Dobbins reprimanded an officer when that officer ticketed cars at the homes of White Lexington citizens.

**B.    *Peter Reeves:***

38.    Like the Harris brothers, Plaintiff Peter Reeves has been subject to false arrest in retaliation for expressing critical views about LPD and subjected to racially discriminatory enforcement of laws. In March 2022, Peter Reeves was arrested after traveling through a roadblock setup by LPD at approximately 2:00 a.m. LPD charged him with felony possession of a controlled substance because he had a Tylenol bottle in his vehicle, despite the fact that Tylenol is not a controlled substance. Mr. Reeves often transports his uncle, a Vietnam war veteran, to and from doctor's appointments. The medicine had been prescribed to his uncle for chronic pain.

39.    Weeks before his arrest, Mr. Reeves had criticized an LPD officer on social media. That same officer is the individual who targeted Mr. Reeves in the roadblock in retaliation for Mr. Reeves' comments.

40.    After arresting Mr. Reeves, LPD officers called a tow truck driver to tow his car. When the tow truck driver arrived on the scene, he informed the officers that he could take the vehicle to Mr. Reeves' home instead of towing it to a lot. The officers became enraged and

assaulted him by slamming him against his towing vehicle twice and exclaiming, "Do the f*cking job we called you to do!"

41.     Sitting in the back of a police vehicle for approximately forty (40) minutes, Mr. Reeves witnessed authorities arrest multiple Black drivers at the roadblock while allowing White drivers to pass through unstopped.

42.     Multiple accounts also confirm that LPD sets roadblocks near the predominantly-Black Holmes County Central High School anytime the school held events. By contrast, LPD does not conduct roadblocks during activities of the predominantly-White Central Holmes Christian High School.

43.     On information and belief, LPD conducted roadblocks multiple times per day for several months. Plaintiffs estimate that in a town with an area no larger than 2.5 square miles, LPD has conducted at least 300 roadblocks within the past year, targeting Black people. These roadblocks are set up for no legitimate purpose other than to surveil Black drivers and passengers.



Black Squares = Black Neighborhoods
Red Squares = Roadblocks

44.    According to these facts, LPD violated Mr. Reeves and others' First Amendment right to be free from retaliation for exercising their protected First Amendment right to free speech, their Fourteenth Amendment right to equal protection, their Fourth Amendment right to be free from unreasonable search and seizure and false arrest, and their right to travel freely.

**C.    *Eric Redmond:***

45.    On June 3, 2022, LPD violated Plaintiff Eric Redmond's First and Fourth Amendment rights. Mr. Redmond, a ten (10) year law enforcement officer who has held positions as Sergeant and Assistant Chief of Police in Tchula and Pickens Police Departments and who currently serves as the Fire Chief for Canton, Mississippi, received a call at night from his brother informing him that LPD officers had arrested his sister. Immediately, Mr. Redmond went to the scene but was notified that his sister had already been detained and taken to the precinct.

46.    Upon arriving at the precinct, Mr. Redmond parked on a private lot near the precinct so as not to block any traffic. Once Mr. Redmond entered the precinct, he received a phone call from his sister explaining to him that she needed $700.00 to be released from jail. As Mr. Redmond was leaving the precinct, he received a second call from his sister notifying him that LPD had changed the bail from $700.00 to $2,000.00. Mr. Redmond immediately asked to speak with the Chief of Police, Defendant Dobbins, to discuss why the bail amount had changed. The arresting officer refused to let Mr. Redmond speak with the Chief.

47.    Mr. Redmond, standing outside the precinct building and waiting to speak with the Chief, was approached and ordered to leave the premises by a visibly angry LPD officer. Chief Dobbins then walked outside and commanded the officer to detain and arrest Mr. Redmond. The officer pulled out his taser and said "I'm gonna blast your a**."  LPD did not explain the reason for the arrest, state the charges, or read Mr. Redmond his Miranda rights. When Mr. Redmond

arrived at Holmes-Humphreys Regional Correctional Facility, he was informed that he had been charged with disorderly conduct and resisting arrest. It was approximately eight (8) hours before he was notified of the amount of his bond. While he was detained, LPD officers had Mr. Redmond's vehicle towed without notifying him or requesting his consent.

48.    LPD officers lacked probable cause to arrest Mr. Redmond and only made the arrest in retaliation for Mr. Redmond's questions regarding the increased bail charged to his sister. Additionally, the force used to arrest Mr. Redmond was not proportionate to any threat or resistance he displayed.

**D.    *Malcolm Stewart:***

49.    Plaintiff Malcolm Stewart, a participant in the April 7th "Know Your Rights" community meeting, was arrested two days after the meeting. LPD officers claimed that Mr. Stewart had outstanding fines. LPD officers also claimed there was a warrant for his arrest–a warrant they never showed Mr. Stewart and that the judge said he did not sign.

