UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROBERT HARRIS, DARIUS HARRIS,
ERIC RECMOND, MALCOLM STEWART
AND PETER REEVES                                    PLAINTIFFS

VS.                        CIVIL ACTION NO. 3:22-CV-479-TSL-MTP

SAM DOBBINS, IN HIS INDIVIDUAL
CAPACITY, CHARLES HENDERSON, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES AS
INTERIM CHIEF OF POLICE OF LEXINGTON,
MISSISSIPPI, THE CITY OF LEXINGTON AND
THE LEXINGTON POLICE DEPARTMENT                     DEFENDANT

MEMORANDUM OPINION AND ORDER

The five plaintiffs in this case – Robert Harris, Darius

Harris, Eric Redmond, Malcolm Stewart and Peter Reeves – filed

their complaint in this cause on August 17, 2022, against the

City of Lexington, Lexington's interim police chief Charles

Henderson, and former police chief Sam Dobbins, alleging that

defendants have engaged in a campaign of racial and retaliatory

abuse and harassment aimed at black citizens of Lexington.  More

particularly, plaintiffs allege that since Dobbins was appointed

chief of police in July 2021, defendants have engaged in an

ongoing pattern, practice and custom of targeting black citizens

for illegal searches and seizures, including false arrests, that

are typically accompanied by excessive force, all in violation

of the Fourth Amendment and the due process and equal protection

1

provisions of the Fourteenth Amendment.  Plaintiffs also allege that defendants, in violation of their First Amendment right to free speech, have engaged in a pattern, practice and custom of retaliating against those complain about defendants' racially discriminatory mistreatment, such retaliation generally taking the form of illegal searches and seizures, accompanied by excessive force.  Contemporaneously with filing their complaint, plaintiffs filed a motion for temporary restraining order (TRO) and preliminary injunction (PI), requesting that the court "enter an immediate temporary restraining order enjoining LPD from continuing its campaign of police violence and constitutional violations against Plaintiffs and other Black residents of Lexington."  The City of Lexington and Henderson, the current interim police chief, responded in opposition, and on Friday, September 9, the court held a hearing on the motion and is now prepared to rule.

SUMMARY OF PLAINTIFFS' ALLEGATIONS

The following summary is drawn from plaintiffs' motion (with affidavits) and accompanying memorandum.  The City of Lexington's population of 1,800 residents is approximately 86% black, 13% white and 1% other.  In July 2021, the Lexington Police Department (LPD), under the direction of its newly-

appointed police chief, Sam Dobbins, who is white, embarked on a practice, that quickly evolved into a custom and policy of routinely violating the constitutional rights of black citizens, hundreds of whom who were unjustly harassed, arrested, fined, detained, threatened, assaulted, attacked and beaten.  Despite a steady stream of complaints to the mayor and board of alderman by the LPD's many victims, these actions went completely unchecked.  No action was taken to halt Dobbins' campaign of racial and retaliatory terror aimed at blacks in general and blacks who complained and/or publicly opposed the LPD's actions, until finally, in July of 2022, when the board of alderman was effectively forced to take action after a secretly-recorded, seventeen-minute audio of Dobbins was released in which Dobbins could be heard saying, among other things, "N****r," and making homophobic remarks.  The Board of Alderman terminated Dobbins by a vote of three to two.  According to plaintiffs, however, defendant Henderson, who was named interim chief, has maintained this custom and policy of violating black citizens' constitutional rights, and injunctive relief is needed, not only for the protection of plaintiffs from the abuses suffered at the hands of the LPD, but for the benefit of all the City's black citizens.

The picture painted by plaintiffs in their brief of the LPD's heavy-handed tactics aimed at the city's black citizens is disturbing.  As it turns out, plaintiffs' memorandum is comprised primarily of claims and assertions for which they have presented no evidence of any sort whatsoever.  The list of their unsupported allegations is unfortunately long but nevertheless worth detailing, because by separating out and discarding them from consideration, the picture becomes somewhat clearer, and it is more easily seen that injunctive relief is unwarranted.

