UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROBERT HARRIS, DARIOUS HARRIS,
ERIC RECMOND, MALCOLM STEWART
AND PETER REEVES                                             PLAINTIFFS

VS.                              CIVIL ACTION NO. 3:22-CV-479-TSL-MTP

SAM DOBBINS, IN HIS INDIVIDUAL
CAPACITY, CHARLES HENDERSON,
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES AS INTERIM CHIEF OF
POLICE OF LEXINGTON, MISSISSIPPI,
THE CITY OF LEXINGTON; THE LEXINGTON
POLICE DEPARTMENT; CORDARIUS EPPS,
IN HIS INDIVIDUAL CAPACITY, JAMES
SHIERS, IN HIS INDIVIDUAL CAPACITY,
JUSTIN NEWELL, IN HIS INDIVIUDAL
CAPACITY, AND DERRICK SCOTT, IN HIS
INDIVIDUAL CAPACITY                                         DEFENDANTS


MEMORANDUM OPINION AND ORDER

Defendants City of Lexington, Lexington Police Department

(LPD), Charles Henderson, in his individual capacity and his

official capacity as Interim Chief of Police of the City of

Lexington, and CorDarius Epps, Justin Newell, Derrick Scott and

James Shiers, in their individual capacities, have moved for

judgment on the pleadings or, in the alternative, for summary

judgment, and defendant Sam Dobbins, in his individual capacity,

has moved for judgment on the pleadings.  Plaintiffs Robert

Harris, Darious Harris, Eric Redmond, Malcolm Stewart and Peter

Reeves have responded to the motions and the court, having

considered the memoranda of authorities, together with evidence

1

presented at the September 9, 2hel22 hearing on plaintiffs' motion for a temporary restraining order/preliminary injunction (TRO hearing), concludes that the motions should be granted in part and denied in part, as set forth below.[1]

## BACKGROUND/PROCEEDINGS

The five plaintiffs in this case – Robert Harris, Darious Harris, Eric Redmond, Malcolm Stewart and Peter Reeves – filed their original complaint on August 17, 2022, against the City of Lexington, Lexington's interim police chief Charles Henderson, in his individual and official capacities, and former police chief Sam Dobbins, in his individual capacity,[2] asserting claims under 42 U.S.C. § 1983 for violations of their rights under the First, Fourth and Fourteenth Amendments, and alleging racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Generally, plaintiffs allege that from the time that defendant Dobbins was appointed as chief of police in July 2021, defendants have engaged in an ongoing

---

[1]    The Municipal Defendants have filed a joinder in Dobbins' motion, and Dobbins has filed a joinder in the Municipal Defendants' motions. Plaintiffs have moved to strike both joinders. The court does not find the joinders to be improper and therefore, it will deny the motions to strike.

[2]    Plaintiffs also named as a defendant the Lexington Police Department, but as this court has explained numerous times, a police department is not a separate legal entity that may be sued. See, e.g., Paterson v. Nelson, No. 1:19cv811-LG-RPM, 2020 WL 6281626, at *4 n.4 (S.D. Miss. Oct. 1, 2020).

campaign of racial and retaliatory abuse and harassment of Lexington's black citizens.  This alleged abuse and harassment, they allege, has included, among other things, falsely arresting black citizens, including (for retaliatory purposes) those who speak out against police misconduct; subjecting black citizens to excessive force; and violating black citizens' rights to equal protection by, among other things, setting up roadblocks exclusively in black neighborhoods.  Plaintiffs charge that defendants' actions have violated their Fourth Amendment right to be free of unreasonable searches and seizures, and to be free from excessive force; their right under the First Amendment to be free from retaliation for speaking out against police harassment and abuse; and their Fourteenth Amendment rights to equal protection and due process and to be free from excessive force.

Upon filing their complaint, plaintiffs promptly moved for a temporary restraining order/preliminary injunction, asking the court to "enter an immediate temporary restraining order enjoining LPD from continuing its campaign of police violence and constitutional violations against Plaintiffs and other Black residents of Lexington."  A hearing was held on September 9, 2022, at which the parties presented evidence, including from plaintiffs' side the testimony of three of the five plaintiffs. By memorandum opinion and order entered September 13, the court

denied plaintiffs' motion.  Plaintiffs filed an amended complaint on October 3, naming as additional defendants four Lexington police officers, in their individual capacities, and adding a claim that defendants have violated their right under the Privileges and Immunities Clause "to travel freely for the purpose of meeting their everyday needs and providing for their families in the State of Mississippi without unlawful interference."

The City, Chief Henderson and the defendant officers, Epps, Shiers, Scott and Newell (Municipal Defendants), have moved for judgment on the pleadings pursuant to Rule 12(c), or in the alternative for summary judgment pursuant to Rule 56, contending that plaintiffs have failed to adequately allege and/or are unable on the undisputed evidence to prove a violation of their constitutional rights.  Chief Henderson and the named officers contend, further, that they are entitled to qualified immunity as to most, but not all, of the claims asserted against them. Former police chief Dobbins has separately moved for judgment on the pleadings, arguing that plaintiffs have failed to state a claim against him and/or that their complaint is inadequate to overcome his qualified immunity.  Although Dobbins has moved for judgment on the pleadings, and not for summary judgment, the court, in evaluating the motion, has considered evidence outside the pleadings and therefore, pursuant to Rule 12(d), the court

has determined to convert his motion to a motion for summary

judgment.[3]

### STANDARDS

### Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary

judgment is required when "the movant shows that there is no

genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Typically on a summary judgment motion, the moving party

---

[3]    Rule 12(d) provides that "[i]f, on a motion under Rule
12(b)(6)[,] matters outside the pleadings are presented to and
not excluded by the court, the motion must be treated as one for
summary judgment under Rule 56." The Fifth Circuit has held
that to comply with Rule 12(b)'s requirement that parties be
given "notice and a reasonable time to respond," the parties
"must have ten days to submit additional evidence once they are
put on 'fair notice' that a 'court could properly treat [a Rule
12(b)(6)] motion as one for summary judgment.'" Snider v. L-3
Communications Vertex Aerospace, L.L.C., 946 F.3d 660, 667 (5th
Cir. 2019) (quoting Clark v. Tarrant County, 798 F.2d 736, 745-
46 (5th Cir. 1986)). Considering a number of factors, the court
concludes that the parties have had ample notice that the court
might convert the motion and have had the required opportunity
to submit evidence. First, this is not a case where the
plaintiffs have not had an opportunity to present any evidence.
In fact, some of the principal evidence the court has considered
in evaluating the present motions is plaintiffs' affidavits and
their testimony at the TRO hearing. Moreover, the claims
against Dobbins arise from the same operative facts as the
claims against his codefendants, who have moved for summary
judgment. Plaintiffs have thus had an opportunity to present
whatever evidence they believe supports even their claims
against Dobbins. There is no reason to believe they would have
responded with different or additional evidence against Dobbins
arising out of the very same incidents. Moreover, while it has
since become unclear what his purpose or intent was in doing so,
Dobbins actually filed a joinder in his codefendants' motion.

bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, a government official's good faith assertion of a qualified immunity defense alters the usual summary judgment burden of proof. Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). Once the official asserts qualified immunity, the plaintiff has the burden to show there is a genuine and material dispute as to whether qualified immunity applies. Castorena v. Zamora, 684 Fed. Appx. 360, 363 (5th Cir. 2017) (citations omitted). See also Thompson v. Upshur Cty., TX, 245 F.3d 447, 456 (5th Cir. 2001) (official not required to demonstrate that he did not violate clearly established federal rights; rather, burden is on plaintiff to establish such violation).

When evaluating whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." Delta & Pine Land Co.

v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398-99 (5th Cir. 2008). In so doing, the court must view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor, even on a summary judgment motion based on qualified immunity. See Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor."). There is a caveat, however: The court is not bound to accept the nonmovant's version of the facts if it is conclusively contradicted by video evidence in the record. Crane v. City of Arlington, Texas, 50 F.4th 453, 461-62 (5th Cir. 2022). That said, the court may only reject a nonmovant's version of facts if the video evidence "provides so much clarity that a reasonable jury could not believe his account." Id.

### Judgment on the Pleadings

The purpose of Rule 12(c) is to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts. Great Plains Trust. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002). The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6), namely, whether, accepting all plaintiffs' well-pleaded facts as

true and viewing them in the light most favorable to the plaintiffs, they have pled "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

### GENERAL LEGAL PRINCIPLES

### Section 1983:  Municipal Liability and Qualified Immunity

To prevail on a claim under § 1983, a plaintiff must (1) prove a violation of a right secured by the Constitution or laws of the United States and (2) show that the alleged deprivation was committed by a person acting under color of state law. Anderson v. Valdez, 845 F.3d 580, 599 (5th Cir. 2016).

### Municipal Liability

The City of Lexington and Chief Henderson, in his official capacity (Municipal Defendants)[4] assert, among other arguments,

---

[4]    The claims against Chief Henderson in his official capacity are, in effect, claims against the City.  See Will v. Mich.

that even if plaintiffs have alleged and/or could prove a
constitutional violation, the City cannot be liable as
plaintiffs have not adequately alleged and/or cannot prove that
any constitutional deprivation they claim to have suffered was
the result of an official government policy.

"[M]unicipalities may be sued under § 1983 but cannot be
held liable for acts of their employees under a theory of
respondeat superior." Gomez v. Galman, 18 F.4th 769, 777 (5th
Cir. 2021) (citing Monell v. Dept. of Social Servs., 436 U.S.
658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). Rather, to
prevail on a § 1983 claim against a municipality, plaintiffs
must plead and prove that "'(1) an official policy (2)
promulgated by the municipal policymaker (3) was the moving
force behind the violation of a constitutional right.'" Id.
(quoting Davidson v. City of Stafford, Tex., 848 F.3d 384, 395
(5th Cir. 2017)). See also Allen v. Hays, --F.4th --, 2023 WL
2580785, at *7-8 (5th Cir. Mar. 21, 2023) ("The Fifth Circuit
interprets Monell as requiring a plaintiff to identify '(1) an
official policy (or custom), of which (2) a policy maker can be
charged with actual or constructive knowledge, and (3) a

---

Dep't of State Police, 491 U.S. 58, 68-70, 109 S. Ct. 2304, 105
L. Ed. 2d 45 (1989) (official capacity suit against government
official is, in effect, a suit against that person's office, and
thus is no different than a suit against the government entity
that employs the person).

constitutional violation whose "moving force" is that policy (or custom).'") (quoting Pineda v. City of Hous., 291 F.3d 325, 328 (5th Cir. 2002)).

Plaintiffs can establish an official policy by showing "'a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by ... an official to whom the lawmakers have designated policy-making authority,'" Allen, 2023 WL 2580785, at *8) (quoting Webster v. City of Hous., 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)), or by demonstrating a persistent, "'widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" Gomez, 18 F.4th at 777 (quoting Alvarez v. City of Brownsville, 904 F.3d 382, 390 (5th Cir. 2018)).  "'The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.'" Guillot on behalf of T.A.G. v. Russell, 59 F.4th 743, 751–52 (5th Cir. 2023) (quoting Spiller v. City of Texas City, Police Dep't, 130 F.3d 162, 167 (5th Cir. 1997)).

**Qualified Immunity**

Defendants Henderson, Epps, Shiers, Scott, Newell and Dobbins, in their individual capacities, contend that, in addition to other grounds for dismissal, they are entitled to

dismissal of plaintiffs' claims against them based on qualified immunity. The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Qualified immunity provides "some shield from 'undue interference with their duties and from potentially disabling threats of liability.'" Collie v. Barron, 747 F. App'x 950, 952 (5th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S. Ct. 2727, 2732, 73 L. Ed. 2d 396 (1982)). It gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

"When a government official asserts a qualified immunity defense, the burden is on the plaintiff to 'show that he pleaded facts showing ... that the official violated a statutory or constitutional right. If the plaintiff makes this ... showing, then [we must] determine whether the defendants' actions were

objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.'" Alexander v. City of Round Rock, 854 F.3d 298, 303 (5th Cir. 2017) (quoting United States ex rel Parikh v. Brown, 587 Fed. Appx. 123, 127–28 (5th Cir. 2014).  Thus, to overcome defendants' qualified immunity defense, plaintiffs must show that "(1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."  Porter v. Epps, 659 F.3d 440, 445 (5th Cir. 2011).  See also Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012) (quoting Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the [qualified immunity] defense once properly raised.").  The court is permitted to use its discretion, considering the circumstances of the case, in deciding which of these two prongs to address first.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"  Ashcroft v. al-Kidd, , 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.

Ed. 2d 523 (1987)).  This does not mean that there must be a case directly on point, but it does mean that "existing precedent must have placed the statutory or constitutional question beyond debate."  Id. at 741, 131 S. Ct. 2074.

"'Because qualified immunity constitutes an immunity from suit rather than a mere defense to liability, the defense is intended to give government officials a right not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery....'"  Webb v. Arbuckle, 456 Fed. Appx. 374, 378, 2011 WL 6845887, at *3 (5th Cir. 2011) (quoting McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).  "Thus, qualified immunity claims should be resolved 'at the earliest possible stage in litigation.'"  Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)).

### Plaintiff's Request for Discovery

Plaintiffs' response to every argument asserted in Municipal Defendants' motion for summary judgment recites, "To the extent the Court finds that the record does support Defendants' assertion … discovery would allow Plaintiffs to create a genuine, triable issue of material fact.  If Plaintiffs are given the opportunity to conduct discovery [on the claim/issue] it is likely it will assist Plaintiffs in creating

genuine, triable issues of material fact on whether [defendants violated plaintiffs' subject rights]."  Plaintiffs have included with their response a nine-page affidavit from one of their attorneys setting forth lists of the discovery they contend they would need to oppose the motion, and ask that if the court is inclined to grant the motion on any given issue, it allow them to have such discovery.

Because "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive," the Fifth Circuit has established a "careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense."  Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012). First, the court must find "'that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity.'"  Id. (quoting Wicks v. Miss. State Emp't Servs., 41 F.3d 991, 994-95 (5th Cir. 1995)).  "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." Id.  "*After* the district court finds a plaintiff has so pled, if the court remains 'unable to rule on the immunity defense

14

without further clarification of the facts,' it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'"  Id. (quoting Lion Boulos v. Wilson, 834 F.2d 504, 507-08 (5th Cir. 1987)).  The court has evaluated plaintiffs' discovery request as directed, and finds that discovery is not warranted and therefore, plaintiffs' request is denied.

## ANALYSIS

As an initial matter, the court notes that despite the seemingly countless references in plaintiffs' complaint to defendants' alleged abuse of Lexington's "black citizens,"[5] plaintiffs have not brought this as a class action.  They do not purport to be suing as representatives of a class of black citizens of Lexington; rather, each plaintiff is asserting the claims herein solely for himself and no one else.  Moreover, while plaintiffs have filed this action jointly, their claims are largely separate and unrelated.  The court first considers the individual claims of each plaintiff.

---

[5]    See, e.g., para. 3 ("LPD has violated Black Lexington citizens' constitutional rights incessantly for over a year and continues to do so today."); para. 5 ("Plaintiffs and other Black Lexington citizens have been falsely arrested, forced to undergo baseless searches and seizures at roadblocks, and subject to unreasonable force by LPD officers…."); para. 6 ("The evidence in this case reflects a continuous pattern of LPD's harassment, coercion, threatening conduct, and often brutal mistreatment of Plaintiffs and other Black Lexington citizens….").

**Fourth Amendment—False Arrest**

Each plaintiff has asserted a claim or claims of false arrest in violation of the Fourth Amendment.  The Fourth Amendment states in relevant part:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. 4.  "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  Lincoln v. Turner, 874 F.3d 833, 840 (5th Cir. 2017) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)).  The extent of protection afforded "varies with the type of seizure at issue."  Id.  The Fifth Circuit has described the following "tiers of citizen-police contact for purposes of [F]ourth [A]mendment analysis":

> The first tier involves no coercion or detention and does not implicate the fourth amendment.  The second tier, an investigatory stop, is a brief seizure that must be supported by reasonable suspicion ... Finally, the third tier is a full scale arrest [which] must be supported by probable cause.

Id. (quoting United States v. Massi, 761 F.3d 512, 520 (5th Cir. 2014)).  Where there is probable cause, "there is no cause of action for false arrest under § 1983…."  Sorenson v. Ferrie, 134 F.3d 325 328 (5th Cir. 1998).  And where there is reasonable suspicion, there is no cause of action for a detention not

amounting to arrest.  Further, an officer who asserts qualified immunity will not be held liable for an arrest (or detention) if he "reasonably but mistakenly conclude[d] that probable cause [reasonable suspicion] [wa]s present."  Dist. of Columbia v. Wesby, --- U.S. ----, 138 S. Ct. 577, 591, 199 L. Ed. 2d 453 (2018) (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

   "Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'"  Sam v. Richard, 887 F.3d 710, 715 (5th Cir. 2018) (quoting State v. Kleinert, 855 F.3d 305, 316 (5th Cir. 2017)).  "The test is objective, not subjective.  Accordingly, the officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'"  Id. (quoting Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)).  "The probable cause can be for any crime, not just the one the officer subjectively considered at the time."  Defrates v. Podany, 789 Fed. Appx. 427, 431 (5th Cir. 2019).  Moreover, "[c]laims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest," and therefore, '[i]f there was probable cause for any of the charges made ... then the *arrest* was

17

supported by probable cause, and the claim for false arrest fails.'" Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001) (quoting Wells v. Bonner, 45 F.3d 90, 95 (5th Cir. 1995)).  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

For a detention falling short of a full-blown arrest, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"  United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)).  In making determinations of reasonable suspicion, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  Id. at 273, 122 S. Ct. 744 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)).

### Eric Redmond

Eric Redmond alleges and has submitted a supporting affidavit attesting to the following:  On June 3, 2022, after

18

learning his sister had been arrested, Redmond went to the police station to post her bail.  Upon arriving at the station, he parked on a private lot near the precinct and did not block any traffic.  His sister initially called and told him her bail was $700, but as he was leaving the station to go to an ATM to get cash, she called back and said the LPD had raised her bail to $2,000.  Redmond asked to speak to then-Chief Dobbins to find out why her bail amount had changed, but defendant Shiers, the arresting officer, refused to allow him to speak to Dobbins. Redmond was standing outside the building waiting to speak to Dobbins when Redmond was approached by a visibly angry Shiers and ordered to leave the premises.  Dobbins then walked outside and commanded Shiers to arrest Redmond.  Shiers pulled out his taser and threatened to "blast [Redmond's] a**," after which Shiers, assisted by Dobbins, handcuffed Redmond and took him to jail.[6]  Only after arriving at the jail was Redmond informed of the ostensible basis for his arrest:  disorderly conduct and resisting arrest.  Redmond alleges that the officers lacked probable cause to arrest him (and claims they only did so in retaliation for his questions about the increased bail charged

---

[6]    Redmond alleges that the LPD had his car towed following his arrest, even though it was parked in a private lot and the owner of the lot did not request to have it removed.  He has not asserted a cause of action based on this allegation.

to his sister.)[7]  The charges against him were ultimately dropped.

Officer Shiers' arrest report paints a different picture of the arrest.  According to his report, Shiers was transporting a female arrestee out of the police station when he noticed there were several people in the parking area, including Redmond, and that his patrol car was blocked in.  When he asked them to move the cars, Redmond began cursing, saying, "[T]this is f***ing bull****."  Shiers at that point realized Redmond was trying to bond out the female Shiers was transporting out of the jail. Shiers ordered Redmond multiple times to leave the parking lot because he was causing a disturbance, but Redmond refused to leave and continued to curse.  Shiers advised Redmond he was under arrest and told him to put his hands behind his back. Redmond began to pull away from Shiers and started locking his arms to keep Shiers from getting the cuffs on him.  Officer Scott and then Chief Dobbins assisted him in getting the cuffs on Redmond who was then transported to jail.

Defendants maintain there was probable cause for Redmond's arrest, and further, that Shiers and Dobbins, in their

---

[7]    Based on this allegation, Redmond has asserted a claim for retaliatory arrest in violation of the First Amendment.  He also asserts a claim that the officers used excessive force in effecting his arrest.  These claims are addressed <u>infra</u> at pp. 35-38 and pp. 48-50, respectively.

individual capacities, have qualified immunity as to Redmond's false arrest claims because reasonable officers in their respective positions reasonably could have thought there was probable cause.  However, there is obviously a dispute between the parties involved as to what occurred; and under Redmond's version of events, which the court accepts as true for purposes of the motion, there was no probable cause, and no reasonable officer in Shiers' or Dobbins' position could have believed otherwise.

Mississippi's disorderly conduct statute, reads in pertinent part, as follows:

> Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to:
>         * * *
>     [a]ct or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order, request or command, shall be guilty of disorderly conduct ....

Miss. Code Ann. § 97-35-7(1)(i).  According to Redmond, at the time of his arrest, he was merely standing outside the police station, waiting for Dobbins to come outside. Nothing more.  Assuming that to be true, no reasonable officer could have concluded that Redmond had an "intent to provoke a breach of the peace," or that circumstances were

21

such as might lead to, or cause or occasion a breach of the
peace. Accordingly, the defendants' motions will be denied
as to Redmond's Fourth Amendment claim for false arrest.[8]
See Mastin v. State, 180 So. 3d 732, 737 (Miss. Ct. App.
2015) (no disorderly conduct under statute where officer,
in giving order, was not attempting to avoid a breach of
the peace).

**Peter Reeves:**

In March 2022, Peter Reeves was stopped twice at roadblocks
in Lexington. The first time, he was ticketed for having no
license and no proof of insurance. He was stopped the second
time around 2:00 a.m. as he was returning home from a nightclub.
He had his license, but again, no proof of insurance. He was
directed to pull over, and minutes later, he was placed in a
patrol car while defendants Henderson, Epps and Newell searched
his vehicle after Henderson reported that he smelled marijuana
in the car's interior.[9] The officers found two pill bottles in

---

[8]    Dobbins has argued that he has qualified immunity because
he could reasonably have thought there was probable cause
because when he walked outside, he had no idea what was actually
going on, and a reasonable officer in his position who saw "a
'visibly upset' officer commanding a citizen to do something he
was refusing to do, would believe" there was probable cause.
First, there is a dispute as to what occurred and hence as to
what Dobbins may have seen. Moreover, in the court's opinion, a
reasonable officer would not assume there was probable cause
when he admittedly has no idea what has actually occurred.

[9]    Reeves testified at the TRO hearing that while he had not

the car.  One contained .325 mg Tylenol, with a label showing it was prescribed for "George Reeves."  The other was unlabeled, and contained oxycontin pills.  Reeves was arrested and charged with illegal window tint, no proof of insurance and possession of a controlled substance.[10]

It cannot reasonably be disputed that there was probable cause for Reeves' arrest.  Although Reeves has maintained that the pill bottles/pills found in the car belonged to his uncle, George Reeves, and that he was not even aware they were in the car, he has acknowledged that the drugs, in fact, were found in his car.  Consequently, there was probable cause for his arrest on the possession charge.  Likewise, Reeves has not disputed that he had no proof of insurance or that his windows had illegal tint. In fact, while Henderson ultimately dropped the possession charge, Reeves paid the fines on the other charges.

---

smoked marijuana, he had been around other people at the club that night who had been smoking marijuana.  He has not disputed that Henderson smelled marijuana.

[10]    Reeves has claimed that after he was taken into custody, the tow truck driver offered to tow Reeves' car to his home, but the officers became enraged, slammed the tow truck driver against his tow truck and told him to "do the f****** job you were hired to do."  This allegation is immaterial to Reeves' claims herein, as Reeves had no right under the Constitution or any law, federal or state, to have his car towed to his house. And he plainly has no standing to challenge the officers' alleged use of force against the tow truck driver.

Reeves' Fourth Amendment claim for false arrest will therefore be dismissed.[11]

### Malcolm Stewart

Malcolm Stewart is suing for false arrest relating to an April 9, 2022 arrest for outstanding fines, and a June 30, 2022 arrest on various charges.[12]  Regarding the April 9 incident,

---

[11]    Reeves is also challenging the legality of the initial stop which led to the search and to his arrest on the basis that the roadblock violated his Fourth Amendment rights and his rights under the Privileges and Immunities Clause.  The court addresses those claims infra at pp. 65-75.  However, "the legality of the initial stop has no bearing on whether the subsequent arrest violated [his] constitutional rights." Marchand v. Hartman, 395 F. Supp. 3d 202, 217 (D. Conn. 2019) (citing Baksh v. City of New York, 2018 WL 1701940, at *4 (E.D.N.Y. 2018), which recognized that "the 'fruit of the poisonous tree' doctrine does not apply to § 1983 claims.")).

[12]    Additional claims by Stewart that he was harassed by being stopped and ticketed in May 2022 and arrested on April 9 and June 20 in retaliation for speaking out against the LPD's abusive practices in violation of his First Amendment, and that he was subjected to excessive force in violation of his Fourth and Fourteenth Amendment rights, are addressed infra at pp. 39-42 and pp. 57-59, respectively.

As to Stewart, the court notes that at the TRO hearing, Stewart described an instance when he was pulled over in September or October of 2022, and arrested because the officer claimed there was an outstanding warrant for Stewart's arrest. After being held at the police station for about 45 minutes, he was released because the officer found that he was mistaken.  No cause of action appears in the complaint relating to this incident; it does not even mention this incident.

The complaint alleges that LPD has "harassed other members of Mr. Stewart's family, including his daughter, son, and nephews," and states that defendant Henderson harassed his daughter for refusing his romantic advances.  Plaintiffs add in a footnote that "more than a dozen women" have reported being

Stewart alleges he was pulled over by defendant Epps, supposedly

for an expired tag – Stewart denies the tag was expired -- and

was then arrested, ostensibly for outstanding fines.[13]  He was

held overnight and released the next day, following payment of

the allegedly outstanding fines.[14]  Stewart claims that, in fact

he did not have outstanding fines and that consequently, there

was no probable cause for his arrest.  Stewart, who is a

mechanic, alleges in the complaint, and also testified at the

TRO hearing, that he previously had outstanding fines, but in

2020, an agreement was worked out with a former city judge and

the former police chief by which he was allowed to work off his

---

harassed by Henderson by being ticketed or arrested for refusing
his sexual advances.  The court disregards these allegations, as
neither Stewart nor any other plaintiff has standing to assert
any claim for relief based on these allegations.

[13]  Plaintiffs assert in their response that "Defendants have
not provided any information about the stop itself or the
circumstances surrounding the stop to show that Defendant Epps
had reasonable suspicion to stop Stewart."  The complaint,
however, does not allege that Epps lacked reasonable suspicion
for the stop or purport to assert a Fourth Amendment cause of
action based on the stop itself, as opposed to the arrest which
followed.

[14]  Stewart alleges that on the day of his arrest, "[v]arious
activists" traveled to the jail to pay his fines so he could be
released, but "LPD officers" refused to release him that night
and he was held in custody until the following day.  He claims
that although he did not owe a fine, he paid the fine so that he
could be released from jail.  Stewart has not made a claim for
relief based on these allegations, and in any event, he has not
alleged that any of the defendants had any involvement in the
decision to require payment of the fines or to hold him
overnight.

fines by servicing LPD vehicles.  According to Stewart, the city clerk notified him in July 2021 that his fines were paid in full, and he maintains, therefore, that at the time of his arrest by Epps in April 2022, he had no outstanding fines. Assuming that is true, Stewart has not alleged facts to show that probable cause was lacking.  The determination whether there was probable cause begins with consideration of the facts known to the arresting officer.  Sam, 887 F.3d at 715.  Stewart has not alleged that Epps knew, or even should have known that Stewart had paid off his fines, nor does he allege any facts to show that Epps could not reasonably have thought there was probable cause to arrest Stewart.  Stewart's allegations are insufficient to establish a constitutional violation, or to overcome Epps' qualified immunity.  This claim against him will be dismissed.  See Carswell v. Camp, 54 F.4th 307, 312 (5th Cir. 2022) (where pleadings are insufficient to overcome qualified immunity, court must grant motion to dismiss).[15]

Regarding his June 30, 2022 arrest, Stewart alleges in the complaint that he was "sitting stationary in his parked vehicle

---

[15]    Plaintiffs argue in their response that "[w]ith regard to Defendant Epps' assertion of qualified immunity, it is clearly established that arrests made as a result of a recklessly maintained warrant system violate the Fourth Amendment." Plaintiffs have not alleged such a claim.  The complaint cannot even arguably be interpreted as alleging that the City "recklessly maintained" its warrant system.

[in front of his sister's home in Lexington], had observed all traffic laws and regulations, had not interfered with traffic in any manner, and had proceeded in an orderly and peaceful manner as he spoke with an individual standing outside his car" when defendant Shiers "approached the vehicle, reached in, and yanked his shirt collar, pulling Mr. Stewart towards him through the window…." Stewart alleges that although he was not intoxicated, and although he repeatedly demanded that officers administer a breathalyzer, Stewart refused to do so and proceeded to arrest him for driving under the influence.

In fact, the undisputed record evidence establishes that Stewart was arrested not just for driving under the influence but also for obstructing/impeding traffic, having no driver's license and failure to comply, and that he was ultimately charged with these offenses and also with resisting arrest, assault by threatening a law enforcement officer, swapped/ switched tag and possession of stolen property (the car). Moreover, record evidence in the form of Shiers' bodycam video also conclusively establishes that Stewart's vehicle was not parked in his niece's driveway or pulled over on the side of the road as Stewart has claimed and that it was instead parked or stopped directly in the lane of travel. The video also shows that Stewart failed to produce a driver's license when asked to do so and that he failed to exit the vehicle when directed to do

27

so by Shiers.[16]  The court acknowledges but rejects plaintiffs'
argument that the court may not properly rely on the bodycam
video in assessing probable cause because the video does not
show events that occurred before Shiers approached Stewart's
vehicle and is therefore incomplete and inconclusive.  Stewart
himself related what had occurred, as follows:  Shiers, as he
was driving past Stewart, asked Stewart to move out of the road.
Shiers drove on by him, went further down the road and then came
back.[17]  He stopped, got out of his patrol car and walked up to
the driver's side window of the car in which Stewart was
sitting.  These facts, accepted as true, do not detract from the
conclusiveness of the bodycam video on the issue of probable
cause.  Accordingly, Stewart's false arrest claim relating to
his June 30 arrest will be dismissed

### Robert Harris and Darious Harris

Robert Harris and Darious Harris, who are brothers, assert
claims relating to two instances in which they were allegedly
falsely arrested in violation of their Fourth Amendment rights.

---

[16]    See infra p. 58.

[17]    Plaintiffs also argue that it is clear from the video that
the vehicle was stopped, but not parked, as evidenced by the
fact that Shiers directed Stewart to put the car in park and
stop out of the car.  Whether or not Stewart put the car in park
when he stopped in the roadway is not material.  What is
material is that he stopped the vehicle in the lane of travel
(and did not move when directed to do so).

The first occurred on New Year's Eve, 2021, and the second, on April 8, 2022.

The complaint alleges that on New Year's Eve, the Harrises were shooting fireworks at Robert's home in Lexington when then-Police Chief Dobbins, accompanied by other LPD officers, arrived at the residence and "threatened to arrest [the Harris brothers] for allegedly violating the City's fireworks ordinance." The brothers, "exhausted by LPD's constant harassment,"[18] told the officers to vacate the premises and "verbally resisted the officers' threats."

In his testimony about this incident at the TRO hearing, Darious Harris stated that after the police pulled up and told the Harrises they needed to stop popping fireworks because someone from down the street had called and complained about the noise, Robert told everyone to stop popping fireworks, which they did. Then "somebody made the suggestion [to the officers] that they could leave now." The officers did not leave. Instead, they "just stayed and wanted to argue or something…." For "probably 20 minutes," he said, the officers and the Harris brothers argued, with the Harrises and then-chief Dobbins standing in Robert's driveway and the other officers standing in

---

[18]    Relative to this encounter, the complaint vaguely states, "LPD has a history of targeting and harassing the [Harris] brothers."

the road.  At some point, Dobbins, referring to Darious, said, "Who the f*** this guy think he is?"  Then, according to Darious, "an officer pulled a gun out on me, and there was actually a bunch of kids out there.  And I actually got mad because I thought he had pulled a gun on me.  And I asked him, Why you pull a gun on me with all these kids out here?  Which I didn't know whether it was a taser or not [because] they kept shining the light in our face."  Epps, he claims, then tased him "suddenly and without warning."  The officers proceeded to handcuff and drag him to the police car, and transported him to the police station.

Once at the police station, while waiting or EMTs to come to the station to remove the taser prongs, Dobbins said he was not going to arrest Darious and told him to call someone to come pick him up.  Darious called Robert, who came to get him.  When Robert arrived, Dobbins grabbed him, twisted his arm behind his back and took him to Dobbins' office, where he threatened Robert, telling Robert that if they kept "bumping heads," there

was going to be a "killing."[19]  Robert alleges he was "scared for

his life."[20]

On January 19, 2022, warrants were issued for both Harris

brothers based on criminal affidavits executed by Dobbins

against Darious Harris for shooting fireworks after hours in

violation of the City's fireworks ordinance and retaliation

against a public servant,[21] and against Robert Harris for

shooting fireworks after hours, retaliation against a public

---

[19]    The complaint alleges that Robert "went to the police
station to inquire about his brother after he was jailed," but
when he arrived, "Dobbins told him to 'shut up' and 'leave'."
Robert tried to leave, but Dobbins grabbed his arm and detained
him.  In Robert's affidavit filed by plaintiffs, there is no
mention of this incident, and Robert did not testify at the TRO
hearing.  Darious, however, provided sworn testimony that Robert
came to the station after Darious called Robert to come pick him
up.

[20]    Darious Harris has asserted claims for excessive force in
violation of the Fourth Amendment based on his being tased and
on the Fourteenth Amendment based on allegations of delay in
removing the taser prongs and in the manner of removal.  Robert
Harris has asserted a claim of excessive force relating to
Dobbins' grabbing him and twisting his arm behind his back.
These claims are addressed infra at pp. 51-55 and pp. 55-57,
respectively.

[21]    See Miss. Code Ann. § 97-9-127(1) ("A person commits the
offense of retaliation if he intentionally or knowingly harms or
threatens to harm another by any unlawful act in retaliation for
anything lawfully done in the capacity of public servant,
witness, prospective witness or informant.").  This is a felony.

31

servant, disturbing the peace,[22] public profanity,[23] and failure to comply.[24]  The warrants were not served at that time; rather, two and a half months later, on April 8, 2022, following a traffic stop and search of his vehicle, an LPD officer arrested Robert, ostensibly for possession of marijuana and based on the outstanding warrants.  Darious Harris was arrested later the same day based on the warrants stemming from the New Year's Eve incident.[25]

It is undisputed that the Harrises were shooting fireworks on New Year's Eve in violation of the City's fireworks ordinance, which makes it unlawful to use fireworks in

---

[22]    See Miss. Code Ann. § 97-35-15(1)("Any person who disturbs the public peace, or the peace of others, by violent, or loud, or insulting, or profane, or indecent, or offensive, or boisterous conduct or language, or by intimidation, or seeking to intimidate any other person or persons, or by conduct either calculated to provoke a breach of the peace, or by conduct which may lead to a breach of the peace, or by any other act, shall be guilty of a misdemeanor….").

[23]    See Miss. Code Ann. § 97-29-47 ("If any person shall profanely swear or curse, or use vulgar and indecent language, or be drunk in any public place, in the presence of two (2) or more persons," he shall be guilty of a misdemeanor).  Plaintiffs argue that Robert did not violate the statute, since he was on his own property.  They also argue that Mississippi's profanity statute violates the First Amendment, but in their complaint, plaintiffs do not seek to have the statute declared invalid or to enjoin its enforcement.

[24]    See supra p. 21.

[25]    Claims by the Harrises that that their respective arrests and/or detentions violated their First Amendment rights to free speech are addressed infra at pp. 38-39.

residential areas or within 100 feet of any structure and prescribes a $25 fine and/or three days' imprisonment for a violation.  This may have been a minor offense, but it was an offense nonetheless.  It follows that the New Year's Eve arrest of Darious Harris and the arrest or detention of Robert Harris[26] were supported by probable cause.  Likewise, the Harrises' subsequent arrests on April 8 based on warrants stemming from the events of New Year's Eve were supported by probable cause.[27]  Consequently, neither has a viable Fourth Amendment claim for false arrest.

**First Amendment:  Retaliatory Arrest/Detention**

Each plaintiff asserts a claim for retaliatory arrest and/or detention in violation of their First Amendment right to

---

[26]    The complaint alleges that Robert was "arrest[ed] and detain[ed]" when he went to the police station on New Year's Eve to check on (pick up) Darious.  Robert was detained but not arrested.

[27]    Plaintiffs allege that the LPD "refused to provide copies of [the] warrants" at or around the time of the arrests, and complain that "LPD officers became ill-mannered and forceful" when Darious Harris went to the police station with a local activist to get paperwork regarding his arrest.  Of course, to be ill-mannered is not to violate the Constitution.  See Vasquez v. Hamtramck, 757 F.2d 771, 773 (6th Cir. 1985) (stating that "an individual does not suffer a constitutional deprivation every time he is subject to the petty harassment of a state agent.").  And plaintiffs acknowledge that they have been provided copies of the warrants and they do not dispute that there were outstanding warrants for the Harrises' arrests on charges relating to the New Year's Eve encounter with police officers.

freedom of speech.[28]  To establish a § 1983 First Amendment retaliation claim, plaintiffs must show that "(1) Defendants were acting under color of state law; (2) Plaintiffs' speech activities were protected under the First Amendment; and (3) Plaintiffs' exercise of their protected right was a substantial or motivating factor in Defendants' actions." Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997).  Criticism of police misconduct is clearly protected by the First Amendment.  Indeed, "official misconduct is of great First Amendment significance, and [the Fifth Circuit] has repeatedly emphasized the need to protect speech regarding police misconduct in particular[.]" Kinney v. Weaver, 367 F.3d 337, 369 (5th Cir. 2004).  In the context of retaliatory arrests, however, the Supreme Court has held that regardless of whether a plaintiff's speech that is alleged to have motivated an arrest was protected by the First Amendment, a claim for retaliatory arrest (or detention) cannot succeed where there is probable cause for an arrest (or reasonable suspicion for a stop). Nieves v. Bartlett, --- U.S.

---

[28]    Plaintiffs point out in their response that "[p]robable cause is irrelevant to the main thrust of Plaintiffs' First Amendment retaliation Claims," and then declare that "[e]ach Plaintiff asserting a First Amendment retaliation claim clearly alleged conduct other than an arrest."  That is not correct.  The complaint is littered with dozens of conclusory assertions that defendants harassed plaintiffs for exercising their First Amendment right to speak out against police misconduct, but the only form of "harassment" they actually describe is plaintiffs' arrests and/or detentions.

----, 139 S. Ct. 1715, 1725, 204 L. Ed. 2d 1 (2019)); Allen v. Cisneros, 815 F.3d 239, 245 (5ᵗʰ Cir. 2016) (no First Amendment retaliation claim where officer had reasonable suspicion for plaintiff's detention).  Thus, when analyzing a retaliatory arrest claim, courts typically look first to whether the plaintiff has demonstrated the absence of probable cause or reasonable suspicion since "[a]bsent such a showing, a retaliatory arrest claim fails." Nieves, 139 S. Ct., at 1725. To succeed on such claim, the plaintiff has the burden to plead and prove the absence of probable cause or reasonable suspicion. Id.  If the plaintiff establishes there was no probable cause/reasonable suspicion, and that his speech was protected, he must then show that that his speech was a substantial or motivating factor behind the arrest or stop.  Id.

**Eric Redmond**

Redmond alleges he was arrested on June 3, 2022 in retaliation for asking questions about the increase in the amount of his sister's bail, which violated his First Amendment right to freedom of speech.  The court has determined, supra at p. 22, that Redmond's Fourth Amendment false arrest claim survives the present motions as there are genuine issues of material fact as to whether there was probable cause for his arrest, or whether the officers involved (including then-Chief Dobbins) could reasonably have concluded there was probable

cause.  His First Amendment claim is due to be dismissed for another reason.

The First Amendment does not protect all speech, and therefore, an essential element of any First Amendment retaliation claim is that the plaintiff's speech was protected by the First Amendment.  In the context of public employment, it has long been established that an employee's speech is protected only if it is on a matter of public concern.  See Lukan v. N. Forest ISD, 183 F.3d 342, 346 (5th Cir. 1999) (elements of First Amendment retaliation claim in public employment context includes that "the plaintiff's speech involved a matter of public concern").  Plaintiffs' vague allegation that Redmond was arrested in retaliation for his questions regarding his sister's bail is not a matter of public concern.[29]  The issue of whether the public concern requirement applies outside the public employment context, in suits by ordinary individuals, however, is unsettled.  The court's research has uncovered no Supreme Court or Fifth Circuit case deciding the issue, and there is no consensus of authority among courts that have addressed the issue.  See Welch v. City of Hernando, MS, No. 3:20-cv-122-NBB-

---

[29]   The question whether a plaintiff's speech is protected under the First Amendment as addressing a matter of public concern is a question of law for the court to decide.  Buchanan v. Alexander, 919 F.3d 847, 853 (5th Cir. 2019) (citing Connick v. Myers, 461 U.S. 138, 148 n.7, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).

JMV, 2022 WL 989226, at *4 (N.D. Miss. Mar. 31, 2022) (holding
that First Amendment claim based on allegation that plaintiff
was arrested in retaliation for speech to arresting officer
about plaintiff's driver's license failed because plaintiff
"failed to establish that he was engaging in speech on a matter
of public concern – that is, protected conduct – as opposed to
mere private conduct."); Stone v. Damons, No. 1:05CV102, 2006 WL
3147725, at *4 (N.D. Miss. Nov. 2, 2006) (stating that public
concern standard "applies to the speech of public or government
employees, not to ordinary citizens,"); Williams v. Town of
Greenburgh, 05 Civ. 10564 (LMS), 2006 WL 8461745, at *10–11
(S.D.N.Y. Oct. 11, 2006) (applying public concern standard to
ordinary citizen's claim for retaliatory arrest and
prosecution).  The point is this:  It was not clearly
established at the time of the arrest that an ordinary (non-
public employee) citizen's speech was protected by the First
Amendment even if not on a matter of public concern.  And since
it would not have been objectively unreasonable for an officer
to conclude that Redmond's speech was not on a matter of public
concern and therefore was not protected by the First Amendment,
Shiers and Dobbins are entitled to qualified immunity for
Redmond's First Amendment retaliatory arrest claim.  Cf. Kinney
v. Weaver, 367 F.3d 337, 367 (5th Cir. 2004) (holding that
defendants did not have qualified immunity where there was "no

question that it was clearly established well before [the challenged actions] that [the plaintiffs'] speech was of public concern and thus was speech protected by the First Amendment").

### Peter Reeves

In December 2021, Reeves criticized defendant Epps' actions as an LPD officer in a Facebook post.  Reeves alleges that Epps retaliated against him for this protected speech by having him ticketed for no license or proof of insurance the first time Reeves passed through a roadblock in March 2022, and by arresting him the second time he was stopped at a roadblock.  Reeves has admitted he had no license or proof of insurance, and there was clear probable cause for his arrest. It follows that Reeves cannot succeed on this claim, which will be dismissed.

### Robert and Darious Harris:

The complaint alleges that "LPD officers violated Darious Harris' right to free speech under the First Amendment on New Year's Eve simply because the officers did not like the stance the brothers took against them"; that LPD officers "violated Robert Harris's right to free speech under the First Amendment for merely inquiring about his brother's arrest"; and that the Harrises' arrests on April 8 occurred "within 24 hours following [a community "Know Your Rights" meeting]" at which both brothers "spoke openly to the audience about their experience with LPD on

New Year's Eve."[30]   The Harrises' First Amendment claims fail because, as discussed supra at pp. 32-33, there was probable cause for their arrests.

**Malcolm Stewart**:

Stewart alleges that he faced retaliation after he attended the community Know Your Rights meeting on April 7 and voiced his concerns about the LPD.  He charges that his April 9 arrest for alleged outstanding fines was retaliatory; that he was retaliated against when he was stopped and ticketed on May 28 for an alleged seatbelt violation; and that his June 30 arrest was also retaliatory.  Stewart has no viable First Amendment claim.  The court has determined, supra at pp. 26-28, that there was probable cause, or the arresting officer could reasonably have concluded there was probable cause, for Stewart's arrests on April 9 and June 30.

Regarding the alleged retaliatory traffic stop, the complaint alleges that on May 28, 2022, defendant Scott "spotted [Stewart's] car at a service station and waited for Mr. Stewart to drive on to the road" and then pulled him over, allegedly for failing to wear his seatbelt.  "When Mr. Stewart pointed out to Defendant Scott that he could not have seen whether Mr. Stewart

---

[30]   The complaint alleges that both brothers spoke at the meeting.  Darious Harris has testified, however, that he left the meeting early and did not speak.

was wearing his seatbelt due to the tint on Mr. Stewart's window, Defendant Scott became agitated and wrote Mr. Stewart a ticket."  The complaint does not state a cognizable First Amendment claim based on this incident, first, because plaintiffs have not adequately alleged that Scott lacked reasonable suspicion for the stop, or could not reasonably have believed there was reasonable suspicion, and second, because there is nothing in the complaint to suggest a causal link between Stewart's being stopped and his protected speech at the Know Your Rights meeting.

Plaintiffs argue in their response that "Stewart was ... stopped and ticketed, without reasonable suspicion."  However, plaintiffs do not actually allege in the complaint that Scott lacked reasonable suspicion for the stop.[31]  Their sole allegation is that Stewart *commented* to Scott at the time of the stop that Scott could not have known whether Stewart was wearing a seatbelt because of car's window tint.  The fact of this

---

[31]    Plaintiffs argue in their brief that there was no reasonable suspicion for the stop but at the same time chastise defendants for being wrongly "fixated on the fact that not wearing a seatbelt and having windows of a certain tint are traffic violations"; they state that "the thrust of Stewart's claim is that he was *followed by LPD* in retaliation for previously voicing his concerns about LPD."  (Emphasis added). Since plaintiffs' position about this claim is unclear, the court assumes that plaintiffs were attempting to state a claim that the stop (rather than just the "following") was unlawful.

comment alone does not tend to show that Scott lacked reasonable suspicion, or that he could not reasonably have concluded there was reasonable suspicion for the stop.  Stewart does not allege that he was wearing a seatbelt or that the window tint necessarily would have prevented Scott from seeing whether Stewart was wearing a seatbelt.  And even if the latter were true, Scott still would have had reasonable suspicion, or arguable reasonable suspicion to make the stop based on a window tint violation.  See United States v. Thomas, No. 5:20-cr-10-DCB-FKB, 2021 WL 5173618, at *2 (S.D. Miss. Nov. 5, 2021) ("An officer's reasonable suspicion that there is a traffic violation – including a failure to wear seatbelts - is an appropriate basis for stopping a vehicle."); Walker v. State, 962 So. 2d 39, 42 (Miss. Ct. App. 2006) (stating that "[p]robable cause for a traffic stop may arise from an officer's reasonable belief that windows of the vehicle are excessively tinted in violation of law.") (citation omitted); Miss. Code Ann. § 63-2-1 ("When a passenger motor vehicle is operated in forward motion on a public road, street or highway within this state, every operator and every passenger shall wear a properly fastened safety seat belt system ...."); Miss. Code Ann. § 63-7-59 (proscribing certain window tinting).[32]

---

[32]   The complaint describes a September 2019 incident in which Henderson approached Stewart as he was sitting in his car in the

The complaint also fails to adequately allege causation. It states that "Mr. Stewart faced retaliation" by being stopped and ticketed by Scott, but that charge is wholly conclusory. There is no "close timing" between the traffic stop and Stewart's participation in the Know Your Rights meeting some two months earlier from which a retaliatory motive could arguably be inferred.  Cf. Benfield v. Magee, 945 F.3d 333, 337 (5th Cir. 2019) (holding in employment context that close timing between

---

parking lot of a store after hours, ordered him to leave, and threatened Stewart's life when he refused to leave, telling him that if did not leave, Stewart's family "was going to [be] wear[ing] a black [dress or suit] come Sunday."  If Stewart is making a claim that this encounter constituted a seizure that violated his Fourth Amendment rights, his claim fails.  "[A] seizure occurs for Fourth Amendment purposes, 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [he was] not free to leave.'"  McLin v. Ard, 866 F.3d 682, 691 (5th Cir. 2017) (quoting Michigan v. Chesternut, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)).  Stewart was not arrested or detained, and based on his allegations, he knew he was free to leave.  In fact, Henderson ordered him to leave.

The complaint also alleges that on this occasion, as on others, "Officer Henderson was targeting and harassing Mr. Stewart in retaliation for Mr. Stewart voicing his concerns about LPD."  Not only is there nothing in the complaint to suggest when or to whom Stewart had previously voiced concerns or what those concerns may have been, he does not allege that Henderson was aware that he had voiced any concerns.  Thus, to the extent plaintiffs may argue this was retaliatory harassment in violation of Stewart's First Amendment rights, the complaint does not state a cognizable claim for relief.  It is notable, moreover, that this allegation is contrary to the overarching theme of plaintiffs' complaint, which is that the harassment and endless constitutional violations began when Dobbins was appointed police chief in July 2021.

protected activity and challenged adverse action may provide
causal connection required to make out a prima facie retaliation
case).  And the single fact alleged, that "friends of LPD
officers attended the meeting," is obviously insufficient to
demonstrate causation.  There are no facts alleged from which it
could reasonably be inferred that Scott – as opposed to some
unidentified friends of some unidentified LPD officers - knew
that Stewart had attended or spoken at the meeting.  For this
additional reason, the court concludes that Stewart has failed
to state a viable First Amendment claim.  See Dearman v. Stone
Cnty. School Dist., 832 F.3d 577, 581 (5th Cir. 2016 (quoting
Tharling v. City of Port Lavaca, 329 F.3d 422, 428 (5th Cir.
2003)) ("'It is axiomatic that a party cannot be "substantially
motivated" by a circumstance of which that party is
unaware.'").[33]

### Fourth Amendment/Fourteenth Amendment – Excessive Force

Four of the five plaintiffs – all but Reeves -- assert
claims for excessive force in violation of the Fourth Amendment.
Two – Darious Harris and Malcolm Stewart -- also purport to
assert excessive force claims under the Fourteenth Amendment,

---

[33]    For the same reason, Stewart's further allegation that on
another occasion, Scott "tailed Stewart as he was driving,"
followed Stewart into a gas station and "only left Mr. Stewart
alone after he mentioned his lawyer," fails to state a viable
claim for First Amendment retaliation.

both for alleged excessive force occurring immediately upon
their arrival at the police station following their arrests.[34]
Claims for excessive force "in the course of an arrest" are
analyzed under the Fourth Amendment, Tyson v. Sabine, 42 F.4th
508, 515 (5th Cir. 2022), whereas the substantive due process
component of the Fourteenth Amendment applies to excessive force
alleged to have occurred after all incidents of arrest are
complete, Valencia v. Wiggins, 981 F.2d 1440, 1449 (5th Cir.
1993); see also Kingsley v. Hendrickson, 576 U.S. 389, 397-398,
135 S. Ct. 2466, 2473-75, 192 L. Ed. 2d. 416 (2015) (Due Process
clause protects pretrial detainees from use of excessive force
that amounts to punishment).  As these alleged incidents are
based on alleged events prior to booking, they are covered by
the Fourth, rather than Fourteenth Amendment.  See McFarland v.
Lee Co. Adult Detention Ctr., No. 1:20CV64-GHD-RP, 2023 WL
2576398, at *3 (N.D. Miss. Mar. 20, 2023) (citing Brothers v.
Klevenhagen, 28 F.3d 452, 457 (5th Cir. 1994), and Gutierrez v.
City of San Antonio, 139 F.3d 441, 452 (5th Cir.
1998))(excessive force claim based on events occurring before
plaintiff had been booked into jail not cognizable under the
Fourteenth Amendment, "as the plaintiff was not a pretrial
detainee.").  Ultimately, however, it makes no difference

---

[34]    For Darious Harris, the booking process never began, as he
was released from custody once the taser prongs were removed.

whether these claims are analyzed under the Fourth or Fourteenth Amendment because the standard governing both is the same: Objective reasonableness.  See Zavala v. Harmon, No. H-19-03341, 2022 WL 17220034, at *4 (S.D. Tex. Oct. 19, 2022) (citing Patel v. Lanier Cnty, Ga., 969 F.3d 1173, 1182 (11th Cir. 2020)) ("[a]fter Kingsley, the Fourteenth Amendment's standard is analogous to the Fourth Amendment's"); Jacobs v. Cumberland Cnty, 8 F.4th 187, 194 (3d Cir. 2021) (explaining that the Supreme Court in Kingsley "thus clarified that the Fourteenth Amendment, like the Fourth, exclusively employs an objective-reasonableness standard"); Hopper v. Phil Plummer, 887 F.3d 744, 752 (6th Cir. 2018) (explaining that "[w]hen assessing excessive-force claims under the Fourth or Fourteenth Amendments, for example, we inquire whether the plaintiff has shown 'that the force purposely or knowingly used against him was objectively unreasonable'" (quoting Kingsley, 135 S. Ct. at 2472-73))).

To prevail on a Fourth Amendment excessive force claim, a plaintiff must establish three elements: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." Buchanan v. Gulfport Police Dep't, 530 F. App'x 307, 312 (5th Cir. 2013) (quoting Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996)).  "'Excessive force

claims are … necessarily fact-intensive'" and 'depend[] on the facts and circumstances of each particular case.'"  Poole, 691 F.3d at 628 (quoting Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam)).  The Fifth Circuit has stressed:

> [T]his analysis must be objective:  To make out a Fourth Amendment violation, let alone one that violates clearly established law, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham [v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)]. We must evaluate an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396, 109 S. Ct. 1865.  Any "evil intentions" motivating an officer's objectively reasonable use of force "will not make a Fourth Amendment violation." Id. at 397, 109 S. Ct. 1865.

Id.  "Additionally, we must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  Mason v. Lafayette City-Parish Consol. Gov't, 806 F.3d 268, 276 (5th Cir. 2015) (quoting Graham, 490 U.S. at 397, 109 S. Ct. 1865).

The test for reasonableness for the use of force is "not capable of precise definition or mechanical application."  Id. at 627-28 (quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865). In the context of excessive force in effecting an arrest, the

Supreme Court has identified the following considerations to take into account: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865).

A claim for excessive force is actionable only if the plaintiff demonstrates an injury resulting directly and only from the application of force. Although the plaintiff is not required to show a "significant injury," he is required to show that he has suffered "'at least some form of injury.' The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed." Lincoln, 874 F.3d at 846 (quoting Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001)). "[C]ertain injuries are so slight that they will never satisfy the injury element," such as handcuffing too tightly. Id. (quoting Flores v. City of Palacios, 381 F.3d 391, 397–98 (5th Cir. 2004) (citing Glenn, 242 F.3d at 314). Bruises and scratches, without more, are regularly held to be de minimis and insufficient to demonstrate that the defendant used excessive force. See id.; McFarland, 2023 WL 2576398, at *4. However, while "a de minimis injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is directly related to the amount of force

47

that is constitutionally permissible under the circumstances."
<u>Alexander v. City of Round Rock</u>, 854 F.3d 298, 309 (5th Cir.
2017).  Thus, "[a]ny force found to be objectively unreasonable
necessarily exceeds the de minimis threshold, and, conversely,
objectively reasonable force will result in de minimis injuries
only."  <u>Id.</u> (citation and quotation marks omitted).  "[A]s long
as a plaintiff has suffered 'some injury,' even relatively
insignificant injuries and purely psychological injuries will
prove cognizable when resulting from an officer's unreasonably
excessive force."  <u>Id.</u> (quoting <u>Ikerd v. Blair</u>, 101 F.3d 430,
434-35 (5th Cir. 1996)).

### **Eric Redmond**

Based on his allegation that Shiers pulled out his taser
and threatened to "blast his a**," Redmond charges that "the
force used to arrest [him] was not proportionate to any threat
or resistance he displayed."  Defendants argue for dismissal of
this claim on the basis that "'mere threatening language and
gestures of a custodial officer do not, even if true, amount to
a constitutional violation.'"  <u>Bender v. Brumley</u>, 1 F.3d 271,
274 n.4 (5th Cir. 1993) (quoting <u>McFadden v. Lucas</u>, 713 F.2d 143,
146 (5th Cir.), <u>cert. denied</u>, 464 U.S. 998, 104 S. Ct. 499, 78
L. Ed. 2d 691 (1983)).  Plaintiffs argue in response that the
officers are not entitled to qualified immunity as "it was
clearly established at the time of the interaction that

48

immediately brandishing a taser and threatening a person for passive noncompliance violates the Fourth Amendment."

Plaintiffs have not cited any case holding that merely threatening an individual with a non-lethal taser violates the Fourth Amendment.[35] There is no Supreme Court or Fifth Circuit case so holding, and it appears that the general consensus, to the extent there is one, is to the contrary. See, e.g., Anderson v. Arnold, 710 Fed. Appx. 343, 344 (10th Cir. 2018) (affirming 12(b)(6) dismissal of excessive force claim where officer responding to traffic accident brandished her taser when driver reached in his pocket for his wallet, because, although

---

[35] None of the cases cited by plaintiff supports this proposition. See Hanks v. Rogers, 853 F.3d 738, 747 (5th Cir. 2017) (denying qualified immunity to officer who "administered a blow to [motorist's] upper back or neck" following stop for minor traffic offense, finding that "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation."); Johnson v. Bay Area Rapid Transit Dist., 724 F.3d 1159, 1176 and n.6 (9th Cir. 2013) (considering, in connection with claim for false arrest, whether fact that officer pulled taser on plaintiffs effectively placed them under arrest, but noting that district court had granted officer qualified immunity from excessive force claim related to his display of taser); Newman v. Guedry, 703 F.3d 757, 760 (5th Cir. 2012) (holding that officers' use of force against passenger that included shoving and pushing him, striking him multiple times with a baton on the arm and right thigh, tasing him three times, and dragging him to the sidewalk, all without having given the passenger any commands with which he failed to comply, was objectively unreasonable under clearly established law).

the officer "brandished a taser, she did not tase Anderson" and the alleged facts did not indicate that he suffered an "'actual injury that is not de mininis, be it physical or emotional"); Laird v. Elliott, No. 3:19-cv-00716-SMY, 2020 WL 6047336, at *4 (S.D. Ill. Oct. 13, 2020) (holding that allegation that officers violated Constitution by brandishing tasers during the arrest without any reasonable cause or provocation failed to state a claim); Dunbar v. Avigdor, No. 3:16-cv-01823 (MPS), 2020 WL 647432, at *6 (D. Conn. Feb. 11, 2020) (concluding that "[a]t the very least, reasonable officers could disagree about whether Officer Runlett's pointing his taser" at tenant when assisting landlord in gaining access to apartment for inspection violated the Fourth Amendment).[36]  The court thus concludes that Shiers is entitled to qualified immunity.  Dobbins likewise has qualified immunity as to any putative claim against him by Redmond for failing to intervene.

---

[36]    In a case currently on appeal to the Fifth Circuit, the district court, noting "there is a robust consensus that pointing a gun at compliant children is objectively unreasonable," denied qualified immunity to an officer who threatened a minor child with a taser after the child failed to stop filming officers' arrest of his mother. Perkins v. Hart, No. 21-879, 2022 WL 2952992, at *11 (E.D. La. July 26, 2022). The officer pushed the minor child in the chest, telling him to back away and then pointed his taser at the child and took several steps toward the child while pointing the taser in the child's direction and threatened to tase the child. Id. at *1. The child suffered uncontested severe emotional distress as a result of the incident. Id. at *11.

### **Darious Harris**

Darious Harris's excessive force claims relate to the New Year's Eve tasing incident, described <u>supra</u> at pp. 29-33.  He alleges that being tased, suddenly and without warning, while standing on private property, unarmed, and posing no threat to officers while merely "verbally resisting the officers' threats," is excessive force, in violation of the Fourth Amendment.  He also alleges that Dobbins' delay in summoning EMTs to remove the taser prongs and then directing them to remove the prongs without the proper tools constitutes excessive force.

The parties have adduced two video recordings of the tasing incident, one from Epps' bodycam video and the other, produced by plaintiffs, a cell phone video recorded by someone at the Harris home at the time of the incident.  The videos, taken together, show Dobbins standing on or near the edge of the driveway with two officers standing in the road several feet behind him, to his left, and the Harris brothers, agitated and angry, standing in the driveway, yelling at Dobbins, with a group of people in the yard behind them, some of them also yelling.  Darious is shown repeatedly walking toward Dobbins and standing in front of him, screaming at him, and being repeatedly

pulled or pushed back, mostly by Robert, with Robert repeatedly telling Darious to go inside or to get back in the yard. Darious, apparently angry that the officers have come to Robert's house to complain about them shooting fireworks when other people are shooting fireworks, yells to Dobbins, among other things, "This is bulls****.  F*** ya'll.  F*** you mother***** …  You come to my motherf****** house, I'd have done shot your ass up out of there. …  Every time you come back here, I'm gonna shoot you're a** off."  Dobbins is heard telling him, "Don't say that.  Don't say that."  A couple of minutes into the video, Dobbins is shown turning back toward one of the officers and asking, "Who is this guy right here?  Do you know who he is?"  At that point, Darious starts in Dobbins' direction again, and an officer, apparently having pulled out his taser, is heard repeatedly yelling at Darious to "Move back".  Darious keeps moving toward Dobbins, with Robert steadily pushing him back. At the second the taser is deployed, Darious is clearly advancing toward Dobbins.

Citing Graham, 490 U.S. at 396, 109 S. Ct. 1865, plaintiffs maintain that the tasing constituted excessive force because the offense Darious Harris was suspected of committing – shooting fireworks – was minor; he was not resisting arrest or fleeing to avoid arrest; and he was unarmed and did not pose any risk to the safety of the officers or others.  The court, however,

concludes that plaintiff's arguments are misplaced.  Further, considering that an officer's use of force is evaluated from the perspective of a reasonable officer on the scene, with allowance made for the fact that officers are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," Graham, 490 U.S. at 397, 109 S. Ct. at 1872, the court concludes that a reasonable officer in Epps' position could have reasonably concluded that tasing Darious Harris was an appropriate use of force under the circumstances.

Darious Harris was not tased for merely shooting fireworks, as plaintiffs suggest.  Rather, at the time the officer deployed the taser, Darious had verbally threatened Dobbins with bodily harm and was physically advancing toward him, despite having been ordered repeatedly to "Move back."  It was these actions that precipitated the use of force and the ensuing arrest. After initially denying in his TRO testimony that the officers ever told him to back away, even though he "was standing right in [Dobbins] face," Darious Harris amended his position, claiming that if the officers told him to back away, he "didn't hear them" because they were standing in the road, and because "[p]eople [behind him] was screaming in [his] ear" and he "couldn't hear nothing but my brother and me screaming." Assuming that is true, and that Harris did not hear the

officer's command, it is nevertheless clear that from the officer's perspective, he repeatedly (and loudly) ordered Darious Harris to "move back" and he continued to advance toward Dobbins.

Plaintiffs argue that Darious Harris did not actually threaten to harm Dobbins and that what he actually said was more of a hypothetical, i.e., that he only said he would "shoot Dobbins' a** off" if Dobbins were to come around Darious's own home. And they point out that Dobbins himself acknowledged to Darious once they were back at the police station that he knew Darious was not going to harm him. But an officer, in the moment of decision, with people yelling and threatening a fellow officer and then advancing, cannot reasonably be expected to take the time to parse the threat and decide exactly what the potential assailant meant or intended. Further, even assuming Dobbins did not believe Darious Harris posed a threat to him, the question is whether an officer in Epps' position could reasonably have concluded that Dobbins' safety was at risk from Harris. In the court's opinion, the answer is yes. Accordingly, the court concludes that Epps is entitled to qualified immunity for the tasing.[37]

---

[37]    Plaintiffs have not alleged that Dobbins is liable for the tasing of Darious Harris. Had they done so, the court would conclude that Dobbins also had qualified immunity. Even if

Plaintiffs allege that after Darious Harris arrived at the police station following the tasing incident, Dobbins delayed summoning medical personnel to remove the taser prongs and then, after the EMTs arrived and discovered they did not have with them the tool they typically used to remove taser prongs, Dobbins directed them to remove the prongs without the tool, i.e., to just yank them out.  Assuming arguendo that the delay in contacting EMTs to remove the taser prongs is properly considered a use of force, it was not excessive force. Plaintiffs do not state how much time passed from when Darious Harris arrived at the station to the time Dobbins contacted the EMTs; they state only that it was an hour or so before the taser prongs were removed.  As for the allegations regarding removal of the prongs, the fact is, Dobbins did not remove the prongs; the EMTs did this.  Dobbins may have told them to remove the prongs without their prong-removal too, but the EMTs made the decision to proceed in this manner, not Dobbins, who had no authority over them.  As Dobbins committed no act of excessive force in violation of Darious Harris's constitutional rights.

**Robert Harris**

---

Dobbins may not have believed that Darious was a threat to his safety, the test for qualified immunity is objective, not subjective.

Robert Harris's excessive force claim is based on his allegation that on New Year's Eve, when he went to check on his brother at the police station, Dobbins twisted Robert's arm behind his back and walked Robert into his office, where he threatened Robert's life, telling him there would be a "killing" if they kept "bumping heads."  Robert alleges that he was "[s]cared for his life."  Plaintiffs argue that any amount of force was excessive, as Robert had committed no offense and posed no threat to Dobbins' or any officer's safety as he was merely there to inquire about his brother.  In fact, however, while Dobbins did not arrest Robert at that time but only briefly detained him, he could have reasonably concluded that it was appropriate to do so, as Robert had just finished threatening Dobbins with bodily harm during the encounter between the two men at Robert's home, telling Dobbins that if it were not for Robert's children being present, he would have done Dobbins harm.  Given that threat, an officer in Dobbins' position could reasonably have concluded some minimal amount of force was appropriate.  Moreover, Robert does not allege that he sustained any injury, or more than a de minimis injury, as a result of having his arm twisted.  The court acknowledges plaintiffs' argument that emotional harm may be sufficient to satisfy the injury required to state a claim for excessive force.  The complaint, however, does not allege that Robert

suffered any harm, emotional or otherwise.  The complaint does allege that Robert was "scared for his life."  Presumably, that allegation relates to Dobbins' alleged threat about a "killing" rather than to the arm-twisting.  In either case, the mere allegation that he was "scared," without more, does not sufficiently allege an actionable injury.

### **Malcolm Stewart**

Stewart's excessive force claim relates to his June 30, 2022 arrest.  Stewart alleges that as he was sitting inside his parked vehicle in front of his sister's house, "Defendant Shiers approached the vehicle, reached in, and yanked [Stewart's] shirt collar, pulling him towards him through the window."  Shiers arrested him on various charges,[38] and transported him to the police station, where "[b]ystanders recorded audio inside the station of Mr. Stewart screaming in pain as a result of the excessive force being used against him."  In his TRO hearing testimony, Stewart testified that Shiers walked up to the car and told Stewart to move the car out of the road.  When Stewart responded that he was parked in his niece's driveway,

> [Shiers] reached in my vehicle and caught me in my collar, and I shoved his hand off of it.  Then he pulled his taser out and told me to get out of the vehicle.  And I stepped out.  He put handcuffs on me.  While he had the handcuffs behind my back, he kept shoving me to my vehicle -- well, the vehicle I was driving.

---

[38]    See supra p. 27.

In their response to the motions, plaintiffs argue that Shiers used excessive force "when he trained his taser on Stewart while he had his hands up, pulled Stewart out of his car, and, after he had placed Stewart in handcuffs, pushed him against the car," all for the alleged minor offense of impeding traffic.

Stewart's version is contradicted by Shiers' bodycam video. The video shows that Shiers did not reach into the car and yank or pull Stewart's shirt collar and pull him toward the window. At one point, Shiers did grab Stewart's arm and push it away, but he did so only after Stewart pushed Shiers' hand away when Shiers reached in to unlock the door after Stewart failed to exit the vehicle despite being repeatedly directed to step out. And, Shiers did pull out his taser and threaten to use it, but again, he did so only after Stewart failed to step out of the car after being twice directed to do so.  Shiers also pushed or shoved Stewart against the vehicle while handcuffing him, but he did so because Stewart repeatedly tried to turn around and face Shiers as Shiers was attempting to place the handcuffs on him. Cf. Poole, 691 F.3d at 629 (use of a Taser objectively reasonable when a suspect ignored repeated commands to turn around and give up his right arm to be handcuffed).

It is manifest from the video that the force used by Shiers was not excessive and was instead reasonable under the

circumstances.  It is true that impeding traffic is a minor offense.  However, Stewart also had no driver's license; he failed to move the vehicle from the roadway after being directed to do so[39]; there were indications he had been drinking; and despite plaintiffs' assertions that he was fully compliant with Shiers' directives, he did not exit the vehicle despite repeated commands to do so; and he resisted Shiers' efforts to handcuff him.  This claim will be dismissed.

### Fourteenth Amendment – Equal Protection

Plaintiffs broadly charge throughout the complaint that "the actions of Defendants in targeting, threatening, coercing, harassing, and assaulting Lexington's Black citizens" because of their race and in retaliation for exercising their First Amendment rights, violated their equal protection rights.  In Count One of the complaint, they allege, more particularly, that defendants have violated their equal protection rights in the following ways:  (1) "Defendants target Black residents for municipal code enforcement"; (2) "Black residents are singled out for arrests without probable cause and retaliation"; and (3) "Defendants have erected roadblocks to conduct illegal searches and seizures exclusively in predominantly Black neighborhoods"

---

[39]    Stewart claims he was parked in his niece's driveway, but it is clear from the video that Stewart was stopped in the roadway.  See supra p. 27.

and "permit[] White drivers to pass through roadblocks without being stopped or investigated."

### Selective Enforcement

The first basis, (1), alleges selective enforcement of municipal ordinances.[40]  "The equal protection clause essentially requires that all persons similarly situated be treated alike." Glass v. Paxton, 900 F.3d 233, 244 (5th Cir. 2018) (quoting Mahone v. Addicks Util. Dist.of Harris Cnty., 836 F.2d 921, 932 (5th Cir. 1988)).  "'Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination.  To address this problem, courts have developed the doctrine of selective enforcement.'" Rowe v. City of Elyria, 38 Fed. Appx. 277, 281 (6th Cir. 2002) (unpublished opinion) (quoting Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000)).  See Southbelt Wrecker Service Inc. v. City of League City, Tex., No. Civ. A. H-05-3011, 2005 WL 3132183, at *2 (S.D. Tex. Nov. 22, 2005) (quoting Rowe); see also Cooper v. Sedgwick Cnty., Kansas, 206 F. Supp. 2d 1126, 1144 (D. Kan. 2002) (recognizing that "while law enforcement discretion is broad, a violation of the Equal Protection Clause arises if the

---

[40]    As all plaintiffs allege that the City's roadblock policy violates several of their constitutional rights, that allegation is addressed separately, infra at p. 65.

enforcement of facially valid laws is done in an uneven manner.").

   To state a claim of selective enforcement, a plaintiff must allege that "(1) [he] has been singled out for the enforcement ... of ... laws while others who are similarly situated have not been subjected to such enforcement and (2) the selection has been invidious or in bad faith and based on intentional discrimination stemming from impermissible considerations…." Cooper v. Sedgwick Cnty., 206 F. Supp. 2d 1126, 1144 (D. Kan. 2002) (citation omitted).  See Bryan v. City of Madison, Miss., 213 F.3d 267, 276 (5th Cir. 2000) (citation omitted) (holding that claim of selective enforcement in violation of equal protection clause requires proof that similarly situated individuals were treated differently and that "the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.").

   Although all plaintiffs purport to assert a claim for equal protection based on racially discriminatory municipal code enforcement, the only factual allegation offered in support of this claim relates to Robert Harris, and states:

> Robert Harris has been subject to disparate
> enforcement of municipal laws.  LPD officers ticketed
> cars parked in Robert Harris's yard following the New
> Year's Eve incident and in the yards of other Black
> Lexington citizens, giving them 24 hours to move them

> or else get towed.  Some residents lost vehicles for
> weeks.  In contrast, Defendant Dobbins reprimanded an
> officer when that officer ticketed cars at the homes
> of White Lexington citizens.

There is no allegation that any other plaintiff has been

subjected to disparate enforcement of municipal laws.  As to

Robert Harris, the complaint does not state a cognizable claim

equal protection claim.

First, the complaint does not allege that cars at Harris's

home were ticketed while cars at white homes were not ticketed.

On the contrary, the complaint clearly states that cars at white

homes were ticketed.  Even if Dobbins reprimanded the officer

for ticketing the cars at white homes, the fact remains, there

was no difference in treatment and consequently, no claim for

relief stated.

Moreover, even if the complaint did allege a difference in

treatment, it fails to allege facts sufficient to show a

difference in treatment of black residents and white residents

in the same or similar circumstances.  In cases involving the

application of an ordinance, "the plaintiff's and comparators'

relationships with the ordinance at issue will generally be a

relevant characteristic for purposes of the similarly-situated

analysis."  Lindquist v. City of Pasadena Texas, 669 F.3d 225,

234 (5th Cir. 2012).  The complaint contains no facts describing

the circumstances in which cars were ticketed and to show how

the ticketing related to any code violation.  In short, there is nothing to show that the alleged ticketing of cars at the homes of white citizens occurred under the same or similar circumstances as the ticketing of cars in Robert Harris's yard. See Rountree v. Dyson, 892 F.3d 681, 685 (5th Cir. 2018) (holding that a plaintiff "did not sufficiently allege that he ha[d] been treated differently from others similarly situated" when "[h]is complaint generally allege[d] that other similarly situated individuals were treated differently, but he point[ed] to no specific person or persons and provide[d] no specifics as to their violations").  This claim will be dismissed.

### Retaliatory Arrests/Arrests Without Probable Cause

Plaintiffs' equal protection claim relating to their false/retaliatory arrests fails to state a cognizable claim.  To be clear, plaintiffs do not allege that the LPD arrests black citizens they reasonably believe to have committed criminal offenses but do not arrest white citizens who are reasonably believed to have committed criminal offenses.  Rather, what they allege is that the LPD arrests black citizens without probable cause but do not arrest white citizens without probable cause. Of all the claims asserted by all the plaintiffs for false and/or retaliatory arrests, only one plaintiff, Eric Redmond, has alleged sufficient facts and/or adduced sufficient proof to withstand dismissal of one claim, his claim for false arrest.

None of the other plaintiffs can state a viable claim that their arrests without probable cause violated their equal protection rights because none of them has adequately alleged or demonstrated that his arrest was retaliatory or lacking in probable cause.

The court has concluded, supra at pp. 21-22, there is a genuine issue of material fact as to whether there was probable cause for Redmond's arrest. It does not follow that Redmond has stated a claim that his arrest violated his right to equal protection. The complaint does not identify a single white person who was not arrested under the same or similar circumstances. Redmond has not otherwise alleged a factual basis for the charge that his arrest was racially motivated. Plaintiffs argue that they have identified in the complaint multiple instances of the LPD targeting black citizens for arrests without probable cause. Most of those instances are the claims of Redmond's co-plaintiffs that they were the victims of retaliatory/false arrests. Even if those allegations, if adequate, would tend to support Redmond's claim, they avail him nothing, as the court has found that the claims are due to be dismissed. The only other nonconclusory allegations in the complaint concerning arrests of black citizens without probable cause are the alleged arrest of a young black man inside a convenience store for a traffic violation; the arrest of another

black man inside a convenience store upon an allegation there
were warrants for his arrest for a traffic violation; and the
arrest of a woman "absent probable cause."  As to the first two
of these arrests, plaintiffs do not even allege that probable
cause was lacking, and the last one is entirely conclusory.
Redmond's claim for violation of his equal protection rights
will be dismissed for failure to state a claim for relief.

### ROADBLOCKS

Plaintiffs allege that the "LPD has a policy of stopping
and searching hundreds of drivers a year through the use of
roadblocks."  They allege that during Dobbins' tenure as police
chief, LPD conducted roadblocks "multiple times per day," and
that this roadblock policy/practice has continued under Chief
Henderson, though with admittedly less frequency, i.e., multiple
times per week.  According to the complaint, the roadblocks are
set up exclusively in Black neighborhoods and near events known
to be attended by large groups of Black citizens, including, for
example, church events, birthday parties and sporting events at
the predominately-Black Holmes County Central High School (but
not during activities of the predominately-White Central Holmes
Christian Academy).  Plaintiffs contend there is no
constitutionally-permissible reason for the roadblocks, which
result in stops of motorists without reasonable suspicion, in
violation of their Fourth Amendment right to be free from

unreasonable seizure.  They further allege that the manner in which they are set up (in or near predominately black areas and events) and the way they run (stopping black motorists but not white motorists) is racially discriminatory, in violation of their equal protection rights.  They also allege that the roadblocks interfere with their right to travel, guaranteed them by the Privileges and Immunities clause of the Fourteenth Amendment.  For these alleged violations, plaintiffs seek compensatory and punitive damages and an order enjoining defendants from, among other things, "interfering with Black Lexington citizens' constitutional right to travel freely, … their Fourth Amendment rights to be free of unreasonable search and seizure, … and their right to equal protection under the Fourteenth Amendment."  Defendants are correct to the extent that only Reeves has standing to assert a claim for damages relating to having been stopped at a roadblock.

An issue is presented as to standing.  As "'an essential and unchanging part of the case-or-controversy requirement of Article III,'" a litigant must have standing to invoke the authority of a federal court.  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  To have standing, a plaintiff must "(1) have suffered an injury-in-fact; (2)

establish a causal connection between the injury-in-fact and a complained-against defendant's conduct; and (3) show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact." _Funeral Consumers All., Inc. v. Serv. Corp. Int'l_, 695 F.3d 330, 342 (5th Cir. 2012). To seek injunctive relief, he must also "'demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.'" _Id._ (quoting _James v. City of Dallas_, 254 F.3d 551, 563 (5th Cir. 2001)).

Despite the alleged prevalence of roadblocks in Lexington, only one plaintiff, Peter Reeves, is alleged to have been stopped at a roadblock. Defendants assert that since only Reeves has been stopped, then Reeves is the only plaintiff with standing to assert a claim for relief stemming from the roadblocks. They argue, however, that because Reeves paid the tickets he received when he was stopped at the roadblocks in March 2022, he is barred by _Heck v. Humphrey_, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), from pursuing a claim for damages on account of those stops. Reeves' roadblock claim is not barred by _Heck_. Under _Heck_, the court must dismiss a complaint brought under § 1983 when the action, if successful, would necessarily imply the invalidity of the plaintiff's conviction or sentence, unless plaintiff demonstrates that the conviction or sentence has been reversed on direct appeal,

expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus under 28 U.S.C. § 2254.  Id. at 486-87, 114 S. Ct. 2364. Defendants argue that Reeves' payment of the traffic tickets is tantamount to a conviction, and that his claim for damages is barred.

Even if defendants were correct that the payment of traffic tickets operates as a conviction for Heck purposes, it is nevertheless clear that success by Reeves on his claim that the stops violated his constitutional rights would have no bearing on the validity of his purported conviction.  In each instance, the stop itself, and not the events that followed, is the alleged basis for liability.  See Marchand v. Hartman, 395 F. Supp. 3d 202, 217 (D. Conn. 2019) ("the legality of the initial stop has no bearing on whether the subsequent arrest violated [his] constitutional rights.").  Accordingly, Reeves has standing to seek damages for the alleged unlawful stop.

In the court's opinion, Reeves also has standing to seek injunctive relief.[41]  Geographically, Lexington is a small town.

---

[41]    In their memoranda on the present motions, the municipal defendants state that "the issue of Plaintiffs' standing for the claims they bring and relief they seek was fully discussed in Municipal Defendants' oppositional response to the preliminary injunction motion."  While that earlier memorandum does include

Assuming that the LPD continues to set up roadblocks with the same frequency alleged in the complaint, it is likely Reeves will encounter another roadblock in the near further.  In so finding, the court is aware that as of the time of filing the complaint, Reeves had only been stopped twice at roadblocks.  However, he testified at the TRO hearing that he has been able to affirmatively avoid roadblocks by checking texts and social media posts by citizens who report where roadblocks are located at any given time.  In fact, Reeves testified that on one of the occasions he was stopped in March 2022, he had failed to check his texts, which would have alerted him to the roadblock.  His encounters with roadblocks would likely have been more frequent if not for his efforts to avoid them; the same would be true going forward.  Therefore, the court concludes that Reeves has standing and may pursue his challenge to the City's roadblock policy/program.

Plaintiffs deny that Reeves is the only one with standing, and argue that the remaining plaintiffs also have standing, as the complaint alleges that all plaintiffs have been stopped at roadblocks.  The complaint separately sets out "Factual Allegations" with headings followed by allegations specific to

---

extensive argument relating to plaintiffs' standing to seek injunctive relief, it does not address the specific issue of standing to seek an order enjoining the roadblocks.

each plaintiff that describe each plaintiff's encounters with defendants.  There is no factual allegation as to any plaintiff other than Reeves relating to a stop at a roadblock.  A couple of paragraphs elsewhere in the complaint do recite that "Plaintiffs and other Black Lexington citizens" have been subjected to searches and seizures at roadblocks.  But these generic references to a collective "Plaintiffs" cannot reasonably be read as alleging that any specific plaintiff experienced a roadblock stop.[42]  The court concludes, therefore, that while Reeves has standing to pursue the roadblock claims, his co-plaintiffs do not.[43]

### Roadblocks:  Fourth Amendment

"[A] vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment."  City of Indianapolis v. Edmond, 531 U.S. 32, 40, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000).  "'While suspicionless seizures are ordinarily unreasonable, and thus Fourth Amendment violations, certain

---

[42]    This is particularly so, given that plaintiffs' counsel obviously knew when filing this amended complaint that Malcolm Stewart had testified, under oath, at the TRO hearing that he had never been stopped at a roadblock in the City of Lexington. Darious Harris also testified that he had learned to "dodge" the roadblocks and had only ridden through one as a passenger.

[43]    Of course, if Reeves were to obtain injunctive relief, that relief would benefit all the plaintiffs.

types of automobile checkpoint stops have been excepted from this general rule.'" United States v. Burgos-Coronado, 970 F.3d 613, 618 (5th Cir. 2020) (quoting United States v. Green, 293 F.3d 855, 858 (5th Cir. 2002)).  For example, the following have been held to be permissible:  See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450, 455, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990) (sobriety checkpoints aimed at removing drunk drivers from the road); United States v. Martinez-Fuerte, 428 U.S. 543, 555, 566–67, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976) (brief, suspicionless seizures at fixed Border Patrol checkpoints to inquire about citizenship); Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979) ("[q]uestioning of all oncoming traffic at roadblock-type stops" to verify driver's licenses and registrations); United States v. Abbott, 265 Fed. Appx. 307, 309, 2008 WL 397635, at *1 (5th Cir. 2008) (properly tailored roadblock "designed to address a specific and dangerous crime – an armed bank robbery -- about which law enforcement had particularized knowledge); United States v. Green, 293 F.3d 855, 857–58 (5th Cir. 2002) (checkpoints designed to check a driver's license and registration in interest of public safety).  The Supreme Court held most recently, in Edmond, that a checkpoint program primarily designed to interdict illegal narcotics violated the Fourth Amendment because the drug checkpoints served the impermissible programmatic purpose of detecting

71

evidence of ordinary criminal wrongdoing. Collins v. Ainsworth, 382 F.3d 529, 538 (5th Cir. 2004) (citing Edmond, 531 U.S. at 41-42, 48, 121 S. Ct. 447).

When a plaintiff challenges a roadblock as violating the Fourth Amendment, the court "is to examine the available evidence to determine the programmatic purpose of the checkpoint implicating the Fourth Amendment. Then [it must] subject such checkpoint to a balancing test to determine whether it is constitutionally permissible — weighing the public interest, if any, advanced by the checkpoint against individual Plaintiffs' protected privacy and liberty interests." Id. at 538-39. Here, the complaint variously – and not necessarily consistently -- describes the purpose of the City's roadblock policy/program as general crime deterrence, generation of fine revenue and/or surveillance of black citizens. Clearly, none of these would be a permissible purpose and would be violative of the Fourth Amendment. Reeves, therefore, has stated a cognizable claim on this basis. And, defendants have provided no explanation of the purpose for the roadblocks.

Dobbins argues that he cannot be held liable on plaintiffs' roadblock claims since the complaint does not allege that he personally participated in any roadblock.[44]  Plaintiffs contend,

---

[44]   Plaintiffs have filed a motion for leave to file a surreply

however, that he is personally liable because he implemented the LPD's/City's unconstitutional roadblock policy.  See Alderson v. Concordia Parrish Corr. Facility, 848 F.3d 415, 420 (5th Cir. 2017) ("To hold [a defendant] liable as [a] supervisory official[] under § 1983, [a plaintiff] must allege either that [the official] participated in acts that caused constitutional deprivation or that [he] implemented unconstitutional policies causally related to [the plaintiff's] injuries.").  Plaintiffs' complaint can fairly be read as alleging that Dobbins implemented an unconstitutional policy.  Dobbins' motion to dismiss plaintiffs' roadblock claim this claim will be denied, as will the Municipal Defendants' motion.[45]

### Roadblocks:  Equal Protection

The complaint alleges that the roadblocks are set up and run in an intentionally discriminatory manner.  It states that roadblocks are focused in or near black neighborhoods and black events for the purpose(s) of surveilling black motorists and/or generating fine revenue from black (but not white) motorists.

---

to Dobbins' motion.  This motion is granted and the surreply attached to the motion is deemed filed.

[45]    Notably, the officers who participated in the roadblock stops of Reeves – Henderson, Epps and Newell - have not argued in their motion that they are entitled to qualified immunity for Reeves' roadblock claims.

The complaint also alleges that black motorists are stopped at the roadblocks while white motorists are allowed to pass through without being stopped.  Reeves has stated a viable equal protection claim based on these allegations.

### Roadblocks:  Right to Travel

The complaint charges that "Defendants maintain an ongoing policy, practice, and custom of unlawfully interfering with Black Lexington citizens' right to travel by subjecting them to suspicionless stops and causeless searches at roadblocks."[46] Defendants contend that plaintiffs have no constitutional right to intrastate, as opposed to interstate, travel, and that this claim must be dismissed.  See Wright v. City of Jackson, 506 F.2d 900 (5th Cir. 1975) (refusing to identify intrastate right to travel); Dupree v. City of Monroe, No. 15-0354, 2017 WL 427147, at *6 (W.D. La. Jan 21, 2017) (stating that "the right

---

[46]    The "right to travel" count also recites that "LPD's actions in stopping Plaintiffs such as Peter Reeves as he drove his car North on Highway 12 North, targeting him as a young Black man, and falsely arresting him on baseless possession charge before having his car towed, violated his constitutional right to travel freely"; that "Defendants also violated Plaintiffs' [right to travel] by unlawfully taxing Plaintiffs when LPD imposed fines on the Plaintiffs and other Black travelers whom they had falsely arrested"; and that "the actions of Defendants in targeting, threatening, coercing, harassing, assaulting, or interfering with Peter Reeves, Malcolm Stewart, and others' right to travel freely violated their rights under the law pursuant to the Fourteenth Amendment of the United States Constitution."  None of these allegations arguably state a claim for violation of the right to travel.

to travel applies only to the ability of citizens to freely move from one state to another, not intrastate travel."); <u>Vincent v. City of Sulphur</u>, 28 F. Supp. 3d 626, 649 (W.D. La. 2014) (explaining that while the "'constitutional right to travel from one State to another' is firmly established, "the Supreme Court has yet to recognize a corresponding right to intrastate travel") (citing <u>Saenz v. Roe</u>, 526 U.S. 489, 498, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999)).

In response to the motion, plaintiffs argue that they "have properly alleged violations of Plaintiffs' firmly established rights to interstate travel" because they have alleged that "under the direction of Defendant Dobbins and then Defendant Henderson, LPD erected roadblocks at two points along Highway 12—a major thoroughfare and channel of interstate commerce." This position is patently without merit.  This claim will be dismissed.

### **MUNICIPAL LIABILITY**

Plaintiffs can prevail on a § 1983 claim against a municipality only if they establish that their constitutional rights were violated as the result of an official policy.[47]  In the absence of any underlying constitutional violation, there can be no municipal liability under <u>Monell</u>.  <u>See</u> <u>Collins v. City</u>

---

[47]    <u>See</u> discussion <u>supra</u> at pp. 8-10.

of Harker Heights, 503 U.S. 115, 120, 112 S. Ct. 1061, 117 L.

Ed.2d 261 (1992) (recognizing that municipal liability requires

an underlying constitutional violation)).  Reeves has asserted

an actionable claim against the City for violation of his rights

under the Fourth Amendment and the Fourteenth Amendment's equal

protection clause relating to the City's roadblock policy.  The

only other actionable claim by any plaintiff is Eric Redmond's

Fourth Amendment false arrest claim.  Plaintiffs allege the City

"maintain[s] an ongoing policy, practice, and custom of

arresting Black Lexington citizens without probable cause."

However, for the reasons discussed supra at pp. 8-10,

plaintiffs' allegations are manifestly insufficient to establish

the existence of a practice or custom of arresting Lexington

citizens without probable cause.[48]  The City's only potential

---

[48]    At the time of Redmond's arrest, in which Dobbins
personally participated, Dobbins was chief of police.
Mississippi law provides that "[t]he governing authorities of
municipalities shall have the power to make all needful police
regulations necessary for the preservation of good order and
peace of the municipality and to prevent injury to, destruction
of, or interference with public or private property."  Miss.
Code Ann. § 21-19-15(1).  However, "'[a] city's governing body
may delegate policymaking authority (1) by express statement or
formal action or (2) it may, by its conduct or practice,
encourage or acknowledge the agent in a policymaking role.'"
Riggins v. City of Indianola, MS, 196 F. Supp. 3d 681, 691 (N.D.
Miss. 2016) (quoting Zarnow v. City of Wichita Falls, 614 F.3d
161, 167 (5th Cir. 2010)).  The complaint contains a single
oblique reference to the City's "final policymakers."  It does
not identify Dobbins as a policymaker and does not, in any
event, allege that he was delegated policymaking authority.

liability, therefore, is for the alleged violation of Reeves'
Fourth Amendment and equal protection rights relating to the
roadblock stops.

### TITLE VI

Title VI of the Civil Rights Act Title VI states, "No
person in the United States shall, on the ground of race, color,
or national origin, be excluded from participation in, be denied
the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance."  42
U.S.C. § 2000d.  To sustain a Title VI claim, plaintiffs must
allege that the City engaged in intentional discrimination based
on race and that the City received federal financial assistance.
Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio, 531
F. App'x 454, 455 (5th Cir. 2013) (per curiam).  Plaintiffs'
complaint does not allege that the City of Lexington received
federal financial assistance.  Accordingly, plaintiffs' claim
for alleged violation of Title VI will be dismissed.

### CONCLUSION

Based on the foregoing, it is ordered that the Municipal
Defendants' motion to dismiss, or in the alternative, for
summary judgment, and the motion of Dobbins for judgment on the
pleadings, are granted as to all but the following:

Plaintiff Eric Redmond's Fourth Amendment claim for false arrest against defendants Shiers and Dobbins, in their individual capacities;

Plaintiff Peter Reeves' claims against the City, and against defendants Henderson, Epps and Newell, in their individual capacities, for damages based on alleged violations of Reeves' Fourth Amendment rights and Fourteenth Amendment equal protection rights relating to roadblock stops; and

Plaintiff Peter Reeves' claim against the City and Chief Henderson, in his official capacity, for injunctive relief based on the same violations relating to the roadblocks.

SO ORDERED this 11th day of April, 2023.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE