# Exhibit F

# Dobbins, Sam  - Volume 1 - 01/22/2024

**Page 00173**

13:     Q.     (By Ms. Jefferson)      So let's talk about

14:     Eric Redmond's arrest then.        Do you recall that?

15:     A.     I didn't arrest Eric Redmond.

16:     Q.     Do you recall Eric Redmond's arrest?

17:     A.     Oh, yes, I do.

18:     Q.     Okay.   What do you remember?

19:     A.     Everything.    What do you want to know?

20:     Q.     Can you play it out?      What happened?

21:     A.     Be more specific.      What do you want to

22:     know?   You want to know if I arrested him?      No, I

23:     did not.

24:     Q.     I want to know, from your memory, what

25:     happened.

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00174)**

SAM DOBBINS

174

01:     A.     I was at the station in my office with

02:     Officer Derrick Scott.     He had a personal problem

03:     and he wanted to talk to his chief.        So I was

04:     talking to him.   Okay.   Officer Shiers was in

05:     booking with a female that just happened to be

06:     Eric Redmond's sister.     At this point, she

07:     couldn't come up with any money after making

08:     multiple calls.   James was transporting --

09:     Officer Shiers was going to transport her to the

10:     county jail.   We're in my office.      I hear all of

11:     this screaming outside.     Myself and Officer Scott

12:     walk outside.   I see this large crowd to the

13:     right.   I go to the right.     I done heard James

14:     tell this man he is under arrest three different

15:     times prior to me breaking the threshold to the

Summary Page 1

16:    door.    I go to the right.    I get all of the women

17:    to back up and go across the street.        They

18:    oblige.    They said, Chief, I don't have a

19:    problem.    They went across the street.        Derrick

20:    Scott, Officer Shiers arrested James.        They put

21:    him in a patrol car.    Officer Scott transported

22:    him to the county jail.    James Shiers transported

23:    the female to the county jail.

24:    Q.    Who ordered Mr. Redmond's arrest?

25:    A.    Officer Shiers.    He arrested him.

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00175)**

SAM DOBBINS

175

01:    Q.    So at no point did you say arrest him?

02:    A.    I had nothing to do with it.

03:    Q.    Okay.    So you did not give that

04:    command?

05:    A.    Ma'am?

06:    Q.    You did not give that command?

07:    A.    I did not.    Officer Shiers had done

08:    told this man he was under arrest three different

09:    times.

10:    Q.    Okay.    Do you know why Officer Shiers

11:    was -- was telling him that he was under arrest?

12:    A.    I don't know.

13:    Q.    Okay.

14:    A.    I don't know.    At this point, I don't

15:    know anything.

16:    Q.    Do you recall Mr. Redmond trying to pay

17:    the fine so that his sister could be released?

18:    A.    I don't work up front, and I have no

19:    recollection of that.

20:    Q.    Okay.    So what Mr. Redmond was told

21:    was -- well, $700 was the original amount that he

22:    was given, and then he brought the $700 and was

23:    told that you said that the amount was now

24:    $2,000.   You don't recall that?

25:    A.   I did not.   I did not.

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00176)**

SAM DOBBINS

176

01:    Q.   That didn't happen?

02:    A.   It didn't come from me.

03:    Q.   Who did it come from?

04:    A.   That came from the clerk up front.

05:    Because this woman owed all of this money that

06:    she had neglected to pay on for multiple years,

07:    but it had nothing to do with me.

08:    Q.   Was the clerk under your supervision?

09:    A.   Do what?

10:    Q.   Was the clerk under your supervision?

11:    A.   My direct supervision?      They did work

12:    for me, yes.

13:    Q.   Okay.   And so --

14:    A.   But they have a job to do.      They pay

15:    attention to the computer.      If it says they owe

16:    this, they owe it.

17:    Q.   Okay.   So this person being under your

18:    supervision, do you know of any instance where

19:    this person would one minute say somebody owed

20:    $700 and then a few minutes later said they owed

21:    $2,000?

22:    A.   Correct.

23:         MS. BLAND:      Object to the form.

24:         MS. TARPLEY:      Object to the form.

25:         THE WITNESS:      Correct.      We go back to

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00177)**

SAM DOBBINS

177

01: the computer, right.    If you get arrested, okay,

02: which the lady had been arrested by Officer

03: Shiers, had been taken to booking.        He has got

04: the list of the fines that he brought her in for

05: and gave to the clerk on the arrest pad, right.

06: The clerk runs her name through the system and

07: sees that she owes all of this other stuff, so

08: yes.

09:        Q.  (By Ms. Jefferson)      Okay.      And so you

10: didn't have anything to do with Mr. Redmond's --

11:        A.  I did not.

12:        Q.  -- arrest?

13:        A.  I did not.

14:        Q.  Okay.    With fines and bonds, how would

15: most people pay?

16:        A.  Do what?

17:        Q.  How did most people pay for their

18: fines?

19:        A.  I don't know.      Honestly, I don't.      I

20: didn't stand there while people paid.        I couldn't

21: tell you.  I didn't collect the money.

22:        Q.  Do you know how most people paid for

23: their bonds?

24:        A.  Through a bondsman.

25:        Q.  Okay.    Do you know if that was through

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00178)**

SAM DOBBINS

178

01:  cash or?

02:       A.    I can't answer that because I didn't

03:  stand there while they were doing it.

04:       Q.    Okay.   Are you aware of drivers making

05:  cash payments during traffic stops or roadblock

06:  stops to satisfy outstanding fines?

07:       A.    No.

08:            MS. TARPLEY:       Object to the form.

09:            MS. BLAND:       Same objection.

10:            THE WITNESS:       No.

11:       Q.    (By Ms. Jefferson)       You are not aware

12:  of any of that?

13:       A.    No.

14:       Q.    Okay.   Did you ever instruct clerks on

15:  how to accept fines or bond money?

16:       A.    Me?

17:       Q.    Yes.

18:       A.    No.

19:       Q.    Okay.   When you say "me," was there

20:  someone else who did?

21:       A.    Yeah.   We had a lady that was there

22:  originally, Ms. Rose.       She trained all of the new

23:  court clerks that came in.       Okay.   She is the one

24:  that instructed these woman how they take money

25:  and how they put it in the system and how it's

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00179)**

SAM DOBBINS

179

01:  labeled.   That system was created by a lady named

02:  Ms. Jackie.       And if there was an issue with the

03:  system, the court clerk or the clerk called

04:  Ms. Jackie and she walked them through the

05:    system.    But we had nothing to do with that.

06:    It's a system that the city used called LEAP.

07:        Q.    Was Ms. Rose under your supervision?

08:        A.    She was.

09:        Q.    Okay.    Was Ms. Jackie under your

10:    supervision?

11:        A.    No.    She was not.    She does not work

12:    for the city.

13:        Q.    Okay.

14:        A.    She contracts.

15:        Q.    Okay.    From your memory, are there any

16:    instances outside of old fines where people were

17:    required to pay in cash?

18:            MS. TARPLEY:    Object to the form.

19:            MS. BLAND:    Same objection.

20:            THE WITNESS:    I just -- I don't know.

21:    I can't recall.

22:        Q.    (By Ms. Jefferson)    Okay.    During a

23:    time as chief, did you train officers on arrests

24:    and how to conduct them?

25:            MS. TARPLEY:    Object to the form.

                Powell Court Reporting, Inc.

                    (769)777-8120


## (continued page 00180)

                    SAM DOBBINS

                        180

01:            MS. BLAND:    Same objection.

02:            THE WITNESS:    Personally, no.    I did

03:    not.

04:        Q.    (By Ms. Jefferson)        Who instructed

05:    them?

06:        A.    They get their training when they go

07:    the academy.    Okay.    But these uncertified guys

08:    that are working, they work with a certified

09:    officer.    The certified officer works with them.

10:       Q.   Okay.   So were both certified officers

11:   and certified [sic] officers under your purview

12:   as chief?

13:       A.   Were they what?

14:       Q.   Were both certified officers and

15:   uncertified officers under your command as chief?

16:       MS. BLAND:     Object to the form.

17:       THE WITNESS:       We are being

18:   interrupted.

19:       MS. JEFFERSON:     Five.   Two minutes.

20:       VIDEOGRAPHER:       Off the record.   The

21:   time is 1:19 p.m.

22:       (Off the record.)

23:       VIDEOGRAPHER:       Back on the record.

24:   The time is 1:27.

25:       (Exhibit 7 marked for identification.)

Powell Court Reporting, Inc.

(769)777-8120

## (continued page 00181)

SAM DOBBINS

181

01:       MS. JEFFERSON:     So I am going to

02:   introduce Plaintiff's Exhibit 7.       This is Eric

03:   Redmond's arrest report.

04:       And Mallory, I only have three copies.       I

05:   will give this to you in just a second.

06:       Q.   (By Ms. Jefferson)     So defendant

07:   Dobbins, you said just a few minutes ago that you

08:   didn't have anything to do with that arrest?

09:       A.   I did not.

10:       Q.   Do you know then why Officer Shiers

11:   would say that you assisted in the arrest in

12:   getting cuffs on Mr. Redmond?

13:       A.   Have you spoke to Officer Shiers?

14:       Q.   Yes.   I'm wondering why.       Do you know

15:  why --

16:  A.  I mean, I'm telling you I did not have

17:  anything to do with the arrest.        I mean, I don't

18:  know why he put that in his report.

19:  Q.  So would this be a lie then in this

20:  report?

21:  MS. BLAND:  Object to the form.

22:  MS. TARPLEY:  Form.

23:  THE WITNESS:  That would not be

24:  accurate.

25:  Q.  (By Ms. Jefferson)  Sorry.  What?

Powell Court Reporting, Inc.

(769)777-8120


**(continued page 00182)**

SAM DOBBINS

182

01:  A.  That would not be accurate.

02:  Q.  So is it -- how often is it -- does it

03:  occur that arrest reports are not accurate?

04:  MS. TARPLEY:  Object to the form.

05:  MS. BLAND:  Same.

06:  THE WITNESS:  I can't answer that.

07:  Q.  (By Ms. Jefferson)  Okay.

08:  A.  You are looking for a statistic.        I

09:  can't answer that.

10:  Q.  I'm looking for LPD.        You said you

11:  review reports.

12:  A.  I can't answer that.

13:  Q.  So in the reports that you review,

14:  did -- were they generally accurate?

15:  MS. TARPLEY:  Object to the form.

16:  MS. BLAND:  Same objection.

17:  THE WITNESS:  Yes.

18:  Q.  (By Ms. Jefferson)  Do you recall any

19:  that were not accurate?

20:         MS. TARPLEY:    Object to the form.

21:         MS. BLAND:    Same objection.

22:         THE WITNESS:    The ones that had

23:    typos, yes.

24:    Q.    (By Ms. Jefferson)    Okay.    Besides the

25:    ones with typos, were there any substantive

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00183)**

SAM DOBBINS

183

01:    errors that you would say that made them

02:    inaccurate?

03:    A.    I can't answer that.

04:    Q.    Okay.    So Officer Scott didn't assist

05:    in the arrest either?

06:         MS. TARPLEY:    Object to the form.

07:         MS. BLAND:    Same objection.

08:         THE WITNESS:    Who?

09:    Q.    (By Ms. Jefferson)    Officer Scott.

10:    A.    Officer Scott and Officer Shiers made

11:    the arrest.

12:    Q.    Okay.    But you were not involved, okay.

13:    A.    I was not involved with it.

14:    Q.    Okay.

15:    A.    I didn't transport them.    I didn't have

16:    anything to do with it.

17:    Q.    Okay.    So you said that officers --

18:    well, you said at the academy they learned about

19:    arrests.    The officers under your purview, did

20:    you give them any instruction on probable cause?

21:    A.    As in?    Be specific.

22:    Q.    In what constitutes probable cause.

23:    A.    Be more specific.    I mean, you want an

24:    example -- I mean, I can give you examples all

25:    day long, but no, I didn't take them by the hand

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00184)**

SAM DOBBINS

184

01:    and say, oh, you can arrest this person because

02:    of this.   No, I didn't do that.

03:        Q.   Did you give a definition of probable

04:    cause for them to follow?

05:        A.   I mean, they had an SOP.

06:        Q.   Okay.   And just to be clear, you said

07:    that you reviewed some reports.        Did LPD have a

08:    policy when you were chief on reviewing arrests?

09:        A.   No.

10:            MS. BLAND:     Object to the form.

11:            MS. TARPLEY:     Object to the form.

12:            THE WITNESS:      No policy.

13:        Q.   (By Ms. Jefferson)      Did LPD have any

14:    training on reviewing arrests?

15:            MS. TARPLEY:     Object to the form.

16:            MS. BLAND:     Same objection.

17:            THE WITNESS:     I don't know what they

18:    have, ma'am.   I have not been there in two years.

19:        Q.   (By Ms. Jefferson)      When you were

20:    chief.  I said did they when you were chief?

21:        A.   I mean, we reviewed cameras.        We

22:    reviewed reports.    I mean, we had meetings, yes.

23:        Q.   So officers did have training on

24:    reviewing arrests?

25:        A.   Well, the supervisors, okay, including

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00185)**

SAM DOBBINS

185

01: myself, reviewed reports, okay.    We watched body

02: cameras.    We had staff meetings to where you

03: critique some of the things that were going on in

04: the department.

05:    Q.    Okay.    So would the -- would you say

06: that these staff meetings counted as trainings on

07: this?

08:    A.    They would.    It would be called

09: in-service training.

10:    Q.    Okay.    In these staff meetings, you

11: know, what -- can you give me an example of

12: something that would -- some instruction that you

13: would give an officer about an arrest -- or

14: probable cause, rather?

15:    A.    Okay.

16:        MS. TARPLEY:    Object to the form.

17:        MS. BLAND:    Same objection.

18:        THE WITNESS:    I mean, I'm not really

19: going to harp on probable cause, but a lot of

20: times --

21:    Q.    (By Ms. Jefferson)    Why?

22:    A.    -- officers would go to a call to where

23: there is a huge disturbance.    And I'm talking

24: family disturbance, okay.    And they would bring

25: all parties to the station when they shouldn't

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00186)**

SAM DOBBINS

186

01: have.    I mean, we didn't have the room or the

02: capacity to deal with something like that.    They

03: should have just transported straight to the

04:    county jail instead of coming to the station and

05:    having this big, chaotic blowout.

06:        Q.    Okay.

07:        A.    In these meetings that we had, they

08:    were told, hey, guys, in certain situations, you

09:    just need to bypass the PD and go straight to the

10:    county jail.   It eliminates from having to call

11:    the National Guard to come help you because the

12:    families in Holmes County get out of control

13:    sometimes at the department.        You don't have the

14:    capacity to deal with that.

15:        Q.    When you say "the families," what

16:    families would you -- are there specific

17:    families?

18:        A.    Families in general.

19:        Q.    Okay.    So you said you are not going to

20:    harp on probable cause.        Is there a reason for

21:    that?

22:            MS. TARPLEY:    Object to the form.

23:            MS. BLAND:    Same objection.

24:            THE WITNESS:    No.   I mean, probable

25:    cause can be different in every situation.

Powell Court Reporting, Inc.

(769)777-8120


**(continued page 00187)**

SAM DOBBINS

187

01:    Q.    (By Ms. Jefferson)        Did -- what was

02:    LPD's standard for probable cause?

03:            MS. BLAND:    Object to the form.

04:            MS. TARPLEY:    Object to the form.

05:            THE WITNESS:    The law.

06:    Q.    (By Ms. Jefferson)    Okay.    What -- to

07:    your understanding, what did the law say?

08:            MS. TARPLEY:    Object to the form.

09:        MS. BLAND:        Same objection.

10:    Q.    (By Ms. Jefferson)        Probable cause?

11:    A.    Again, Ms. Jefferson, every situation

12:    is different.  You know, from a busted tail light

13:    to a busted windshield to -- I mean, to a family

14:    disturbance and, I mean, they are all different.

15:    Q.    Okay.    A busted windshield would be

16:    probable cause under the law?

17:    A.    That is probable cause to make a

18:    traffic stop, yes.    It is a traffic infraction.

19:    Q.    Okay.    What infraction would that be?

20:    A.    Ma'am?

21:    Q.    Which infraction would that be?

22:    A.    Improper equipment.

23:    Q.    Okay.    Did LPD -- when you were chief,

24:    were there any alternatives that were taken to

25:    arrest, you know, if there was a disturbance?

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00188)**

SAM DOBBINS

188

01:    A.    What do you mean "alternatives"?

02:    Q.    Were there any options other than

03:    arrest, if there was a disturbance?

04:    A.    You know -- okay.    Again, every

05:    situation is different, okay.        And it's

06:    clearly -- it's proven to you that -- I mean, I'm

07:    not this monster that you guys are trying to

08:    create.    I mean, I did cut breaks to the best of

09:    my ability to help people, okay.        I didn't charge

10:    them with everything, but if you go to a family

11:    disturbance, okay.        You would say, guys, just

12:    leave.    Just leave.    You give them the benefit of

13:    the doubt.    They leave at this time.        Twenty-five

14:    minutes later, you are back over here for the

15:    same thing, okay.        So yes, there was options

16:    available that we tried besides just arresting

17:    somebody, but here it never -- it never panned

18:    out.    I mean, you always ended back up over there

19:    making an arrest.

20:        Q.    When you say "back up over there,"

21:    where is "over there"?

22:        A.    It could be anywhere, wherever the call

23:    is.    I'm just talking, you know, in context to

24:    what you are asking.        It could be anywhere.

25:        Q.    Okay.    So every single time, it called

                    Powell Court Reporting, Inc.

                        (769)777-8120


**(continued page 00189)**

                    SAM DOBBINS

                            189

01:    for more?

02:        A.    Most of the time.

03:            MS. TARPLEY:        Object to the form.

04:            MS. BLAND:        Object to the form.

05:            THE WITNESS:        Yes.

06:        Q.    (By Ms. Jefferson)        Most of the time.

07:    What about the times when it didn't?

08:        A.    Very rarely, did you --

09:            MS. TARPLEY:        Object to the form.

10:            THE WITNESS:        -- get in a situation

11:    where somebody was -- they would agree to leave

12:    and stay gone.

13:        Q.    (By Ms. Jefferson)        Okay.

14:        A.    Most of the time -- and I'm going to

15:    say nine times out of ten -- they would come back

16:    and create another disturbance.        And the female

17:    or the male or somebody in the household would

18:    call the law.    And then the officers, the police

19:   department was right back over there.

20:     Q.    Okay.   During your time as chief, did

21:   you review or ask any questions about your

22:   subordinate officers' decisions to arrest people?

23:     A.    Did I?

24:     Q.    Yes.

25:     A.    All the time.

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00190)**

SAM DOBBINS

190

01:     Q.    Okay.   Can you give me some examples?

02:   What are some examples where you would ask --

03:   where you would, you know, ask about their

04:   decision?

05:     A.    Well, I mean, I ask why somebody was

06:   arrested.

07:     Q.    Okay.

08:     A.    Okay.   I mean, the officer could tell

09:   me why he made an arrest.

10:     Q.    Okay.   So if they are telling you why,

11:   what types of things are you listening for and

12:   taking into consideration?

13:     A.    Again, it goes back to they go to a

14:   family disturbance, okay.      And I ask, did y'all

15:   ask them to leave?      Did anybody leave?       How many

16:   times did you go back?       And I mean, usually

17:   everything is in the report.      You know, hey, we

18:   went over there multiple times that's why he's in

19:   jail.

20:     Q.    Okay.

21:     A.    I mean, you keep in mind, as the chief

22:   I wasn't here 24/7 all the time, right?          I did

23:   have a life.   I did go home and sleep.        So in the

24:    morning, I would come in to my phone ringing

25:    nonstop.    Such and such is in jail.        Can you tell

                    Powell Court Reporting, Inc.

                        (769)777-8120

**(continued page 00191)**

                        SAM DOBBINS

                            191

01:    me why?  And at this point, I don't know why he's

02:    in jail because I haven't been briefed.        You see.

03:    So I mean, I wasn't always here.        I had to -- I

04:    had to learn those things, just like everybody

05:    else in the morning.

06:        Q.    Okay.    When you were not there, how

07:    were -- how were officers supervised?

08:        A.    My under -- my under guy, the

09:    investigator was my number two.

10:        Q.    That would be Henderson?

11:        A.    That would be Henderson.

12:        Q.    Did Henderson report to you on any --

13:    on what happened at any point?

14:        A.    All the time.        All the time, but he's

15:    not going to wake me up over something that he

16:    doesn't need to wake me up over.

17:        Q.    Okay.

18:        A.    Okay.    Now, if -- if it needed to be

19:    spoken to, I mean he would call and wake me up

20:    and I would answer the phone.        And I would come

21:    if I needed to, but if he could handle the

22:    situation, he didn't need me, he done his job.

23:        Q.    Was it policy for Henderson to report

24:    to you what happened when you were not there?

25:            MS. BLAND:        Object to the form.

                    Powell Court Reporting, Inc.

                        (769)777-8120

**(continued page 00192)**

SAM DOBBINS

192

01:      MS. TARPLEY:     Object to the form.

02:      THE WITNESS:     Yeah.    Exactly, I mean,

03:   he let me know the business.

04:      Q.   (By Ms. Jefferson)     You said, yes, the

05:   objections were --

06:      A.   Yes, he would call me and tell me and

07:   if we didn't meet at the police department, I

08:   mean we would meet for breakfast or whatever and

09:   discuss things.

10:      Q.   Okay.    So according to that policy, he

11:   was required to tell you what happened when you

12:   weren't there?

13:      MS. TARPLEY:     Object to the form.

14:      MS. BLAND:     Same objection.

15:      THE WITNESS:     He -- he let me know

16:   everything I needed to know.

17:      Q.   (By Ms. Jefferson)     Okay.    And so you

18:   were still aware of what was happening, even

19:   though you were not there?

20:      A.   Are we talking --

21:      MS. TARPLEY:     Object to the form.

22:      MS. BLAND:     Same objection.

23:      THE WITNESS:     Are we talking while

24:   I'm in the bed at home or the next morning?

25:      Q.   (By Ms. Jefferson)     The next morning,

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00193)**

SAM DOBBINS

193

01:   you became aware?

02:      A.   The next morning, I knew what was going

03:     on after I came to work, yes.

04:         Q.  Okay.   Okay.    During your time at LPD,

05:     were there any cameras outside the LPD entrance?

06:         A.  Yes.

07:         Q.  Where were they?

08:         A.  I believe there was two.          There is one

09:     on the -- one above the fire station, above the

10:     county fire truck.       And then there was one by the

11:     tower in the front.      There is two up front, one

12:     in the back that monitors the cars that sit on

13:     the back lot.

14:         Q.  Okay.   So this would be the parking

15:     lot.   Would these be -- would this be like a

16:     parking lot where these cameras were?

17:         A.  No.

18:         Q.  Okay.   Can you -- I'm trying to

19:     visualize, you know.        So -- well, were there any

20:     cameras in the parking lot?

21:         A.  Not in the parking lot parking lot no.

22:         Q.  When you say "parking lot parking lot,"

23:     what does that mean?

24:         A.  You are referring to -- the only

25:     parking lot at the station is across the street.

                    Powell Court Reporting, Inc.

                        (769)777-8120

**(continued page 00194)**

                        SAM DOBBINS

                                        194

01:     That is the library parking lot.

02:         Q.  Okay.

03:         A.  Because you can't legally park in front

04:     of the firehouse, where you see some officers

05:     park.

06:         Q.  Uh-huh (affirmative response).

07:         A.  That is a forbidden zone.         That's not a

08:    parking lot.    That's an emergency zone for the

09:    fire trucks to get out.

10:        Q.    So when you say the "parking lot

11:    parking lot," what are you referring to?

12:        A.    The parking lot across the street, but

13:    in the back, I'm referring to the cars that are

14:    parked on the line.

15:        Q.    Okay.

16:        A.    That's facing Double Quick.          It's

17:    facing Highway 12.

18:        Q.    Okay.    Did you ever review any of the

19:    footage from the cameras that were outside?

20:        A.    Did I?

21:        Q.    Yes.

22:        A.    All the time.

23:        Q.    Okay.    Did you have access to that

24:    footage?

25:        A.    Me?

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00195)**

SAM DOBBINS

195

01:        Q.    Yes.

02:        A.    Now?

03:        Q.    No, then when you were chief.

04:        A.    When I was chief, yes.

05:        Q.    How -- can you explain what your access

06:    was?

07:        A.    I would go in there and put a code in

08:    and I would rewind it and watch it.

09:        Q.    Did you have access remotely?

10:        A.    Me?

11:        Q.    Yes.

12:        A.    No.

13:        Q.  So you -- when you were at home, for

14:    example, you couldn't see -- you couldn't tap in

15:    to see what was going on at the police --

16:        A.  I could watch the cameras inside.

17:        Q.  Okay.

18:        A.  Remotely, but I couldn't watch outside

19:    remotely.

20:        Q.  Okay.    So apologies for jumping around,

21:    you know, I just want to make sure I get all of

22:    this.

23:            When Mr. Redmond was arrested, you said

24:    you didn't have anything to do with that.        That

25:    you came outside and you saw Officer Shiers

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00196)**

SAM DOBBINS

196

01:    directing him, telling him he was under arrest.

02:    Are you aware of what the probable cause was for

03:    Mr. Redmond's arrest?

04:        A.  I am not.    I don't really know.

05:        Q.  Okay.

06:        A.  I know now, I believe.        I think he --

07:    he asked him to leave.        He refused to leave and

08:    he made an arrest.        But at the current time, I

09:    didn't know anything about it.

10:        Q.  Do you know why he asked him to leave?

11:        A.  I do not.

12:        Q.  Okay.    Is the police station a public

13:    building?

14:        A.  Is it?

15:        Q.  Yes.

16:        A.  Yeah.

17:        Q.  Okay.    Is it a crime to be at the

18:    police station?

19:        A.    It is if you are creating a

20:    disturbance.

21:            MS. BLAND:        Object to the form.

22:        Q.    (By Ms. Jefferson)        Okay.    And are you

23:    saying that Mr. Redmond -- was Mr. Redmond

24:    creating a disturbance?

25:        A.    I don't know.

                Powell Court Reporting, Inc.

                    (769)777-8120


**(continued page 00197)**

                    SAM DOBBINS

                            197

01:        Q.    Okay.

02:        A.    I didn't witness that.        I can only tell

03:    you what I told you.

04:        Q.    Okay.    Okay.    Do you have any body worn

05:    camera footage of Mr. Redmond's arrest?

06:        A.    I do not.

07:        Q.    Okay.

08:        A.    I do not.

09:        Q.    Did you not have your camera on at the

10:    time?

11:        A.    Okay.    So this line of question, all

12:    right, I wasn't working.    Okay.    I was not

13:    working working.    Now, keep in mind, I am on duty

14:    24 hours day, but I'm dressed down doing a

15:    financial report for a month end report that

16:    needed to be turned in prior to when all of this

17:    stuff was going on in the parking lot.        The

18:    officers had body camera on, okay.        And I did

19:    view the camera.    I did, that night.        I viewed

20:    the camera from start to finish.

21:        Q.    Okay.

22:        A.    I didn't download it to the computer.

23:    I left it on the body camera, put it back in the

24:    bag and I went home.

25:        Q.   When you reviewed the footage, you

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00198)**

SAM DOBBINS

198

01:    didn't know what probable cause -- what the

02:    probable cause was --

03:        A.   I mean, I could see -- I could see Eric

04:    Redmond screaming and cussing and yelling and

05:    telling the officer what he was going to do and

06:    what he wasn't going to do.     And when the officer

07:    told him to go back to his car and leave, he

08:    refused.   So when you fail to do what you are

09:    instructed to do, you are going to get in

10:    trouble.   You are going to go to jail.

11:        Q.   Is cursing a crime?

12:        A.   Is what?

13:        Q.   Is cursing a crime?

14:        A.   It depends.   It is if you are cussing

15:    around multiple people, two or more people in the

16:    state of Mississippi.   It is illegal.    Those

17:    people can't be police officers.      They have to be

18:    the general public and they were there.       They

19:    were all over the parking lot.      So yes, that is

20:    actually a crime.

21:        Q.   It's illegal to curse in Mississippi?

22:        A.   Yes, it is.   It is a state statute.

23:        Q.   And --

24:        A.   Now, with that being said, okay, if the

25:    officer instructs you to leave and you do not,

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00199)**

SAM DOBBINS

199

01:    you can go to jail for that.

02:    Q.    Why?

03:    A.    Why?    Because you are given a lawful

04:    order.

05:    Q.    What makes it a lawful order?

06:        MS. BLAND:    Object to the form.

07:        MS. TARPLEY:    Object to the form.

08:        THE WITNESS:    Because the police

09:    officer that's doing his duty instructed him to

10:    leave and he chose not to.

11:    Q.    (By Ms. Jefferson)    Okay.    How -- so

12:    you hinted at a definition of a lawful order just

13:    then.

14:    A.    A lawful order comes when a police

15:    officer on duty while on shift, right, he says

16:    leave.  You must leave.    There is no if, ands, or

17:    butts about it.    You got to leave, okay.

18:    Q.    So is it a lawful order whenever a

19:    police officer tells you to do something?

20:        MS. TARPLEY:    Object to the form of

21:    the question.

22:        MS. BLAND:    Same objection.

23:        THE WITNESS:    I mean, that's what I

24:    just said, right.

25:    Q.    (By Ms. Jefferson)    If a police officer

Powell Court Reporting, Inc.

(769)777-8120

**(continued page 00200)**

SAM DOBBINS

200

01:    tells you to do something, that's a lawful order?

02:    A.  Correct.

03:        MS. TARPLEY:      Object to the form of

04:    the question.

05:        MS. BLAND:      Same.

06:    Q.  (By Ms. Jefferson)      No matter what it

07:    is?

08:        MS. TARPLEY:      Object to the form of

09:    the question.

10:        MS. BLAND:      Same objection.

11:    Q.  (By Ms. Jefferson)      Okay.      And would

12:    that be an arrestable offense?

13:    A.  Yes.

14:        MS. TARPLEY:      Object to the form.

15:        MS. BLAND:      Same objection.

16:    Q.  (By Ms. Jefferson)      You said you

17:    reviewed Shiers' footage that night.        Did you

18:    review it with Shiers?

19:    A.  I did.

20:    Q.  Okay.   Was there any conversation about

21:    it?

22:    A.  As in?

23:    Q.  Did you all discuss what happened?        Did

24:    you talk about what was happening while you were

25:    watching the footage?

Powell Court Reporting, Inc.

(769)777-8120


**(continued page 00201)**

SAM DOBBINS

201

01:    A.    Not really.

02:    Q.    Okay.    So what happened in this review?

03:    A.    I mean, I just watched the camera.        I

04:    wanted to see what was taking place, what I

05:    missed.

06:    Q.    Okay.

07:    A.    Because at this point, my phone was

08:  ringing.   Everybody but the Pope called me, okay.

09:  So I wanted to see what this was all about.

10:    Q.    Okay.    So was -- was there any

11:  conversation while you were reviewing this

12:  footage with Shiers?

13:    A.    Not really.    We watched it.    I

14:  unplugged it.   He carried it back in there.     He

15:  signed it in.   I went home.