50.    Mr. Stewart, a mechanic, had made an agreement with the City Judge and former Chief of Police, Defendant Dobbins, the previous year, stipulating that he would work off all his then-existing outstanding fines by servicing LPD's vehicles. Mr. Stewart worked off his fines for approximately a year and a half. He was notified by the clerk on his final day of work on a Friday in July 2021 that his fines were paid in full. However, after voicing his concerns at the community meeting, LPD officers claimed the fines were still due and arrested him.

51.    Various activists traveled to Holmes-Humphreys Regional Correctional Facility to pay Mr. Stewart's fines so that he could be released from custody, but even with cash in hand, LPD officers refused to release Mr. Stewart that night and did not release him from custody until the next day.

52.    Previously, in March 2021, Lexington's now-Interim Chief, Defendant Henderson, threatened to kill Mr. Stewart as he sat in his car on private property simply because Mr. Stewart had refused to leave the premises. Defendant Henderson told Mr. Stewart that he was working that night and did not want "nobody" out. Mr. Stewart opposed Defendant Henderson's order because the property's owners had not issued the request.

53.    Defendant Henderson then threatened to arrest Mr. Stewart for "disobeying a direct order." Defendant Henderson then told Mr. Stewart, "If you don't get the f*ck off this lot, your family gone be wearing a Black suit or a Black dress by Sunday." Officer Henderson was targeting and harassing Mr. Stewart in retaliation for Mr. Stewart voicing his concerns about LPD.

54.    On Thursday, June 30, 2022, the day after civil rights attorneys from JULIAN and ACLU-Mississippi who had been investigating the police crisis met with Lexington's City Attorney, Katherine Barrett Riley, to discuss LPD's targeting, harassment, assaults, and civil rights violations,[2] LPD officers targeted Mr. Stewart again. As he was sitting inside his parked vehicle in front of his sister's home in Lexington, officers approached the vehicle, reached in, and yanked his shirt collar, pulling him through the window, continuing a pattern and practice of excessive force and retaliation.

55.    Up to this point, Mr. Stewart, sitting stationary in his parked vehicle, had observed all traffic laws and regulations, had not interfered with traffic in any manner, and had proceeded in an orderly and peaceful manner as he spoke with his sister from the car. Officers arrested him on charges of driving under the influence. According to Mr. Stewart and eyewitnesses, Mr. Stewart was not intoxicated, and he repeatedly requested that officers administer a breathalyzer. LPD officers refused to do so.

---

[2] Notably, during the meeting with Attorney Barrett, she made excuses for LPD's behavior that the civil rights attorneys found clearly pretextual.

56.    After LPD officers took Mr. Stewart to the police station, bystanders recorded audio inside the station of Mr. Stewart screaming in pain while officers assaulted him.

57.    LPD has also harassed other members of Mr. Stewart's family, including his daughter, son, and nephews. Indeed, after Mr. Stewart's daughter refused Defendant Henderson's romantic advances,[3] Defendant Henderson began harassing her, citing her for a traffic violation as she stood outside her car at a private car wash, vacuuming it. On several other occasions, Defendant Henderson approached her at stores and forced her to leave based on alleged crimes he made up on the spot, such as "taking too long" to get out of her car. In another instance, he threatened to arrest her for getting out of her car after he himself had directed her to exit the vehicle. Many of Mr. Stewart's family members avoid driving through Lexington altogether now due to LPD's constant harassment.

**E.    *Chief Henderson In His Individual Capacity Has Regularly Used Excessive Force and LPD Maintains An Ongoing Pattern, Practice, and/or Custom of Using Unnecessary and Unreasonable Force.***

58.    LPD maintains customs, policies, and practices of using disproportionate and unnecessary force against Black Lexington citizens who are not resisting arrest and otherwise pose no threat of harm to officers. All uses of excessive force against Plaintiffs were pursuant to LPD's customs, policies, and practices. Unfortunately, Plaintiffs are not the only individuals to be subjected to unnecessary force.

59.    In one incident, LPD officers, including Defendant Henderson, broke down a woman's door without a warrant, maced her, arrested her absent probable cause for a crime without Mirandizing her, and hosed her down from head to toe with a fire hose, before leaving her outside.

---

[3] More than a dozen women have reported to civil rights organizations and city staff that Defendant Henderson has propositioned them for sex and proceeded to ticket or arrest them when they refused. One woman reported being detained for three months after denying Defendant Henderson's advances.

She was in her 60s. It was the middle of winter, and she had on nothing but a nightgown. In another incident, Defendant Henderson shoved an elderly woman against her car during an unnecessary stop even though she was not actively resisting Defendant Henderson's orders or attempting to flee.

60.    Victim accounts and images of injuries confirm that on multiple occasions, LPD officers have beaten up individuals in their custody. In one account, officers left one man on a hospital curb after assaulting him.

61.    Despite the dozens of instances of unnecessary uses of force against Black Lexington citizens, including instances that directly involved police leadership, LPD and the City of Lexington failed to take any actions to impose additional training, discipline officers, or adequately supervise LPD officers.

## F.    *LPD Maintains An Ongoing Pattern, Practice, and/or Custom of Making Illegal Searches, Seizures, and False Arrests.*

62.    LPD maintains customs, practices, and policies of arresting individuals for crimes for which there is no probable cause. In addition to the illegal seizures and false arrests suffered by Plaintiffs, many other Black Lexington citizens have been falsely arrested or illegally seized by LPD over the last year or so. In particular, LPD has a policy of stopping and searching hundreds of drivers a year through the use of roadblocks.

63.    Between June 27, 2021, and May 17, 2022, LPD only arrested seven White individuals but arrested over 100 Black individuals during the same period. Over 40% of the arrests of the Black individuals were for minor traffic violations such as disregarding a traffic device or no proof of insurance that would typically result in a ticket. Moreover, over a quarter of all arrests of all Black individuals were for traffic violations that could not be ascertained prior to the stop.

64.    LPD officers arrested one 21-year-old Black man on a traffic violation while he was shopping inside a convenience store. Officers then ticketed his mother who was not even in the state at the time. LPD targeted this same young man to the point of claiming that he had committed traffic violations during periods of time when he did not even have access to a car.

65.    When one individual went to the police station to inquire about their relative's charges, LPD officers illegally searched that individual's vehicle while he was inside.

66.    LPD officers handcuffed and threw to the ground a woman during a roadblock, breaking her finger after they discovered she had "old fines." She still does not have full functionality in her finger back, and she and others now report that they only leave their homes during select hours of the day when LPD officers are on shift change or when they otherwise do not expect officers to be on patrol.

**G.    LPD Maintains An Ongoing Pattern, Practice, and/or Custom of Retaliating Against Officers Who Report Misconduct.**

67.    Upon information and belief, 23 officers have resigned from LPD within the past year after refusing to go along with the city's culture of corruption.

68.    Some officers have reported seeing other officers pull civilians from the backs of patrol cars and brutally beat them.

69.    One officer reported witnessing Chief Dobbins kick a cuffed suspect in the head. That officer later resigned.

70.    At least four officers have reported being forced out by LPD after refusing to violate individuals' rights.

**H.    LPD Officers Lack Certification.**

71.     Defendants maintain a custom, policy, and/or practice of failing to properly train or hire police officers.  Many of the officers who have worked in LPD have lacked certification at the time of hire and failed to obtain it later.

**I.     The City of Lexington Maintains An Ongoing Policy, Practice, and/or Custom of Deliberate Indifference, Ratification, and Active Support of LPD.**

72.     The culture of Lexington is corrupt. The city is in a sense under its own martial law with Black citizens held hostage to the police, afraid to leave their homes. The targeting, harassment, and corruption run so deep that most community members are afraid to speak to civil rights attorneys and activists out of fear of retaliation. Many of those who do talk do so only in the shelter of their homes or outside the city altogether. One woman even relocated her entire family to Memphis to escape LPD's targeting and harassment.

73.     LPD and court clerks have repeatedly stonewalled attorneys' attempts to obtain information concerning LPD's targeting cases. Court dates have been changed in an attempt to keep attorneys from representing their clients. Attorneys who did appear were barred from entering the courtroom. The then-chief, Defendant Dobbins, physically blocked one Black lawyer from entering court and threatened to arrest her when she tried to go inside. That attorney then called State Attorney General Lynn Fitch's office seeking assistance. The attorney general's office told that attorney that the attorney general's office did not have jurisdiction.

74.     Notably, the Barretts, a white family who largely controls Lexington's power structure and serves as the city's attorney, had donated tens of thousands of dollars to Attorney General Fitch's campaign.

75.     The attorney who was blocked from entering the courtroom later spoke with the Mayor of Lexington about LPD keeping individuals out of court when court is in session. The Mayor told that attorney that jurisdiction rested with Lexington's city judge. When that attorney

asked Lexington's judge about the problem, he told her that it was the Chief of Police's decision who can and cannot enter court.

76.    Moreover, in addition to this situation, the City of Lexington has been on notice of LPD's pattern of constitutional violations over the last year through official complaints filed with the Mayor and Board of Aldermen. However, on information and belief, the City of Lexington has taken no steps to provide additional supervision or discipline for LPD officers. Instead, in the wake of public criticism, rather than correcting Lexington's corrupt culture, the city removed public comment from its board meetings, essentially closing their ears and burying their heads in the sand to the community's crisis.

J.    *Chief Sam Dobbins' racism and violence captured on leaked audio, in addition to the City of Lexington's history of discrimination and disparate treatment, prove discriminatory intent and a pattern, practice, and/or custom of constitutional violations.*

77.    On or about Monday, July 18, JULIAN, a civil and international rights organization, obtained and released the audio of Lexington's then-Chief of Police, Defendant Sam Dobbins, saying "nig***" and "fa**ot," and telling an LPD officer that he would not care if the officer "killed a motherf**ker in cold blood." In the nearly 17-minute recording, the Defendant Dobbins continues, telling the officer that he has killed 13 people in his career and "justified" even shooting one man who was running away from him 119 times. Unaware that the conversation was being recorded, Defendant Dobbins relished in the fact that the Lexington community "fears" him.

78.    The racist and homophobic recording of Defendant Dobbins establishes LPD's discriminatory intent. On the recording in question, Defendant Dobbins, a Lexington official at the time, proves that by pattern, practice, and custom/policy he and thereby LPD encouraged officers to treat people brutally based on race and sexual orientation and to impose unlawful, cash-only fines without mercy.

79.    Upon information and belief, Defendant Dobbins promised Lexington City Officials that he would generate more fines to bring in more revenue. This revenue was obtained by violating Black citizens' constitutional rights and fining them for it.

80.    Following the audio's release and national pressure, Lexington's Board of Aldermen met and narrowly voted 3-2 to terminate Defendant Dobbins, effective immediately.

81.    What is even more disturbing is the fact that the board fired Defendant Dobbins grudgingly and terminated him in title only because on information and belief, even though Dobbins has been terminated, he continues to menace the community, patrolling in the passenger seat of a police-issued vehicle with an on-duty officer. The mayor herself is reportedly afraid of what he may do.

82.    After terminating Defendant Dobbins, the Board of Aldermen appointed Defendant Henderson as Interim Chief. Throughout Henderson's tenure with LPD, he helped Dobbins carry out the department's targeting, harassment, and abuse of Black citizens as the chief's second in command.

83.    Staff members at LPD report that it was actually Defendant Henderson who told Dobbins what to charge individuals with after LPD had falsely arrested them and that Henderson explained to Dobbins how to set the bonds stemming from those false arrests.

84.    Defendant Henderson was often the officer dispatched to conduct wrongful arrests while Defendant Dobbins stayed behind at the police station. Defendant Henderson played a pivotal role in many of the constitutional violations discussed herein, and LPD, now under his command, has continued to target and harass Black residents.

85.    Notably, following the Board of Aldermen's vote, one of the Black aldermen who voted to terminate Defendant Dobbins was fired from his job at a white-owned funeral home and

threatened by white citizens who told him, "N***er, we told you how to vote." Out of fear for his life, that alderman has ceased communication with civil rights groups.

86.    Defendants have committed these acts of explicit racial animus against the backdrop of an extensive history of racism in Lexington, Mississippi. For example, the White officials of Lexington and Holmes County historically denied Black residents right to vote. It was not until the federal government intervened with the Voting Rights Act of 1965 (VRA) that Black people in Holmes County were truly able to register. The year before the VRA was passed, Holmes County had only twenty registered Black voters.[4] But two years after the passage of the VRA, in 1967, there were over 6,000 Black voters registered in the County.[5] Despite the passage of the VRA, the Black vote remained diluted, as local officials, including law enforcement, vigorously resisted registering Black people to vote. This voter dilution persists to this day and, in the wake of *Shelby County v. Holder* (2013), has worsened.[6]

87.    Local law enforcement violently retaliated against the Black people who attempted to register to vote in Lexington prior to the passage of the VRA, just as the Lexington Police Department continues to retaliate against Black people for exercising their First Amendment rights. A group of 14 Black residents were violently confronted by the Holmes County Sheriff, thirty auxiliary police officers, and other White public officials when they attempted to register to vote in April 1963.[7] The home of one of these 14 people, Hartman Turnbow, was firebombed and

---

[4] David C. Colby, *The Voting Rights Act and Black Registration in Mississippi*, 16 PUBLIUS 123, 123 (1986).
[5] *Id.*
[6] *See* Kevin Morris, Peter Miller, and Coryn Grange, *Racial Turnout Gap Grew in Jurisdictions Previously Covered by the Voting Rights Act*, Brennan Center for Justice (Aug. 20, 2021), https://www.brennancenter.org/our-work/research-reports/racial-turnout-gap-grew-jurisdictions-previously-covered-voting-rights (noting the growing racial turnout gap throughout the state of Mississippi).
[7] Holmes County Civil Rights Movement, Mississippi Encyclopedia, last accessed Aug. 12, 2022. https://mississippiencyclopedia.org/entries/holmes-county-civil-rights-movement/.

shot at in retaliation for attempting to register to vote.[8] Mr. Turnbow called the Holmes County Sheriff's office seeking aid, but the sheriffs arrived several hours later.[9] They arrested *Mr. Turnbow* for arson and then arrested Robert Moses, who was also Black, for "interfering with the investigation" simply because Moses was taking pictures.[10] This is just one of many instances of local law enforcement officers targeting and harassing Black people in retaliation for their First Amendment activity.

88.    In addition to the suppression of the Black vote, Lexington has a history of racially segregated public facilities, including public schools. White officials of Holmes County were so resistant to integrating public schools that the United States Supreme Court needed to intervene in 1969, ordering the Holmes County Board of Education to integrate its schools. *Alexander v. Holmes County Bd. of Ed.*, 396 U.S. 19 (1969). Although the Supreme Court invalidated Holmes County's *de jure* segregation in 1969, *de facto* racial segregation persists to this day in Holmes County schools. Holmes County is about 16 percent White and 82 percent Black, but the public schools are nearly 100 percent Black. There are fewer than thirty (30) White students enrolled in the County's public schools, as most White families in the County send their children to private schools to avoid integration.[11]

**K.    Defendants Continue to Violate Black Citizens' Constitutional Rights, Necessitating Plaintiffs' Prayer for Relief.**

89.    Only days ago, on Sunday July 31, 2022, Defendant Henderson set up a roadblock, stopping and unreasonably searching and seizing Black churchgoers. Given the fact that LPD has

---

[8] Hartman Turnbow, SNCC Digital Gateway, last accessed Aug. 12, 2022. https://snccdigital.org/people/hartman-turnbow/.
[9] *United States v. Holmes County*, 385 F.2d 145, 147 (5th Cir. 1967).
[10] *Id.*
[11] https://www.clarionledger.com/in-depth/news/politics/2020/02/10/black-children-holmes-county-mississippi-denied-equal-education/4510336002/.

continued its harassment under Henderson and given that Dobbins is still allowed to intimidate Black residents, a great number of them victims and witnesses, Lexington's Black residents have not received any relief that would render this suit unnecessary.

90.    Additionally, the closed and abusive proceedings in Lexington's Municipal court have not stopped. Judge, Marc Boutwell, who has the authority to dismiss unconstitutional charges, has presided over the cases of dozens of LPD's targeting victims in the past six (6) months and has consistently upheld LPD's unconstitutional charges, fines, and excessive bail amounts in those cases.

91.    With few exceptions, court in the United States of America is an open proceeding, built upon the idea of liberty—that this nation would not allow its citizens to be railroaded in secret. For the past four months, however—a period when the state of Mississippi had no Covid-19 requirements, Judge Boutwell has allowed LPD to close court proceedings without notice to almost anyone except the accused, in an effort to conceal from the media and the bar his role in sanctioning constitutional violations. He has even allowed LPD to lock the courthouse door when court is in session to prevent anyone from entering.

92.    When questioned about why the proceedings were closed, Judge Boutwell invoked Article 3, Section 26 of the Mississippi Constitution, which allows the court to exclude "all persons [from the courtroom] except such as are necessary in the conduct of the trial" in cases where individuals are being prosecuted for "rape, adultery, fornication, sodomy or crime against nature." However, there were no such cases of that nature on the docket that day.

93.    Judge Boutwell himself has taken part in Lexington's harassment of Black people. Indeed, on August 11, 2022, he used his position to harass a Black attorney who sat silently in the back of the courtroom, observing proceedings. After that attorney had gone outside to speak with

a Lexington targeting victim, Judge Boutwell sent LPD to bring the attorney back into court where he commanded that she stand before him as he questioned her insolently and without cause or basis about why she was there.

94.     When the attorney challenged the judge on the basis and relevance of his abusive questioning, Judge Boutwell threatened to hold that attorney in contempt of court for "smirking." Of note, court was no longer in session when Judge Boutwell commanded the attorney's presence and issued the contempt threat. The attorney had done nothing more than sit silently in the back of the courtroom.

95.     Upon information and belief, after the attorney had left, Judge Boutwell immediately called a White attorney whom he believed the Black attorney worked for and lied to that attorney, telling him that the Black attorney had "acted a fool" in his courtroom, in an attempt to get that attorney reprimanded. In stark contrast, only one hour earlier, Judge Boutwell had greeted White attorneys in his courtroom with dignity, respect, and kindness.

96.     Also on August 11, around the same time that Judge Boutwell called the Black attorney before the court in an abuse of power, Lexington Alderman Charles Earl Simmons, one of the two aldermen who voted against terminating Defendant Dobbins, attempted to run over one of JULIAN's community organizers with his pickup truck in an act of retaliation.

97.     Alderman Simmons harassed and stalked another JULIAN community organizer, taking photographs of vehicles outside her office—a space where she often stays alone. Alderman Simmons has also called the employers of both organizers to impact their jobs and thereby their livelihood. Both organizers have filed criminal charges against him. Alderman Simmons has abused his position as a city official to retaliate against organizers who worked to correct LPD's constitutional violations.

98.     Upon information and belief, Alderman Simmons and Defendant Dobbins have a close relationship.

99.     Upon information and belief, Alderman Simmons personally requested that LPD target and harass Plaintiffs Robert and Darius Harris who live in his ward, less than a quarter of a mile from his home.

100.    Lexington's Black community members have repeatedly asked attorneys "How long will we have to endure?" before confessing that they are at a "breaking point." JULIAN has even had to hide Black citizens outside the Lexington city limits to protect them from LPD's violence and constant harassment and the control of the white power structure in Lexington.

101.    JULIAN has contacted the U.S. Attorney and FBI regarding the Lexington police crisis, requesting a formal investigation.

102.    LPD's targeting, threats, coercion, harassment, and assaults interfered with Plaintiffs' constitutional rights and stepped across the "constitutional boundary line" that lies between the interests of the public in law and order and the right of American citizens to be treated and protected equally, especially in the context of public safety. This unreasonable interference by the defendants on Black American citizens' freedom constituted an unconstitutional deprivation of their First Amendment right to freedom of speech, their Fourth Amendment right to be free of unreasonable search and seizure, their right to equal protection, their right to be free of excessive force as pre-trial detainees under the Fourteenth Amendment of the U.S. Constitution, their right of free movement within the State of Mississippi and the broader United States, and their right to be free from discrimination under Title VI of the Civil Rights Act of 1964.

103.    These Plaintiffs, in recognition of the proposition that their constitutional rights are not unrestricted, but, to the contrary, must be exercised, if exercised at all, within this "constitutional boundary," have filed with this Court the following causes of action.

## CAUSES OF ACTION

### A.    COUNT ONE

**Violation of the Equal Protection Clause of the Fourteenth Amendment Brought Pursuant to § 1983 —All Plaintiffs Against All Defendants.**

104.    Plaintiffs hereby repeat and reallege every allegation of the Complaint.

105.    The law is clear since *Brown v. Board of Education*, 347 U.S. 483 (1954), that the rights of Black Americans are equal to those of White Americans and must be so treated. Government conduct violates the equal protection clause where that conduct disparately impacts racial minorities and an invidious discriminatory purpose can be inferred from the totality of the circumstances. *Washington v. Davis*, 426 U.S. 229 (1976).

106.    As set forth in this Complaint, the actions of Defendants in targeting, threatening, coercing, harassing, and assaulting Lexington's Black citizens violated their right to equal protection under the law pursuant to the Fourteenth Amendment of the United States Constitution. Defendants have erected roadblocks to conduct illegal searches and seizures exclusively in predominantly Black neighborhoods in Lexington. Additionally, LPD permits White drivers to pass through roadblocks without being stopped and investigated. Further, Defendants target Black residents for municipal code enforcement, including the 2022 enforcement of a prohibition on residents parking vehicles on their lawn against Black residents while allowing White residents to violate the code without consequence. Moreover, Black residents are singled out for arrests without

probable cause and retaliation. LPD's disparate treatment of Black Lexington citizens has no legitimate basis and is motivated by invidious discriminatory animus.

107.    Defendants' disparate treatment of Plaintiffs because of their race violated Plaintiffs' basic human rights, constitutional protections, and the fundamental principles of equal protection. There is significant direct and circumstantial evidence of Defendants' racial animus including Lexington's history of de jure segregation and explicitly racist final policymakers.

108.    Defendants' actions are pursuant to a purposeful ongoing, concerted policy, practice, or custom undertaken with the intent to violate Plaintiffs' right of the equal protection of law under the Fourteenth Amendment.

### B.  COUNT TWO

**Violation of the Fourth Amendment to Be Free of Unreasonable Search and Seizure
Brought Pursuant to § 1983 —All Plaintiffs Against All Defendants.**

109.    Plaintiffs hereby repeat and reallege every allegation of the Complaint.

110.    It is unconstitutional for police to erect roadblocks for general crime control purposes or to conduct drug interdiction. *Indianapolis v. Edmond*, 528 U.S. 1153 (2000). Random stops of drivers are generally impermissible, and an officer must have probable cause to believe that a driver is violating a law. *Delaware v. Prouse*, 440 U.S. 648, 661 (1979).

111.    Defendants subjected Plaintiffs and other Black Lexington citizens to dozens of roadblock stops absent any probable cause that they had violated the law. Moreover, the frequency and discriminatory location of the roadblocks reveals that there was no weighty state interest driving Defendants decision to erect the roadblocks.

112.    Moreover, the Fourth Amendment prohibits the arrest of an individual absent probable cause that they committed a crime based on a reasonable belief that the Plaintiffs' conduct

satisfies each of the elements of the crime defined in the underlying statute. *Glenn v. City of Tyler*, 242 F.3d 307, 312-3 (5th Cir. 2001).

113.    Each Plaintiff was arrested by Defendants even though their alleged conduct did not meet the elements of the crime for which they were arrested.

114.    None of Defendants' acts discussed herein are objectively reasonable in their context.

115.    Their actions were intentional and objectively unreasonable in violation of Plaintiffs' right to be free from false arrest and unreasonable seizures without probable cause under the Fourth Amendment.

116.    Defendants maintain an ongoing policy, practice, or custom of stopping and searching Black Lexington drivers at roadblock without any particularized suspicion or probable cause. They also maintain an ongoing policy, practice, and custom of arresting Black Lexington citizens without probable cause.

### C.  COUNT THREE

**Violation of the Right to Travel Freely Under the Privileges or Immunities Clause of the Fourteenth Amendment Brought Pursuant to § 1983 —All Plaintiffs Against All Defendants.**

117.    Plaintiffs hereby repeat and reallege every allegation of the Complaint. The law is clear in *Crandall v. Nevada* 73 U.S. (6 Wall.) 35 (1867), and *United States v. Guest*, 383 U.S. 745 (1966) that unreasonable interference with an individuals' right to travel freely violates the U.S. Constitution.

118.    In *Kent V. Dulles*, 357 U.S. 116, 125-27 (1958), the Supreme Court held that, among other things, "The right to travel is a part of the 'liberty' of which a citizen cannot be deprived without due process of law under the Fifth Amendment."

119.    LPD's actions in stopping Plaintiffs such as Peter Reeves as he drove his car North on Highway 12 North, targeting him as a young Black man, and falsely arresting him on baseless possession charge before having his car towed, violated his constitutional right to travel freely.

120.    Defendants also violated Plaintiffs' rights under *Crandall* by unlawfully taxing Plaintiffs when LPD imposed fines on the Plaintiffs and other Black travelers whom they had falsely arrested.

121.    Therefore, as set forth in this Complaint, the actions of Defendants in targeting, threatening, coercing, harassing, assaulting, or interfering with Peter Reeves, Malcolm Stewart, and others' right to travel freely violated their rights under the law pursuant to the Fourteenth Amendment of the United States Constitution.

122.    Defendants maintain an ongoing policy, practice, and custom of unlawfully interfering with Black Lexington citizens' right to travel by subjecting them to suspicion-less stops and causeless searches at roadblocks.

## D. COUNT FOUR

**Violation of the Right to Free Speech Brought Pursuant to § 1983–All Plaintiffs Against All Defendants.**

123.    Plaintiffs hereby repeat and reallege every allegation of the Complaint.

124.    The First Amendment of the United States Constitution guarantees all citizens freedom of association and the right to petition the government, including the right to criticize the government and government officials. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991).

125.    The First Amendment also protects Plaintiffs against retaliation for engaging in constitutionally protected activity. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

126.    Defendants' arrests of Plaintiffs for objecting to police harassment, criticizing police harassment, and joining together to advocate for improved police services violates Plaintiffs' rights to free speech, association, and to petition the government for redress as guaranteed by the First and Fourteenth Amendments of the Constitution. Defendants lacked probable cause for each Plaintiff's arrest.

127.    Defendants maintain a concerted ongoing policy, custom, or practice of targeting dissident Lexington citizens for arrest and harassment when they object to police mistreatment and abuse.

### E. COUNT FIVE

**Violation of the Fourth Amendment to Be Free of Excessive Force Brought Pursuant to § 1983 —All Plaintiffs Against All Defendants**

128.    Plaintiffs hereby repeat and reallege every allegation of the Complaint.

129.    The Fourth Amendment of the U.S. Constitution establishes the right of an individual to be free of unreasonable search and seizure. *Graham v. Connor*, 490 U.S. 386 (1989). In particular, a police officer violates the Fourth Amendment if they use force against an individual that is not actively resisting the officer or attempting to flee. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

130.    LPD officers assaulted Plaintiffs and other Black people in Lexington where they were not actively resisting officer commands. Officers that committed these assaults used excessive force in violation of Plaintiffs' Fourth Amendment rights.

131.    Defendants maintain a concerted ongoing policy, custom, or practice of targeting Black Lexington citizens with excessive uses of force during traffic stops, frisks, and arrests.

## F. COUNT SIX

**Violation of the Fourteenth Amendment Due Process Right to Be Free of Excessive Force Brought Pursuant to § 1983 —All Plaintiffs Against All Defendants.**

132.    Plaintiffs hereby repeat and reallege every allegation of the Complaint.

133.    The Fourteenth Amendment's Due Process Clause protects pretrial detainees from excessive force using a standard of objective reasonableness. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

134.    LPD officers assaulted Plaintiffs and other Black people in Lexington after LPD had already arrested them, constituting uses of excessive force on pretrial detainees in violation of the Fourteenth Amendment's Due Process Clause.

135.    As set forth in the facts, LPD used excessive force against Plaintiff Malcolm Stewart when he was in their custody to the point where he screamed out in agony. His screams were captured cell phone footage. LPD also continued to use excessive force against Plaintiff Darius Harris after LPD had already arrested him because they did remove the taser's probes from Mr. Harris' body until at least an hour after his arrest, causing avoidable and unnecessary pain.

136.    Defendants maintain a concerted ongoing policy, custom, or practice of targeting Black Lexington citizens for harassment, arrest, and/or detention and subjecting them to excessive force once they are in custody.

## G.    COUNT SEVEN

**Violation of Title VI of the Civil Rights Act of 1964--All Plaintiffs Against All Defendants**

137.    Plaintiffs repeat and reallege every allegation of the Complaint.

138.    Title VI of the Civil Rights Act of 1964 prohibits discrimination by recipients of federal funding against individuals on the basis of race. 42 U.S.C. 2000d.

139.    As set forth in the facts, LPD used excessive force against Plaintiff Malcolm

Stewart when he was in their custody to the point where he screamed out in agony. His screams

were captured cell phone footage. LPD also continued to use excessive force against Plaintiff

Darius Harris after LPD had already arrested him because they did remove the taser's probes

from Mr. Harris' body until at least an hour after his arrest, causing avoidable and unnecessary

pain.

140.    By targeting Plaintiffs and other Black Lexington citizens with false arrest,

retaliation, excessive force, and illegal searches and seizures, Defendants have engaged in racial

discrimination and harassment prohibited by 42 U.S.C. §2000d.

141.    This harassment and discrimination by Defendants were so severe, pervasive, and

objectively offensive that it denied Plaintiffs' equal treatment under law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and seek relief

from Defendants as follows:

A.  Issue a judgment declaring that LPD's policy, practice, and/or custom of targeting,
    threatening, coercing, assaulting, and harassing these Plaintiffs and other Black Lexington
    citizens violates the First, Fourth, and Fourteenth Amendments to the United States
    Constitution, Plaintiffs' fundamental right to travel freely, and Title VI of the Civil Rights
    Act of 1964 and that the implementation, enforcement, and sanctioning by Defendants is a
    direct and proximate result of the following policies, practices, and/or customs of
    Defendants:

1. Failing to adequately monitor LPD and its personnel and discipline those personnel who violate the constitutional rights of the residents of the communities they patrol; and

2. Encouraging, sanctioning, and failing to rectify LPD's policy, practice, and/or custom of unreasonably searching and seizing persons, homes, cars, and other property in the absence of reasonable suspicion or probable cause and on the basis of race, and of conducting false arrests and using unconstitutionally excessive force in connection with such searches and seizures; and

3. Encouraging, sanctioning, and failing to rectify LPD's policy, practice, and/or custom of not protecting Lexington's Black citizens equally; and

4. Encouraging, sanctioning, and failing to rectify LPD's policy, practice, and/or custom of violating Black individuals' freedom of speech and association;

5. Encouraging, sanctioning, and failing to rectify LPD's policy, practice, and/or custom of violating Black individuals' right to due process; and

6. Encouraging, sanctioning, and failing to rectify LPD's policy, practice, and/or custom of violating Black individuals' fundamental right to travel freely.

B. Issue an order for the following injunctive relief:

1. Enjoining Defendants from threatening, coercing, harassing, assaulting, or interfering with Black Lexington citizens' constitutional right to travel freely, their First Amendment rights to free speech and association, their

Fourth Amendment rights to be free of unreasonable search and seizure, false arrests, and excessive force, their Fourth Amendment right to due process, and their right to equal protection under the Fourteenth Amendment.

2. Specifically, enjoining Defendants from interfering with Black Lexington citizens' peaceful, nonviolent, lawful travel on the public roads and highways in Lexington, Holmes County, Mississippi, such as Highway 12 East and West, Highway 17 North and South, and the roadways bordering the named Plaintiffs' professional and residential addresses: 307 Fourth Street, 244 Kickernick Elm Street, 2554 Love Road, and 221 Church Street.

3. Enjoining Defendants from failing to provide adequate police protection for the Plaintiffs and other Black Lexington citizens in the exercise of their aforementioned constitutional rights by requiring the City of Lexington to request police support from the State of Mississippi for the purpose of policing LPD.

4. Requiring the City of Lexington to establish an independent civilian complaint review board, which will be tasked with reviewing and investigating complaints by the public against LPD for abuse of authority, discrimination, improper use of force, stops and frisks, and searches and seizures, among other conduct; and requiring the City of Lexington to empower the civilian complaint review board to investigate LPD policies and practices to identify systemic problems, subpoena LPD documents and

testimony for investigations, and impose binding disciplinary decisions upon findings that an LPD officer has violated civil rights.

5.  Requiring City of Lexington and LPD to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate LPD's policy, practice, and/or custom of unreasonably searching and seizing persons, homes, cars, and other property in the absence of reasonable suspicion or probable cause and on the basis of race, and of conducting false arrests and using unconstitutionally excessive force in connection with such searches and seizures, of violating Plaintiffs' rights to free speech and association, fundamental right to travel freely, right to equal protection, and right to due process.

C.  Award Plaintiffs compensatory damages against Defendants in amounts that are fair, just, and reasonable, to be determined at trial;

D.  Award Plaintiffs punitive damages against Defendants Sam Dobbins and Charles Henderson to the extent that their liability is based on reprehensible actions and/or inaction undertaken in their individual capacities, in amounts that are fair, just, and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

E.  Award all Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

F.  Award all Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

G.  Grant Plaintiffs any such other and further relief as the Court deems just and proper.

\_\_ /s/ Thomas J. Bellinder, Esq. _____
Thomas J. Bellinder (MSB # 103115)
**BELLINDER LAW FIRM**
200 E. Government St.
Brandon, MS 39042
Phone: (601) 487-9340
Fax: (601) 265-1795
Thomas.Bellinder@BellinderLawFirm.com

**ATTORNEYS FOR PLAINTIFFS**