Plaintiffs have offered no evidence in support of any of the following assertions:

- "Dobbins was terminated in title only, and continues to menace Black Lexington citizens, patrolling in the passenger seat of a police-issued vehicle with an on-duty officer," and that "[e]ven the mayor of Lexington is reportedly afraid of what Defendant Dobbins may do";
- "one of the Black aldermen who voted to terminate … Dobbins was fired from his job at a white-owned funeral home and threatened by white citizens who told him, "'N***er, we told you how to vote.'  Out of fear for his life, that alderman has ceased communication with civil rights groups"[1];
- "LPD officers [beat a black citizen] so severely that the officers left [the] man on the curb outside of the hospital after the assault";

---

[1]    The referenced alderman, Walter Pitchford, has stated in a responsive sworn affidavit that this allegation is false.  In her closing argument, counsel for plaintiffs asserted that Alderman Pitchford gave this affidavit under duress.  There is also no proof to that effect, however, and the court thus accepts the affidavit as true.

4

- in "one instance, after breaking down her door without a warrant and arresting her without reading her Miranda rights, LPD officers, with Defendant Henderson present, maced and later hosed down an elderly woman in her sixties and left her outside in the middle of winter with nothing on but her nightgown";
- "Defendant Henderson shoved an elderly woman against her car during an unnecessary stop even though she compli[ed], did not resist orders, and did not attempt to flee";
- "after stopping a woman during a roadblock and claiming she had 'old fines,' LPD officers handcuffed her and threw her to the ground, breaking one of her fingers," and now "she – along with many other Black Lexington citizens – is afraid to leave her home unless LPD officers are on a shift change or they do not expect LPD officers to be on patrol";
- "LPD officers … arrested a man for a traffic violation while he was inside shopping in a convenience store and ticketed the man's mother even though she was not present in the state of Mississippi at the time" and "then targeted the same man for multiple traffic violations, including during times in which he did not have access to a car";
- "in [one] instance, when an individual entered LPD's police station to inquire about a relative's charges, LPD illegally searched the vehicle that was parked outside."
- "Black Lexington citizens have been paralyzed with fear after being targeted and harassed by LPD and many are afraid to speak to civil rights attorneys or activists for fear of retaliation from LPD while others will only do so in the privacy of their own homes or outside of the city limits," and "[i]n one instance, a citizen relocated her entire family to Memphis, Tennessee to escape LPD's targeting and harassment."
- LPD "has retaliated against LPD officers who have reported misconduct or refused to commit constitutional violations or misconduct";
- "officers have reported seeing other LPD officers pull individuals from the backs of their patrol cars and brutally physically assault them.  One officer even

witnessed Defendant Dobbins, then-Chief, kick a handcuffed suspect in the head";

- "23 officers have resigned from LPD within the past year or so [and] [a]t least four officers have reported that they were forced out of LPD because they refused to commit constitutional violations";

- LPD has "failed to properly vet, hire, and train officers and has failed to confirm officers are certified" and "[m]any of the officers who have worked at LPD lacked certification at the time of hire and failed to obtain it post-hire";

- "the City [has] opted to remove public comment from its board meetings, preventing concerned citizens from speaking out against LPD's misconduct and the City's inaction;"

- Municipal Judge Marc Boutwell "has allowed LPD to close court proceedings without notice to almost anyone except the accused, in an effort to conceal from the media and the bar his role in sanctioning constitutional violations [and] has even allowed LPD to lock the courthouse door when court is in session to prevent anyone from entering";

- "Judge Boutwell himself has harassed Black Lexington citizens. On August 11, 2022, he used his position to harass a Black attorney who sat silently in the back of the courtroom, observing proceedings. After that attorney had gone outside to speak with an individual who had been targeted by LPD, Judge Boutwell sent LPD to bring the attorney back into courtroom where he commanded that she stand before him as he questioned her insolently and without cause or basis about why she was there. When the attorney challenged Judge Boutwell on the basis and relevance of his abusive questioning, he threatened to hold that attorney in contempt of court for 'smirking.' Of note, court was no longer in session when Judge Boutwell commanded the attorney's presence and issued the contempt threat. Upon information and belief, after the attorney had left, Judge Boutwell immediately called a White attorney whom he believed the Black attorney worked for and told him that the Black attorney had 'acted a fool' in his courtroom in an attempt to get that attorney reprimanded. In stark contrast, only one hour earlier, Judge Boutwell had greeted White

attorneys in his courtroom with dignity, respect, and kindness";

- The City has "endorse[d] LPD's ongoing misconduct" as "evidenced by other instances in which attorneys were prevented from gaining access to information as well as physical access to the courtroom";

- "[C]ourt dates have been changed in an attempt to interfere with how attorneys are able to represent their clients. When attorneys are given the correct court date and show up to the courthouse to represent their clients, they have been barred from entering the court room";

- "In one case, Defendant Dobbins, then-Chief of LPD, physically blocked an attorney from entering the courtroom and threatened to arrest her when she tried to enter"; (Plaintiffs add that this attorney contacted Mississippi Attorney General Lynn Fitch's office for assistance and was told their office did not have jurisdiction. They note that "the most powerful family in Lexington, the Barretts, has donated tens of thousands of dollars to Attorney General Fitch's campaign. One member of the Barrett family, Katherine Barrett Riley, currently serves as the City Attorney for Lexington.");

- Lexington Alderman Charles Earl Simmons "ha[s] actively engaged in the targeting of, harassment of, and retaliation against Black individuals who have spoken out about LPD's constitutional violations and misconduct. On August 11, 2022, [he] attempted to run over one of JULIAN's community organizers with his pickup truck in an act of retaliation" and has "harassed and stalked another JULIAN community organizer, taking photographs of vehicles outside her office—a space where she often stays alone";

- "Alderman Simmons personally requested that LPD target and harass Plaintiffs Robert and Darius Harris who live in his ward";

- "LPD has … harassed … members of [plaintiff] Stewart's family, including his daughter, son, and nephews. … [A]fter Mr. Stewart's daughter refused Defendant Henderson's romantic advances, Defendant Henderson began harassing her, citing her for a traffic violation as she stood outside her car at a private car wash, vacuuming it"; and

- "More than a dozen women have reported to civil rights organizations and city staff that Defendant Henderson has propositioned them for sex and proceeded to ticket or arrest them when they refused.  One woman reported being detained for three months after denying Defendant Henderson's advances."

In addition to the foregoing statements in plaintiffs' memorandum, plaintiffs' counsel made a number of factual assertions during the hearing for which there is no record support, including that the Holmes County District Attorney has said that if the LPD presents any of the pending felony charges related to the plaintiffs, she will dismiss the charges and not present them to the grand jury and the FBI and Civil Rights Division of the U.S. Justice Department are currently investigating the LPD.  These statements will also be disregarded.

STANDARD FOR INJUNCTIVE RELIEF

To obtain injunctive relief, whether a TRO or preliminary injunction, the burden is on the movant to establish: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm to the non-movant; and (4) that the granting of the preliminary injunction will not disserve the public interest.  Big Tyme Invs., L.L.C. v.

8

Edwards, 985 F.3d 456, 463-64 (5th Cir. 2021) (internal quotation marks omitted).  The party seeking the injunction must "clearly carr[y] the burden of persuasion on all four requirements." Id. at 464.  See also Clark v. Prichard, 812 F.2d 991, 993 (5th Cir. 1987) (stating that the movant "must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted.").  Whether to grant a TRO "is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden." John Crane Prod. Sols., Inc. v. R2R & D, LLC, 861 F. Supp. 2d 792, 794 (N.D. Tex. 2012); see also White v. Carlucci, 862 F.2d 1209, 1211 (5th Cir. 1989) (same).

Likelihood of Success on the Merits

Plaintiffs assert claims in this cause under 42 U.S.C. § 1983 for alleged violations of their (1) Fourth Amendment right to be free from unreasonable search and seizure; (2) First Amendment right to freedom of speech; and (3) Fourteenth Amendment right to equal protection.  Plaintiffs have failed to demonstrate a likelihood of success on the merits of any of these claims.

<u>False and/or Retaliatory Arrests</u>

<u>Fourth Amendment</u>:  Each plaintiff claims to have been
arrested without probable cause in violation of the Fourth
Amendment and/or in retaliation for having complained about
abuses of the LPD and/or specific LPD officers, in violation of
their First Amendment right to freedom of speech.  Injunctive
relief is available, if at all, only against the City and/or
Chief Henderson, in his official capacity.  To prevail on their
claim for violation of their Fourth Amendment rights, plaintiffs
will have to prove that they were arrested without probable
cause pursuant to a policy of the City to arrest people without
probable cause.  <u>See</u> <u>Evans v. City of Meridian Miss.</u>, 630 Fed.
Appx. 312, 314 (5th Cir. 2015) ("'[A] local government may not
be sued under § 1983 for an injury inflicted solely by its
employees or agents," and instead, "[i]t is only when the
'execution of a government's policy or custom ... inflicts the
injury that the government as an entity is responsible under §
1983.'") (quoting <u>Monell v. Dept. of Social Services of City of</u>
<u>New York</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611
(1978)); <u>see</u> <u>also</u> <u>Sorenson v. Ferrie</u>, 134 F.3d 325 328 (5th Cir.
1998) ("Whether an arrest is illegal ... hinges on the absence
of probable cause" and as such, "there is no cause of action for
false arrest under § 1983 unless the arresting officer lacked

probable cause."); <u>Nieves v. Bartlett</u>, 139 S. Ct. 1715, 1721 204 L. Ed. 2d 1 (2019) ("[P]robable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment.").  "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."  <u>Flores v. City of Palacios</u>, 381 F.3d 391, 402 (5th Cir. 2004).  Since "[c]laims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest," then "'[i]f there was probable cause for any of the charges made ... then the arrest was supported by probable cause, and the claim for false arrest fails."  <u>Price v. Roark</u>, 256 F.3d 364, 369 (5th Cir. 2001) (citations and internal quotation marks omitted). And, "'[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'"  <u>Lockett v. New Orleans City</u>, 607 F.3d 992, 998 (5th Cir. 2010) (quoting <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001) (involving arrest for very minor criminal offense of failure to fasten a seatbelt)).

Evidence offered by plaintiffs to demonstrate the existence of the LPD's alleged policy or custom of making arrests without probable cause consists of the affidavits and/or live testimony of the individual plaintiffs.  However, this evidence does not establish a substantial likelihood of success on the merits of this claim.  With arguably one exception, no individual plaintiff has demonstrated that he was arrested on any occasion without probable cause.[2]

Malcolm Stewart has been arrested three times this year.[3] First, he was arrested in April on a warrant for outstanding

---

2    Defendants argue that four of the five plaintiffs' claims – those with pending criminal charges -- are foreclosed by the Heck doctrine.  Plaintiffs maintain in response that that Heck is inapplicable to all, and certainly the bulk of their claims because they are not seeking to enjoin the prosecution of the currently-pending criminal charges against them but rather to enjoin defendants "from continuing to engage in specific policing practices that violate their constitutional rights." However, plaintiffs' request for an injunction against future violations of their constitutional rights is firmly grounded on their claim that defendants have committed past violations of their constitutional rights, including their right to be free from arrest without probable cause.  Thus, while Heck itself may not foreclose, at least in part, their claim for injunctive relief – an issue about which the court expresses no opinion - the principles that animate Heck are still arguably relevant. But since plaintiffs cannot prevail on their claim for injunctive relief in any event, the court need not further consider Heck's bearing, if any, on the present motion.
    Defendants also argue that the court should abstain under Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971).  The court finds it unnecessary to reach this argument at the present time.
3    Stewart estimated he has been arrested 20 times in the past

fines.   Stewart, a mechanic, maintains that the arrest was
unjustified because under an agreement worked out with a prior
police chief and municipal judge, he had worked off his old
fines by performing service/repair work on city vehicles.
However, while Stewart claimed that he had been told by the city
clerk in July 2021 that his fines were paid off, he acknowledged
in his testimony that he had no idea whether the arresting
officer knew the fines had been paid or deemed paid.   Thus,
there is no evidence that the arresting officer lacked probable
cause to believe that the fines remained outstanding.

    Stewart was arrested a second time in June 2022 on multiple
charges, including obstructing traffic, failure to comply,
resisting arrest, driving under the influence, assault by
threatening a law enforcement officer, possession of stolen
property and switched tags.   Plaintiffs have not demonstrated
the absence of probable cause for even one of these offenses.
Stewart denies he had been drinking, but the police report
reflects that the officer could smell the overwhelming odor of
alcohol coming from the car.   Stewart does not deny that the
officer told him to move his vehicle from the roadway but denies
that he was blocking the roadway.   The video of the stop from

---

10 to 12 years, but at issue in this action are only his 2022
arrests.

the officer's body camera shows that the vehicle was in the roadway, and not in a driveway or pulled off to the side of the road, as claimed by Stewart; and he did not move the vehicle after being instructed to do so. Stewart claims he did not know the car was stolen or that the tag had been swapped, explaining that the car had been dropped off at his shop for repairs; but he does not deny that he was, in fact, in possession of a vehicle that had been reported stolen or that the car had the wrong tag on it. Moreover, the body cam video clearly shows Stewart repeatedly and explicitly threatening to beat the officer's ass once he got to the police station.

According to his testimony at the hearing, a few weeks ago, i.e., after the present motion was filed, Stewart was stopped, ostensibly for an expired tag, and was arrested on a warrant for outstanding fines. After arriving at the police station, the officer released him, saying he was mistaken about the warrant. Stewart claims the stop was unjustified in the first place because the tag was not expired; but the car did not belong to him – it was one he was working on - and his claim that the tag was current was based on a receipt he noticed lying on the vehicle's dashboard. He did not claim to have seen the actual tag and thus cannot have known whether it was expired. And he has pointed to no evidence to indicate that the officer did not

have an objectively reasonable basis for believing there was an outstanding warrant for unpaid fines.

Plaintiff Eric Redmond was arrested on June 3, 2022 when he went to the police precinct in Lexington after learning that his sister had been arrested. According to Redmond's affidavit, when he arrived, he parked on a nearby private lot so as to not block traffic. After entering the precinct, his sister called and said she needed $700 in bail; but as he was leaving to go to the ATM, she called and said she needed $2,000 for bail. Redmond returned to the precinct and asked to speak with Dobbins to find out why her bail had been increased. He states that the arresting officer, visibly angry, refused to let him speak with Dobbins and demanded that he leave the premises. Dobbins then walked outside and commanded the officer to arrest Redmond. The officer pulled out a taser and threated to "blast [Redmond's] ass," and proceeded to arrest him, but without explaining the reason for the arrest. He learned upon arrival at the jail that he was charged with disorderly conduct and resisting arrest; and he was not notified of the amount of bond for approximately eight hours.

The arrest report relating to this incident tells a very different story. According to the report, prepared by an Officer Shiers, as he was attempting to transport a female

arrested on bench warrants, several people in the parking area
had his car blocked.  When he asked them to move their cars,
Redmond "started cursing saying this is f***ing bullshit," and
"stated that he wasn't going anywhere."  The officer stated that
he ordered Redmond multiple times to leave the parking lot
because he was causing a disturbance, and he refused and
continued to curse.  At that point, the officer told Redmond he
was under arrest and to put his arms behind his back.  Redmond
began to pull away and locked his arms to keep the officer from
placing cuffs on him.  With assistance from Dobbins and another
office, Redmond was handcuffed and transported to the Holmes
County jail and charged with disorderly conduct, failure to
comply and resisting arrest.  The court cannot credit without
question Redmond's version of the arrest, in view of the arrest
report; thus, the court finds that plaintiffs have not shown
that the officer lacked probable cause for Redmond's arrest.

Peter Reeves has been detained on two occasions at
roadblocks set up by the LPD, both in or around March 2022 and
both in the early morning hours as he was returning home from a
local night club.  Reeves testified that the first time, the
white officer who stopped him was going to let him pass through
with just a warning for no proof of insurance when Cordarius
Epps, a black officer, insisted that he be pulled over and

ticketed.  He was given a ticket for having no proof of
insurance and allowed to go.  A few weeks later, around 2:00
a.m., as he was driving home from the nightclub, Reeves
encountered a roadblock.  He had a license but again, no proof
of insurance.  The officers smelled marijuana coming from the
vehicle, and then-Officer Henderson directed Reeves to step out
of the vehicle.  The officers searched the vehicle and found two
pill bottles:  one contained .325 mg Tylenol with a label
indicating it was prescribed for a George Reeves, and the other,
which was unlabeled, contained what Officer Henderson determined
was 19 oxycontin pills.  Reeves was arrested and charged with
possession of a controlled substance, and with having no proof
of insurance and illegally tinted windows.[4]

Reeves testified that he had not been smoking marijuana
himself but acknowledged he was around others at the nightclub
who were smoking marijuana, which would explain the smell of
marijuana noticed by the officers.  Moreover, while Reeves
claimed that did not know the pill bottles were in his vehicle

---

[4]  In Reeves' affidavit, submitted by plaintiffs in support of
their motion, he does not mention the unlabeled bottle
containing oxycontin, indisputably a controlled substance.
Instead, he incorrectly asserts that LPD charged him "with
felony possession of a controlled substance because [he] had a
Tylenol bottle in [his] vehicle, even though Tylenol is not a
controlled substance."

and stated that the pills were not his but rather belonged to his uncle, a Vietnam veteran whom Reeves regularly drove to doctors' appointments, he did not deny that these items were, in fact, in his vehicle.  Moreover, Reeves testified that while he paid the fine for the window tint and no proof of insurance charges, Henderson "[gave] him a break on the pill bottles" and dropped the possession charge.

It is unclear whether plaintiffs claim that probable cause was lacking for Reeves' arrest.  If so, their position is unfounded.  Reeves does not deny that officers found in his vehicle oxycontin pills that had not been prescribed for him. They may have belonged to his uncle, and he may not have known they were in the car, but those facts do not negate the existence of probable cause.

Brothers Darius and Robert Harris were shooting fireworks at Robert's home in Lexington on New Year's Eve 2021 when LPD officers, including then Chief Dobbins, arrived at the home in response to a noise complaint.  The Harrises were not the only ones in the neighborhood shooting off fireworks and it is unknown whether officers went to any other homes.  The Harrises both state in affidavits that the officers came to the residence, "harassing" them and their family while they were shooting fireworks; that they were aware that shooting fireworks

did not violate any ordinance[5] and they were not in violation of any curfew; that they repeatedly asked the officers to leave the residence because they were not in violation of any policies; and yet the officers "refused and maintained their harassment." And then, "[s]uddenly and without warning," one of the officers tased Darius in the chest and proceeded to arrest him.

The parties each presented a video recording of this New Year's Eve encounter, defendants from the body camera of one of the officers and plaintiffs from the cell phone of a family member.  What they depict is this:  Then-Chief Dobbins watched as the brothers shouted at the officers to leave the property and never come back.  Only when Darius threatened, "You gonna come to my m****r f***ing house, I'm gonna shoot your ass up out of here.  I tell you the truth. … Every time you come back here, I'm gonna shoot your ass," did Dobbins speak, saying, "Don't say that.  Don't say that."  Darius then made a movement toward Dobbins, at which time another officer began loudly stating, "Move back!", a command he repeated ten times before dislodging the taser into Darius' chest.  Darius maintained in his hearing testimony that none of the officers ever gave him any command before tasing him, but he also acknowledged that he and Robert

---

5    They were mistaken.  Shooting fireworks in a residential area is prohibited by a Lexington city ordinance.

"were mad" and that he "didn't really listen" and really "couldn't hear nothing."  It is manifest, however, that regardless of what may have precipitated the exchange between the officers and the Harris brothers, Darius Harris threatened Dobbins and did not comply with the LPD officer's repeated command to "Move back."  Ultimately, Darius was charged with several offenses relating to this incident, including violation of the city's fireworks ordinance, failure to comply, disturbing the peace, and retaliation against a public servant (based on his threats to Dobbins).  And plaintiffs plainly have not demonstrated a substantial likelihood of success on their claim that probable cause was lacking for any of these charges.

Both of the Harrises were subsequently arrested in April 2022, though the court is unable on the present record to reasonably discern from the record – including their affidavits, Darius Harris' hearing testimony, and police records – to the bases or circumstances relating to those arrests.  Even if the court assumes for present purposes that there was no probable cause for the arrests, and also assumes that the arrests were attended by an unreasonable use of force, the court sill finds that plaintiffs have not demonstrated a likelihood of proving an official policy of either arresting people without probable cause or of excessive force.

First Amendment:  Plaintiffs allege that Robert Harris, Darius Harris, Malcolm Stewart and Peter Reeves have suffered retaliation in the form of arrests on baseless charges in violation of the First Amendment for engaging in protected speech.  They point, in particular, to the arrests of the Harris brothers and Stewart within days of attending and speaking out against LPD misconduct at the April 7, 2022 "Know Your Rights" community meeting; and Reeves was ticketed and later arrested after he made a Facebook post critical of LPD Officer Epps.[6]

In typical retaliatory arrest/prosecution cases, "a plaintiff must plead and prove the absence of probable cause for the underlying criminal charge."  Gonzalez v. Trevino, 42 F.4th 487, 492 (5th Cir. 2022) (citing Nieves v. Bartlett, --- U.S. ----, 139 S. Ct. 1715, 204 L. Ed. 2d 1 (2019), and Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)).  There are two narrow exceptions.  First, a "plaintiff need not plead lack of probable cause 'where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'"  Id. at 492 (quoting Nieves, 139 S. Ct. at 1724).  That does not apply here.  Second, probable cause will not negate a

---

[6]    Reeves contends that even though he did not call Epps by name in the post, it was obvious to everyone, including Epps, that the post was about Epps, and that in fact, he was informed by another LPD officer that Epps was mad about the post.

claim for retaliatory arrest/prosecution where the plaintiffs "assert[] a Monell claim against the municipality itself, rather than individuals." Id. (citing Lozman v. City of Riviera Beach, --- U.S. ----, 138 S. Ct. 1945, 1954, 201 L. Ed. 2d 342 (2018)). Plaintiffs in this case do assert a First Amendment retaliation claim against the City. To secure injunctive relief on this claim, they must demonstrate a substantial likelihood of proving "the existence and enforcement of an official policy motivated by retaliation." Id. (quoting Lozman, 138 S. Ct. at 1954). This, they have not done.

An "official policy" may be shown in three ways: "(1) 'written policy statements, ordinances, or regulations'; (2) a 'widespread practice that is so common and well-settled as to constitute a custom that fairly represents' the city's policy; or (3) under 'rare circumstances,' a single act can be considered a policy if done by an official or entity with 'final policymaking authority.'" Webb v. Town of Saint Joseph, 925 F.3d 209, 214 (5th Cir. 2019) (citations and quotations omitted). Plaintiffs presumably rely on option (2), but their proof does not suggest a likelihood of success of proving an official policy in this, or any other way. In this regard, while Reeves testified that he complained to the mayor after one of the two roadblock stops, there is no proof as to the

substance of his complaint and no proof that the mayor or any other City official was aware of Reeves' Facebook post.

The arrests of three of the plaintiffs over a one to two day period in April 2022 after they attended and/or spoke out against the LPD at the community meeting in April 2022[7] also does not tend to show a policy of retaliation.[8]

Equal Protection

Plaintiffs charge that the LPD's actions "in targeting, threatening, coercing, harassing, and assaulting Lexington's Black citizens violated their right to equal protection under the law pursuant to the Fourteenth Amendment." As the basis for this charge, they principally maintain that "[d]efendants have erected roadblocks to conduct illegal searches and seizures

---

[7]    Plaintiff Stewart described what he claimed was a 2021 encounter with then-Officer Henderson in which Henderson threatened to kill him as he sat in his car on private property simply because Stewart refused to leave the premises. Plaintiffs say that Henderson "was targeting and harassing Mr. Stewart in retaliation for Mr. Stewart voicing his concerns about LPD." Police records relating to this incident, however, reflect that it occurred in 2019, not 2021, and there is no proof that Stewart had made prior complaints about LPD. They also reflect that Stewart was not merely sitting in a vehicle on private property talking on the phone as he claimed, but rather, he and others were sitting outside their cars in the parking lot of a closed business in the early morning hours drinking beer and playing loud music. Henderson told them to leave, and Stewart loudly refused to do so.
[8]    Notably, these arrests occurred during Dobbins' tenure as police chief, and of course, he is no longer with the LPD.

exclusively in predominantly Black neighborhoods in Lexington"
and "permits White drivers to pass through roadblocks without
being stopped and investigated."[9]

Ample evidence has been presented that the LPD,
particularly during Dobbins' tenure, has routinely used
roadblocks, perhaps more often than can reasonably be justified
and perhaps for reasons that are not legitimate from a law
enforcement standpoint.  However, the court is not persuaded
that an injunction against future roadblocks is warranted.  It
is apparent that Dobbins was initially responsible for the
extraordinarily heavy use of roadblocks in the City – which, by
some accounts, occurred almost daily and at least every other
day while he was in office.  No witness was able to offer
anything more than speculation as to the reason for the
roadblocks.  And the witnesses all agreed that the use of
roadblocks has diminished considerably since Dobbins'
termination, though it appears they are still used more than
they were before Dobbins' appointment as chief.  Plaintiffs have
alleged that the roadblocks have been set up in predominantly
black neighborhoods, yet the evidence shows that the entire city

---

9    Plaintiffs also charge that "Black residents are singled
out for arrests without probable cause and retaliation," but the
proof offered does not substantiate this claim.

of Lexington covers an area of less than two and a half square
miles and that the roadblocks are always set up on the two state
highways that intersect the city, Highway 12 and Highway 17.
Especially since Lexington's population is more than 86% black,
it may well be that predominately black neighborhoods are
located in close proximity to these highways.  That is not a
basis for an injunction.  And while plaintiffs allege that
whites are allowed to pass through roadblocks without being
stopped, the evidence they have presented to date does not
support this charge.[10]  Lastly, plaintiffs have presented
testimony that the LPD's roadblocks are set up to coincide with
events in the black community that tend to draw crowds (and
hence traffic), such as sporting events at the predominately
black Holmes County Central High School, and even birthday
parties and church services.  Even so, the court does not find
this to warrant the extraordinary remedy of an injunction,
particularly since only one of the five plaintiffs alleges he

---

10    Notably, whereas Reeves' sworn affidavit, submitted by
plaintiffs in support of their motion, recites that during the
40 minutes he sat in the back of the police vehicle, he
"witness[ed] authorities arrest multiple Black drivers at the
roadblock while allowing White drivers to pass through
unstopped," Reeves, testified at the hearing that "little to no"
cars went through the roadblock during the 30 to 40 minutes he
waited in the patrol car, and that "none" were told to pull
over.  The court credits his hearing testimony, and finds that
his affidavit in this regard is false.

has been stopped at an LPD roadblock.[11]

CONCLUSION

This case is not before the court at this time for a decision on the merits.  Rather, the only issue before the court at this time is whether an injunction should issue.  As the Fifth Circuit has cautioned time and again, "[a] preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'"  Ades v. United States, 2022 WL 1198206, at *2 (5th Cir. 2022).  Such relief should be granted only in the clearest of factual circumstances and for the most compelling of equities.  The court makes no judgment at this time about whether plaintiffs can prevail.  The court concludes only that they have failed on the evidence they have thus far presented to establish a substantial likelihood of success on the merits of their claims, any of them.[12]

In so concluding, the court does note that the vast majority of plaintiffs' complaints relate to actions that were taken while the LPD was under the leadership of Dobbins.  He is

---

11   Apparently, they are easily avoidable.
12   Having concluded that plaintiffs have failed to establish entitlement to relief for themselves, the court need not address defendants' remaining arguments as to the propriety and scope of plaintiffs' request for injunctive relief.

gone now.  And it is clear to the court, particularly from the

testimony of long-time Holmes County Sheriff Willie March, that

the policing situation in Lexington has improved.  Sheriff March

testified that prior to Dobbins' appointment as police chief,

his office received an occasional complaint about the City's

police department, but once Dobbins took office, the sheriff got

calls all throughout the day and night from citizens complaining

about the way they had been treated by the LPD.  Since Dobbins'

termination, he gets "very few calls about the police

department."[13]

---

13    Plaintiffs have offered testimony from a Ms. Elois Gibson
about getting stopped recently at a roadblock while driving home
a "tipsy" friend who had been drinking.  When the officers noted
the smell of alcohol, the friend volunteered that she was the
one drinking and showed them a cup containing alcohol.  Ms.
Gibson denied she had been drinking.  Chief Henderson reportedly
responded, "You can tell anybody you don't drink but you could
be drinking." He administered a breathalyzer and then told her
to open the door, but Ms. Gibson had trouble finding the door
latch.  Henderson, she says, opened the door and began grabbing
or pulling at her.  She protested, telling him, "No.  Back up.
Don't' touch me," adding that she would get out on her own.
(She had recently had surgery and was afraid of being injured).
When she tried to stand, she fell to the ground on her knees.
Ms. Gibson was offended by Chief Henderson's treatment of her
and apparently thought he should have accepted her statement
that she had not been drinking.  The court is uncertain how
plaintiffs contend Ms. Gibson's testimony bears on their request
for an injunction, other than to show that misconduct did not
end with Dobbins.  But plaintiffs have not shown that Chief
Henderson was not warranted in investigating; and Ms. Gibson was
not ticketed or arrested and was allowed to leave.

Accordingly, based on all of the foregoing, it is ordered that plaintiffs' motion for a temporary restraining order or preliminary injunction is denied.

SO ORDERED AND ADJUDGED this 13th day of September, 2022.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE